```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,    )
                                  )
 4        Plaintiff,              )
                                  )
 5          vs.                   )    Docket No. SA-10-CR-536(1)-FB
                                  )
 6   ROBERT BROOKS,               )    San Antonio, Texas
                                  )    January 25, 2013
 7        Defendant.              )
     _____)
 8
               TRANSCRIPT OF TRIAL TESTIMONY OF CHERYL BROOKS
 9                BEFORE THE HONORABLE FRED BIERY
                 CHIEF UNITED STATES DISTRICT JUDGE
10                       AND A JURY

11   TRANSCRIPT ORDERED BY:  Michael McCrum, Esquire

12   A P P E A R A N C E S:

13   FOR THE PLAINTIFF:
          UNITED STATES ATTORNEY'S OFFICE
14        By:  William R. Harris, Esquire
          601 N.W. Loop 410, Suite 600
15        San Antonio, TX  78216

16   FOR THE DEFENDANT:
          GORDON LAW FIRM, PC
17        By:  Stephen Gordon, Esquire
          5820 IH-10 West, Suite 400
18        San Antonio, TX  78201

19   COURT REPORTER:
          CHRIS POAGE
20        United States Court Reporter
          655 E. Cesar E. Chavez Blvd., Rm. 314
21        San Antonio, TX  78206
          Telephone:  (210) 244-5036
22        chris_poage@txwd.uscourts.gov

23   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
24

25
```

1                          **INDEX**

2                                                          PAGE

3    CHERYL BROOKS

4    Direct Examination by Mr. Harris ......................   3

5    Cross-Examination by Mr. Gordon .......................   26

6    Redirect Examination by Mr. Harris ....................   59

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Beginning of excerpt)
 2             THE COURT:  Next witness.
 3             MR. HARRIS:  The United States calls Cheryl Brooks.
 4        (Witness enters)
 5             THE COURT:  Ms. Brooks, if you'll come right up here,
 6   please, and raise your right hand.
 7        (The oath was administered)
 8             THE COURT:  All right.  You may be seated.
 9             And Mr. Harris, you may proceed.  Okay.
10             MR. HARRIS:  Thank you, Your Honor.
11             CHERYL BROOKS, GOVERNMENT'S WITNESS, SWORN
12                       DIRECT EXAMINATION
13   BY MR. HARRIS:
14   Q.   Good morning, ma'am.
15   A.   Good morning.
16   Q.   Would you please tell the ladies and gentlemen of the jury
17   your name?
18   A.   Cheryl Lee Brooks.
19   Q.   And how is it that you are related to the defendant Robert
20   Brooks?
21   A.   He's my husband.
22   Q.   To state the obvious, is this awkward and uncomfortable?
23   A.   Very.
24   Q.   Okay.  If you need to pause, if you need to take a break,
25   will you please let me know?
```

Cheryl Brooks - Direct

1    A.    Yes.

2    Q.    Okay.  Tell us about yourself first.  Where were you born?

3    Where did you grow up?

4    A.    I was born in Edinburgh, Scotland.  My father was in the

5    military.  And we came stateside.  He was stationed in

6    California, northern California, Travis Air Force Base.  And I

7    grew up primarily there in Fairfield in between San Francisco

8    and Oakland.  Graduated high school there, went into the Air

9    Force briefly, got out of the Air Force, went back to Fairfield

10   and basically started working retail management, stayed with

11   the same company for about nine years.  They transferred me to

12   Phoenix, Arizona, stayed there for a year.

13          I have an older sister that lives in Dallas here,

14   that I frequently visited -- or not in Dallas, in San Antonio.

15   And I moved to Dallas, worked in Dallas.  And that's how I

16   ended up in Dallas, basically.  I have three children, three

17   boys.  I had my first child at 35.  He's eight now.

18   Q.    And let me ask.  Did you have that child with Mr. Brooks?

19   A.    No.  That's my biological child.

20   Q.    Okay.

21   A.    Met Robert Brooks 2004, after I had broken up with my

22   son's biological father.  He also had a child, too, which was

23   around the same age.

24          THE COURT:  "He" being?

25          THE WITNESS:  Robert.

Chris Poage, RMR, CRR
United States Court Reporter

Cheryl Brooks - Direct

```
 1              THE COURT:  Go ahead.
 2   BY MR. HARRIS:
 3   Q.   How did you meet Mr. Brooks?
 4   A.   I met him through a mutual friend, actually my
 5   hairstylist.
 6   Q.   Okay.
 7   A.   And we became friends at first.  He was opening up a salon
 8   at the time.  And he --
 9   Q.   What kind of salon?
10   A.   A salon boutique, which would have clothes, have stylists,
11   just a salon boutique.  And he needed help for the back end to
12   make calls, to manage it basically on the front end.  And I did
13   that, helped him with that.
14              Our friendship obviously turned into more than
15   that because we had a lot in common.  He was having -- he just
16   had a child with his father's -- I mean, his baby's mom, and I
17   just -- I was single with a child, too.  So that kind of
18   brought us together, also.  In 2005 him and I had a child
19   together, which is our youngest son.
20   Q.   Okay.  What all businesses did he have at the time that
21   you met him?
22   A.   It was the salon at the time.  I know he was doing some
23   real estate, but the salon more so.
24   Q.   And what all companies have you two since set up and
25   formed together?
```

Cheryl Brooks - Direct

1    A.    Salon and Fashion, I know he added me on to that.   That

2    was a salon.   Upscale Realty, Upscale Leasing, RC Brooks, and I

3    wasn't on Relocation.

4    Q.    Well, then let me broaden the question.

5    A.    That was basically it.

6    Q.    What all companies are affiliated with your husband, Mr.

7    Brooks, that you are aware of?

8    A.    The ones that I just named.

9    Q.    Okay.

10   A.    Relocation Studio, the Studios Online and Texas

11   Residential.

12   Q.    Texas Residential Properties.   Pro Processing?

13   A.    Pro Processing, yes.

14   Q.    Progressive Title & Abstract?

15   A.    Yes.

16   Q.    The various companies were set up with other people,

17   perhaps, to run them on a day-to-day basis such as Yvonne

18   Salazar for Pro Processing and Geraldine Williams for

19   Progressive Title & Abstract, correct?

20   A.    Yes, sir.

21   Q.    Who was the supreme overall boss of all of this?

22   A.    Robert was.

23   Q.    And either directly or indirectly through others, did

24   everyone report to him?

25   A.    For the most part.

Cheryl Brooks - Direct

```
 1   Q.   Who would be the exception?
 2   A.   I know the people in the title company would report to
 3   Geraldine, and the people in Pro Processing report to Yvonne
 4   and Robert.
 5   Q.   And then Geraldine and Yvonne, in turn, would report to
 6   Robert?
 7   A.   Yes.
 8   Q.   Does he report -- did he report to anyone?
 9   A.   No.
10   Q.   Is there anyone who could fire him?
11   A.   No.
12   Q.   Is there anyone he could not fire?
13   A.   Not that I can think of, no, except for his partners, I
14   guess.  I don't know.
15   Q.   Okay.  Well, including you.  Could he fire you?
16   A.   He could relieve me of my duties, yes, yes.
17   Q.   Has he periodically done that?
18   A.   Yes.
19   Q.   Many times?
20   A.   A few times, yes.
21   Q.   A few times, yes.  What was your role?
22   A.   More administrative.  I would write the checks, pay the
23   bills.  I did manage the properties that were in Topaz, take
24   the rent, make sure maintenance was done, just day-to-day
25   operation with that.
```

Cheryl Brooks - Direct

1    Q.    Let's pick up there.  Were the rents that were coming in,

2    combined with the maintenance expense, enough to make the

3    mortgage payments?

4    A.    No.

5    Q.    Did you ever discuss that with your husband, the shortfall

6    in that?

7    A.    I did ask.

8    Q.    And what was his response?

9    A.    He said that eventually the properties would go up and --

10   eventually the properties would go up because they're appraised

11   at a certain amount, and that basically not for me to worry

12   about that.

13   Q.    Were you paying moneys to the various appraisers such as

14   Cedric Lester?

15   A.    I did write checks to them, yes.

16   Q.    Did you question the fact that maybe the appraisals

17   weren't what they should be?

18   A.    I didn't so much question it, no.  I just went along with

19   what he told me it was.

20   Q.    Was that basically your standard operating pattern, to go

21   along with what he directed you to do?

22   A.    Yes.

23   Q.    Let's talk about some of the other companies that we've

24   heard about.  Supreme Mortgage and LeDale Coles, were you aware

25   that Mr. Brooks had financed that entity?

Cheryl Brooks - Direct

1    A.    I know he put money into it, yes.

2    Q.    And were you aware of moneys that he lent to Stacey Owens

3    when she was in some dire straits?

4    A.    Yes.

5    Q.    Did Ms. Owens pay the money back?

6    A.    She didn't pay -- not that I know of, no.

7    Q.    Not that you know of.  Let's talk about, overall, the

8    various actions that were done for primarily Topaz but the

9    other properties as well.  Did you ever attend a meeting where

10   your husband was giving the presentation to the would-be

11   investor?

12   A.    No.

13   Q.    So you never heard what they were being told?

14   A.    No.

15   Q.    Okay.  The jury has seen indications, various emails.  I

16   want to talk about emails first.  Let's talk about email

17   accounts.  The jury has seen an email account that would --

18   various email accounts and permutations of CB@.  Is that you?

19   A.    Yes.

20   Q.    They've seen permutations of RB or rcbrooks or RCB.  Is

21   that your husband?

22   A.    Yes.

23   Q.    Did you ever go into his email account and send, receive

24   emails as him?

25   A.    No.

Cheryl Brooks - Direct

```
 1   Q.   So if the jury has seen emails where he is directing you
 2   to undertake certain activity, was that, in fact, coming from
 3   you?
 4   A.   Can you repeat that?
 5   Q.   I don't know if I can.  But let me try it this way.  Any
 6   email that indicates that it's coming from Robert Brooks to
 7   your knowledge came from Robert Brooks?
 8   A.   Yes.
 9   Q.   The jury has seen numerous emails directing you to put
10   money into various would-be buyers' accounts in order to
11   support VOD.  Are you familiar with that?
12   A.   Yes.
13   Q.   Please explain to our jury what was going on and how that
14   practice worked.
15   A.   In regards to my direction or just why that was done?
16   Q.   Well, let's first go with your understanding of why it was
17   done and then proceed to what you did and at whose direction
18   you did it?
19   A.   I would get the information from either -- from Yvonne or
20   somebody at Pro Processing, that were processing the loans, in
21   regards to money that needed to be transferred into an account.
22   I had asked -- I did ask Robert about -- any time that somebody
23   sent me something or told me to write anything or send
24   something out, I would ask Robert about it because I wouldn't
25   send any money.
```

Chris Poage, RMR, CRR
United States Court Reporter

Cheryl Brooks - Direct

1  Q.   So let me interrupt.  When we see an email from Yvonne to

2  you saying that -- I'm just going to pull one from air from

3  memory.  I'll ask the jury to recall the particulars.  Rick

4  Russell has X amount in his account.  He needs to show X plus,

5  so please send him difference.

6  A.   Yes, sir.

7  Q.   Did you then seek Mr. Brooks' approval before you sent

8  that amount?

9  A.   Yes.

10 Q.   Okay.  How did you get the money back from these people?

11 A.   They would either wire it back.  That was the most part.

12 They would wire it back.

13 Q.   Did you have to ask them to wire it back, or did somebody

14 else let them know that it was to come back?

15 A.   I wouldn't -- I wasn't involved in that part, so I wasn't

16 directly involved with any of those, the applicants.

17 Q.   Would you report back to Mr. Brooks that:  We received X

18 amount back from Rick Russell?

19 A.   Yes.

20 Q.   Okay.  Now, was that money to be used by those people to

21 go out and buy their own cashier's check to come to closing, or

22 are checks and wires for closing an entirely different

23 transaction?

24 A.   Yeah.  That would be a different transaction.

25 Q.   Okay.  So, first, we go through the verification of

Cheryl Brooks - Direct

1    deposit at some stage to show that the person is creditworthy?

2    A.    Yes.

3    Q.    And then at a later stage, with the exception of about

4    three transactions, where -- the jury has seen where

5    individuals were directed to get cashier's check, did you

6    get -- either go get a cashier's check or send a wire to

7    represent the cash due at closing from the borrower?

8    A.    Yes, when directed.

9    Q.    And who directed you?

10   A.    It would -- I would either probably get an email from

11   Geraldine or Cesar letting me know how much they needed to have

12   a deposit for or to pay off for the property.  And then when I

13   got that, I would go and get the -- either wire it or get the

14   cashier's check.

15   Q.    Where did y'all bank?

16   A.    At Woodforest National Bank.

17   Q.    Were all the accounts at Woodforest?

18   A.    All of them, yeah, that I wired from.

19   Q.    Okay.  How about the verification of employments?  We've

20   shown you a variety of those forms.  And do you recall seeing

21   those?

22   A.    Yes.

23   Q.    Do you recall that there was one form that you said, no,

24   that's not my signature?

25   A.    Yes.

Cheryl Brooks - Direct

1   Q.   That one -- no offense, but that was one that was kind of

2   legible, right?

3   A.   I can't really recall, but -- I can't recall, but I know

4   there's a few we went over that was not, and was and was not my

5   signatures.

6   Q.   If you're going to indulge me, I'm going to do something

7   incredibly cheesy.  Let me have a blank piece of paper, please.

8   Holding up a blank piece of paper.  I'm going to mark it

9   Government's Exhibit 300.

10          Lora, can you prepare the overhead, please?

11          I'm just going to ask you to pretend that this is

12  a check or this is a wire request or this is a HUD-1.  Will you

13  please write -- sign your signature, oh, maybe half a dozen

14  times somewhere on the piece of paper?  If you're a little

15  nervous, shaking, that may affect it.

16     (Witness complies)

17  Q.   Are those fair representations of your signature?

18  A.   Yes.

19          MR. HARRIS:  Okay.  We move for the admission of

20  Government's Exhibit 300.

21          MR. GORDON:  No objection.

22          THE COURT:  Admitted.

23     (Government's Exhibit No. 300 admitted)

24  BY MR. HARRIS:

25  Q.   The cash flow of various businesses and transactions,

Cheryl Brooks - Direct

1    would you move moneys between accounts as needed?

2    A.   Yes.

3    Q.   Before doing so, did you just do so on your own, or did

4    you discuss it with Mr. Brooks and let him know moneys needed

5    to be moved?

6    A.   Yes.

7    Q.   And what would he tell you to do?

8    A.   Do what you need to do.  Go ahead, take care of it.

9    Q.   There came a point where -- and we've just seen the tax

10   return of Upscale Realty, and we're going to get into it

11   shortly, but the jury has seen that it was formed on April 10th

12   of 2007.  Does that sound about right to your recollection?

13   A.   Yes.

14   Q.   Okay.  And around August of 2007 is where we see the

15   change in all the HUD-1s from Texas Residential Properties,

16   signed either by or on behalf of R. Brooks, suddenly become

17   Upscale Residential signed by you.  Can you tell us how and why

18   that change came about?

19   A.   Robert wanted to create companies that, one, he bought and

20   sold real estate out of.  And then, two, for the leasing

21   company so we can keep the books right.

22   Q.   Okay.  And I misspoke.  I said Upscale Residential.  It's

23   Upscale Realty?

24   A.   Leasing.

25   Q.   Well, Upscale Leasing, but the HUD-1s show Upscale --

Cheryl Brooks - Direct

```
1    A.    Realty.
2    Q.    -- Realty.  Who directed you to sign all those HUD-1s that
3    we have seen?
4    A.    Robert.
5    Q.    The jury has seen, I presume ad nauseam, numerous HUD-1s
6    of roughly, I don't know, maybe a dozen transactions that we
7    have presented here.  You're familiar with the indictment in
8    this case, correct?
9    A.    Yes.
10   Q.    Because, of course, you, yourself, were charged and
11   pleaded guilty to the conspiracy count, right?
12   A.    Yes.
13   Q.    The indictment covers approximately 40 some transactions,
14   correct?
15   A.    Yes.
16   Q.    How many condos, if you recall, ballpark, of -- the jury
17   heard there were 108 at Topaz -- were part of this flip
18   transaction involving you and your husband?
19   A.    I would say probably about 40.  I couldn't tell you the
20   exact amount.
21   Q.    You couldn't tell us the exact amount.  The jury --
22   already admitted in evidence are some 40 additional
23   transactions and documents to go through.  Were all those
24   basically conducted, more or less, the same as the specific
25   ones I've gone over with you before coming to court?
```

Cheryl Brooks - Direct

1    A.    Yes.

2    Q.    Okay.  I mentioned the Upscale Leasing.  Let's talk a

3    little bit about the income tax aspect of this case.  You're

4    also familiar with that indictment, correct?

5    A.    Yes.

6    Q.    That indictment charges you with making and subscribing --

7    that means signing and filing -- a false income tax return,

8    correct, yes.

9    Q.    And you pleaded guilty to that count as well before Judge

10   Biery?

11   A.    Yes.

12   Q.    Your husband is charged in two counts of causing false

13   income tax returns to be filed, one being the same 1040 for

14   which you pled guilty, correct?

15   A.    Yes.

16   Q.    And the other being for causing you to file the Upscale

17   return, correct?

18   A.    Yes.

19   Q.    And we charged you with causing that to be filed as well.

20   But we have foregone that in exchange for your guilty plea to

21   the 1040 return, correct?

22   A.    Yes.

23   Q.    Okay.  Dealing first with your 1040 return, your

24   individual income tax return, who did you and Mr. Brooks use as

25   a CPA?

Cheryl Brooks - Direct

1    A.    Stephen Scheller.

2    Q.    And did he prepare a draft income tax return based on the

3    information he had gotten from Carol Harlem to prepare a 1040

4    for you folks?

5    A.    Yes.

6    Q.    And you should have before you what's been admitted into

7    evidence as, bear with me, Government's Exhibit T-3.  Nope, I'm

8    coming up.  Let me have T-3, T-4 and T-7, please.

9              MR. HARRIS:  If I may briefly question from here,

10   Your Honor?

11             THE COURT:  Yes.

12   BY MR. HARRIS:

13   Q.    What is T-3?  Go ahead and put it on the screen, please.

14   A.    You just want me to read the draft for 1040?

15   Q.    It's a draft of the 1040 return for the year 2007?

16   A.    Yes.

17   Q.    For you and Mr. Brooks?

18   A.    Yes.

19   Q.    Excuse me.  Is that you signing or --

20   A.    It doesn't look like my signature.

21   Q.    It does not?  Does that look like Mr. Brooks'?

22   A.    It does, yes.

23   Q.    And how much does this show as your total income?

24   A.    875,991.

25   Q.    Which also becomes your adjusted gross income?

Cheryl Brooks - Direct

1   A.    Yes.

2   Q.    Going to the next page of the draft return at the top

3   portion after your personal exemptions and itemized

4   deductions -- because the personal exemptions are you and your

5   husband and your three children, correct?

6   A.    Yes.

7   Q.    We get to a taxable income of how much, please?

8   A.    432,255.

9   Q.    I'm sorry.

10  A.    I'm sorry.  For 832,255.

11  Q.    And it shows that your total tax on that is how much?

12  A.    263,320.

13  Q.    And so net of what had been withheld, paid in, et cetera,

14  if this return had been filed, you would have had to pony up to

15  the IRS how much, please?

16  A.    145,650.

17  Q.    What was your response when you saw that?

18  A.    That we don't have the money to pay that.

19  Q.    And did you discuss that with Mr. Brooks?

20  A.    Yes.

21  Q.    And what was his response?

22  A.    He told me to ask Stephen Scheller, is there any way we

23  can make payments?  What can we do?  Because we don't have the

24  money to pay that right away.

25  Q.    So what did you do?

Cheryl Brooks - Direct

```
 1    A.    I asked Stephen Scheller:  What can we do because, like,
 2    we can't pay it?
 3    Q.    Were you one on one with Stephen or on the phone with
 4    Stephen Scheller or --
 5    A.    Probably on the -- I can't recall if I was one-on-one with
 6    him or on the phone with him.
 7    Q.    And what did he tell you?
 8    A.    That we -- if we had an S corporation or a C corporation,
 9    we can delay paying that tax by forwarding some income over to
10    that other company because the taxes are due in June and
11    because the year -- we were in 2008 at the time.
12    Q.    Right, because you get into preparing a tax return after
13    the year has ended, right?
14    A.    Yes.  Because the 2008 return would -- more than likely
15    we'd get something back because we took losses, a lot of loss.
16    And if we filed that at the beginning of the year, then
17    whatever we get back, we can apply it to whatever's going to be
18    due and what work out payments on the rest.
19    Q.    Now, in suggesting that you come up with an S corporation
20    or another corporation that you could put some money to, does
21    that, in essence, ask -- he's telling you to make something up?
22    A.    Yes.
23    Q.    Did you discuss that with your husband?
24    A.    I told him some of what he told me because I didn't
25    totally understand what -- how it worked.  So he talked to
```

Cheryl Brooks - Direct

1   Stephen about it, Robert.

2   Q.   And then -- in your presence?

3   A.   I think it was on the phone.  I'm not for sure.

4   Q.   Okay.  Afterward, did you and Mr. Brooks discuss what

5   y'all were going to do?

6   A.   Yes.

7   Q.   And what was that?

8   A.   That we would go with what Stephen suggested because we

9   asked him:  Is it okay to do that?  And he said:  Yeah.  I do

10  it with my clients -- I've done it with other clients before.

11  Q.   But you did understand it was basically asking you to make

12  something up?

13  A.   At the time I didn't think about it.  But yes, yes.

14  Q.   Okay.  Let me direct your attention to Government's

15  Exhibit T-7, which is the return for Upscale, correct?

16  A.   Is this over here?

17  Q.   I think.  Let me help you out.  Yes, ma'am.  And I think

18  it really will be easier, if the Court will indulge me, to

19  question from here.

20        The jury has just been through this exhibit.  And

21  we see that there's, several pages from the end of the

22  exhibit -- let me count them.  I think it was the sixth page

23  from the end of the exhibit.  We show -- there.  If we can zoom

24  in on that top portion, please.  We see the various deductions

25  that Upscale incurred, of bank charges, dues and subscriptions,

Cheryl Brooks - Direct

1  legal and professional supplies, telephone, travel, et cetera.

2  The bottom one being management fee to Amadeus, Inc. of

3  $475,000.  Do you see that?

4  A.   Yes.

5  Q.   Which, when combined with the other expenses, results in

6  total expenses on this page of almost $799,000, correct?

7  A.   Correct.

8  Q.   During the year 2007, did Upscale incur -- did Upscale

9  pay/incur/owe/actually write a check, anything to Amadeus?

10  A.   No.

11  Q.   What was Amadeus?

12  A.   It was a company that Vadim, one of Robert's partners,

13  had.  I guess it was a C corp or S corp that Stephen had said

14  that's what we needed to do.

15  Q.   Okay.  So falsifying a non-existent $475,000 management

16  fee to Amadeus, correct?

17  A.   Yeah.

18  Q.   So that increases the total expenses of seven hundred

19  almost ninety-nine thousand dollars by that amount, which

20  carries over into a Schedule E on this return -- let's make

21  this simple.  It reduced the -- it increased the deductions of

22  the business by -- there we go.  The 798.  Increased that line

23  of line 20 by $475,000, which in turn reduced the income of

24  Upscale by nearly half a million bucks, right?

25  A.   Correct.

Cheryl Brooks - Direct

1    Q.   Your signature?

2    A.   Yes.

3    Q.   Okay.  The jury has seen this, but let's go through it

4    with you as well.  That figure flies over and carries over into

5    the tax return, which Mr. Scheller then prepared.  He prepared

6    a new one for you.  That's the one that actually got filed with

7    the IRS, correct?

8    A.   Yes.

9    Q.   Now, let's go first to -- on Government's Exhibit T-4,

10   we'll go to the bottom of the third page of the exhibit, which

11   is actually the bottom of the second page of your tax return.

12   And let's zoom in on the signatures.  And I'll ask, is that

13   your signature?

14   A.   Yes.

15   Q.   Is that Robert Brooks' signature?

16   A.   No.

17   Q.   Who did that?

18   A.   I did.

19   Q.   Okay.  Why?

20   A.   Because he told me go ahead and sign off on it.

21   Q.   Which "he"?

22   A.   Robert.

23   Q.   Robert, your husband.  So the income figure that we saw

24   from Upscale comes into your personal tax return, correct?

25   Q.   Which is a reduced amount?

Cheryl Brooks - Direct

1    A.    Yes.

2    Q.    Which, when mixed with your other business entities,

3    reduced all of your income and your tax due from what we saw

4    before, of owing $145,650; instead, it becomes an amount owed

5    of $45,990?

6    A.    Correct.

7    Q.    Still nothing to sneeze at, but was that more manageable

8    for y'all?

9    A.    It would have been, yes.

10   Q.    Okay.  And again, turning to that aspect, would you have

11   done any of that on your own?

12   A.    No.

13   Q.    Whose permission did you need to undertake that?

14   A.    Robert's.

15   Q.    Now, you mentioned that you wrote checks to a variety of

16   people at Mr. Brooks' direction, correct?

17   A.    Yes.

18   Q.    And there were times that he also wrote checks, correct?

19   A.    Yes.

20   Q.    Let's take a look at some random samplings of checks.  And

21   I think we'll start with Government's Exhibit 73-02.  And we'll

22   go to the third page of this exhibit.  And up at the top we

23   have a check to Debbie Allen for $20,000.  You may not --

24              Do we have all those up there, Mr. Vihil?

25              Okay.  Have you found it yet?

Cheryl Brooks - Direct

```
1    A.    Yes.

2    Q.    Are you with me?

3    A.    Yes.

4    Q.    Okay.  This check in August 24, 2007, is that all your

5    handwriting?

6    A.    Yes.

7    Q.    And your signature?

8    A.    Yes.

9    Q.    What does it say that it is for?

10   A.    Lease payment.

11   Q.    And who directed that it be designated that way?

12   A.    Robert.

13   Q.    Let's go ahead and jump to Government's Exhibit 73-03.  Do

14   you see that?

15   A.    Yes.

16   Q.    Check to George Autobee on Millennium Reality?

17   A.    Yes.

18   Q.    For $20,000, lease payment.  Whose handwriting is this?

19   A.    Robert's.

20   Q.    And do you recognize his signature?

21   A.    Yes.

22   Q.    You've certainly seen it enough through the years,

23   correct?

24   A.    Yes.

25   Q.    The second page of the exhibit, another example of his
```

Cheryl Brooks - Direct

1   signature?

2   A.   Yes.

3   Q.   Let's go to 73-05.

4   A.   05, you said?

5   Q.   Yes, ma'am.  I'm sorry.  73-07.  And this is drawn on

6   which entity?

7   A.   Relocation Studio.

8   Q.   Now, I notice that it's a Capital One.  That just leaped

9   out at me.  So you did bank at other than Woodforest?

10  A.   Yes.

11  Q.   Okay.  Whose handwriting?

12  A.   Robert's.

13  Q.   And his signature as well?

14  A.   Yes.

15  Q.   Same on the next page of this exhibit?

16  A.   Yes.

17  Q.   And the following?

18  A.   Yes.

19  Q.   So let's just kind of highlight and zoom in on Mr. Brooks'

20  signature.  We mentioned your guilty plea and that you agreed

21  to -- as part of it, you agreed to testify, correct?

22  A.   Yes.

23  Q.   Truthfully?

24  A.   Yes.

25  Q.   And completely?

Cheryl Brooks - Direct

1   A.    Yes.

2   Q.    In all the transactions that we've talked about, this

3   charged mortgage fraud scheme, mail fraud, financial

4   institution fraud, did you exercise any independent decision

5   making?

6   A.    No.

7   Q.    Did you know it was wrong?

8   A.    Yes.  Not all of it, no.

9   Q.    Not all of it?

10  A.    No.

11  Q.    But certainly enough?

12  A.    Yes.

13  Q.    Was there any action -- and the same with the tax.  You --

14  did you know it was wrong to file false tax returns?

15  A.    To file false tax returns, yes.

16  Q.    At any time in this whole period of business dealings, did

17  you ever exercise any independent decision making without first

18  getting the approval or direction of your husband?

19  A.    No.

20          MR. HARRIS:  If I may have a moment, please?

21          THE COURT:  Yes.

22      (Discussion off the record)

23          MR. HARRIS:  We'll pass the witness.

24          THE COURT:  Cross.

25                      **CROSS-EXAMINATION**

Cheryl Brooks - Cross

```
 1    BY MR. GORDON:
 2    Q.   Good morning, Ms. Brooks.
 3    A.   Good morning.
 4    Q.   Let me just ask you a little bit about your educational
 5    background, if I could.  Did you receive a high school diploma?
 6    A.   Yes.
 7    Q.   Okay.  Did you take any college courses?
 8    A.   Yes, I did.
 9    Q.   Okay.  What kind of courses did you take?
10    A.   Business courses.
11    Q.   Business courses.  Okay.  And about how many years worth,
12    you think?
13    A.   I was doing University of Phoenix.  I did that for three
14    years, but I didn't graduate.
15    Q.   Okay.  Did you take any courses in accounting as well?
16    A.   I don't know if I did accounting.  There was some
17    bookkeeping courses because that's involved in business.
18    Q.   Okay.  So, obviously, from your testimony you were very
19    involved in all these businesses that we've been discussing,
20    correct?
21    A.   Yes.
22    Q.   Okay.  And you were there to observe Robert's interaction
23    with people in terms of how he dealt with these other
24    individuals that we've talked about, right?
25    A.   No, not always.  Very seldom.
```

Cheryl Brooks - Cross

1   Q.   Okay.  All right.  Fair enough.  Okay.  So do you know a

2   gentleman by the name of Ron Lozoff?

3   A.   Yes.

4   Q.   Okay.  And he was the gentleman who owned the Topaz

5   Townhomes Condominiums, right?

6   A.   Yes.

7   Q.   Okay.  And he knew Robert as well; is that correct?

8   A.   Yes.

9   Q.   Okay.  Did you ever see him and Robert together?

10  A.   I never actually saw him and Robert together.  I only saw

11  Ron Lozoff maybe twice --

12  Q.   Okay.

13  A.   -- at the most.

14  Q.   From what you could tell, did Ron Lozoff appear to

15  understand that Robert was buying these condos and then

16  reselling to people?

17  A.   Yes.

18        MR. HARRIS:  Object -- it's been answered.

19  BY MR. GORDON:

20  Q.   Okay.  Thank you.

21        So if Mr. Lozoff got up here and testified that he

22  didn't know that Robert was buying and reselling those condos,

23  that wouldn't be true, right?

24  A.   No.

25        MR. HARRIS:  That mischaracterizes the testimony,

Cheryl Brooks - Cross

```
 1   objection.
 2          THE COURT:  The jury's instructed that it will be the
 3   sole judge of what the testimony of any witness was.  And the
 4   objection is overruled.
 5   BY MR. GORDON:
 6   Q.   Had you personally ever been out to the Topaz Townhomes
 7   site?
 8   A.   Yes.
 9   Q.   Okay.  Do you recall them ever having -- like, having a
10   sign out in front that told you about the condos?
11   A.   Yes.
12   Q.   Okay.  And it had the prices on there, right?
13   A.   Yes.
14   Q.   Okay.  So anybody who had driven to the Topaz Townhomes
15   Condominium unit could have seen a fairly large sign, right?
16   A.   Yes.
17   Q.   And it would specifically say condos, in some cases, 200
18   to 250,000?
19   A.   Yes.
20   Q.   Okay.  All right.  You ever been to their sales office of
21   Topaz Townhomes?
22   A.   Yes.
23   Q.   Okay.  And they also had brochures there at the sales
24   office, as well, telling you about the condos, right?
25   A.   Yes.
```

Cheryl Brooks - Cross

1  Q.   Okay.  And they also had the prices listed in there as
2  well?
3  A.   Yes.
4  Q.   Okay.  Did you know that they had a web site as well,
5  Topaz Townhomes?
6  A.   Yes, sir.  They do have that.
7  Q.   Okay.  Had you ever been on the web site or not?
8  A.   No.
9  Q.   Okay.  You know a gentleman by the name of Richard Howard?
10 A.   Yes.
11 Q.   Okay.  And he was a person that Robert did some business
12 with, right?
13 A.   Yes.
14 Q.   And you knew he was an attorney, right?
15 A.   Yes.
16 Q.   Okay.  And isn't it fair to say that he was present in a
17 lot of the meetings that Robert was involved in with investors
18 and things?
19 A.   Yes.
20 Q.   Okay.  And was it your understanding that Mr. Howard was
21 providing advice to Robert from time to time?
22 A.   Yes.
23 Q.   Okay.  Is it fair to say that Robert was relying on Mr.
24 Howard's expertise?
25          MR. HARRIS:  Objection.

Cheryl Brooks - Cross

```
 1              THE COURT:  I'm sorry.  What was the question?
 2              MR. HARRIS:  Is it fair to say that Mr. Brooks was
 3   relying on Mr. Howard's expertise?
 4              THE COURT:  Sustained.
 5   BY MR. GORDON:
 6   Q.   Did Mr. Howard seem to be in a position to where he could
 7   actually observe exactly what Robert was doing with the
 8   businesses?
 9   A.   Can you -- I don't understand.
10   Q.   How involved was Mr. Howard with the process of buying and
11   reselling these properties?
12   A.   I know he was with Robert frequently, most every day when
13   he was out.  I don't know exactly the extent of what he knew,
14   what he did not know.  But I know he was with Robert most every
15   day.
16   Q.   So he was at least in a position to see Robert on a
17   day-to-day basis?
18   A.   Yes.
19   Q.   Okay.  Were you aware of Mr. Howard ever buying and
20   selling these properties on his own?
21   A.   Yes.
22   Q.   Okay.  And did he follow the same general business model
23   that Robert used in terms of buying them and reselling them to
24   someone?
25   A.   Yes.
```

Cheryl Brooks - Cross

```
 1    Q.   Okay.  Do you know one individual by the name of --
 2              THE COURT:  Hold on just a minute.  Where did Mr.
 3    Harris learn the business model?
 4              MR. HARRIS:  Mr. Who?
 5              THE COURT:  Mr. Howard.  Excuse me.  Where did Mr.
 6    Howard learn that business model?
 7              THE WITNESS:  He would have learned it from Robert.
 8              THE COURT:  I mean, he didn't create it himself.  He
 9    learned it?
10              THE WITNESS:  I would assume so, yes.
11              THE COURT:  Beg your pardon?
12              THE WITNESS:  I would assume so, yes.
13              THE COURT:  Well, okay.  All right.  Go ahead.
14    BY MR. GORDON:
15    Q.   And Robert learned his business model from other people
16    too, right?
17    A.   Yes.
18    Q.   He didn't just create it on his own one day out of the
19    blue, right?
20    A.   No.
21    Q.   Okay.  Did you ever -- were you ever in a position to
22    determine if Mr. Howard had indicated to Robert that he should
23    change his business practices?
24    A.   No.
25    Q.   And I was asking, I'm sorry, about Ms. Bettie Artis.  Do
```

Cheryl Brooks - Cross

1   you recall her?

2   A.   I know the name, yes.

3   Q.   Okay.  Did you ever meet her personally?

4   A.   I met her twice, yes.

5   Q.   Okay.  How would you describe Ms. Artis, just generally

6   speaking?

7   A.   Very high-strung.

8   Q.   Okay.  Did she seem like the type of person that you could

9   force to do something against her will?

10  A.   No.

11  Q.   Okay.

12  A.   I didn't know her that well.

13  Q.   Okay.  And you knew a LeDale Coles, correct?

14  A.   Yes.

15  Q.   Okay.  And she had her own mortgage company for a while,

16  correct?

17  A.   Yes.

18  Q.   Okay.  And her and Robert worked together, right?

19  A.   Yes.

20  Q.   Okay.  Isn't it true that Robert stopped working with her

21  at some point?

22  A.   Yes.

23  Q.   Okay.  And wasn't the reason he stopped working with her,

24  because he was --

25           MR. HARRIS:  I'm going to object unless it's from

Cheryl Brooks - Cross

```
 1   Mrs. Brooks' personal knowledge, rather than anything Mr.
 2   Brooks may have told her.
 3            THE COURT:  Sustained.
 4   BY MR. GORDON:
 5   Q.   Okay.  Well, I don't know exactly if you know or, if you
 6   do, how you know.  But do you know -- do you know if Robert
 7   stopped working with her because she was doing things that were
 8   not proper in the paperwork?
 9   A.   Yes.
10            MR. HARRIS:  Same objection.
11            THE COURT:  Overruled.
12   BY MR. GORDON:
13   Q.   And LeDale Coles was engaged in doing a lot of things with
14   the paperwork that should not be done, right?
15   A.   Yes.
16   Q.   Okay.  And from what you could tell LeDale was doing
17   things that were dishonest on her own that had nothing to do
18   with Robert, right?
19   A.   From what I experienced.  Can you rephrase that?  I don't
20   know.  You're asking me a question that -- I'm not sure on how
21   to answer that to make it clear to everybody.
22   Q.   Okay.  Before Robert Brooks and LeDale ever started doing
23   business together, LeDale was doing things with the paperwork
24   that she shouldn't be doing, right?
25            MR. HARRIS:  Objection, unless it's from personal
```

Cheryl Brooks - Cross

```
 1   knowledge.
 2             THE COURT:  Sustained.
 3   BY MR. GORDON:
 4   Q.   Do you have any personal knowledge of?
 5   A.   I have to answer.  Okay.  Do I have to answer that?
 6             THE COURT:  No, no.  If I sustain it, don't answer
 7   it.
 8   BY MR. GORDON:
 9   Q.   Do you have any personal knowledge of LeDale doing things
10   with paperwork that she shouldn't have been doing?
11   A.   Yes.
12   Q.   Okay.  And do you have knowledge that she was doing that
13   kind of stuff before she ever got together with Robert?
14             MR. HARRIS:  I object.  Objection, unless it's
15   personal knowledge.  And I query how that can possibly be.
16             THE COURT:  Sustained.
17   BY MR. GORDON:
18   Q.   Do you have any personal knowledge as to whether LeDale
19   Coles was doing things with paperwork that shouldn't be done
20   before she ever started working with Robert?
21   A.   No.
22   Q.   Do you know who Yvonne Quintanilla is?
23   A.   Yes.
24   Q.   Okay.  And she used to work for LeDale, right?
25   A.   Yes.
```

Cheryl Brooks - Cross

```
 1   Q.   Okay.  And eventually she wanted to start a company with
 2   Robert, correct?
 3   A.   Yvonne?
 4   Q.   Yes.
 5   A.   Yes.
 6   Q.   Okay.  A processing company is what she wanted to start,
 7   right?
 8   A.   Yes.
 9   Q.   Okay.  And Robert agreed to put the funds up to start that
10   company, right?
11   A.   Yes.
12   Q.   Okay.  And actually, you and Robert and Yvonne all had an
13   ownership interest in that company, right?
14   A.   Yes.
15   Q.   Okay.  So let me ask you about that real quick.  If you
16   all three own that company, then nobody can fire each other
17   from that company, right?
18   A.   No, not if they're partners.
19   Q.   Okay.  So Robert couldn't fire Yvonne?  I mean, she had an
20   ownership interest in the company, right?
21   A.   Yes.
22   Q.   Okay.  Same thing for you.  He couldn't just say:  Well,
23   even though you own a third of the company, you're just out,
24   and I just say you're out.  Right?
25   A.   Yes.
```

Cheryl Brooks - Cross

1    Q.    I mean, legally you'd still own a third of the company?

2    A.    Yeah.  Legally, I'd still own a third of the company.

3    Q.    Okay.  And Yvonne Quintanilla basically ran Pro

4    Processing, right?

5    A.    Yes.

6    Q.    Okay.  She had the authority to hire and fire people at

7    Pro Processing?

8    A.    Yes.

9    Q.    Okay.  And, in fact, she did hire some people at Pro

10   Processing, right?

11   A.    Yeah.

12   Q.    Okay.  And she wanted to work with Robert instead of

13   LeDale at some point, right?

14   A.    I don't know if she -- yes, she ended up working with

15   Robert, yes, after she got fired.

16   Q.    Isn't it true she had to kind of make a choice whether she

17   wanted to stay with LeDale or go work for Robert?

18   A.    That's what I was told.

19   Q.    Okay.  Did you see any evidence that Yvonne was doing

20   things with paperwork that shouldn't be done, similar to what

21   LeDale had been doing?

22   A.    In regards to what type of paperwork?  I don't --

23   Q.    Just putting any kind of false information in paperwork?

24   A.    Yes.

25   Q.    Okay.  And some of the things Yvonne was doing in regards

Cheryl Brooks - Cross

1    to that, putting false information, was similar to what LeDale
2    had been doing, correct?
3    A.   Yes.
4    Q.   Okay.  Do you have any opinion as to whether Yvonne
5    learned any of that from LeDale?
6    A.   I don't know where she learned it from.
7    Q.   Do you remember Penelope Whittington?
8    A.   Yes.
9    Q.   Okay.  And she was a representative from AmericaHomeKey,
10   right?
11   A.   Yes.
12   Q.   And AmericaHomeKey was one of the companies that lent
13   money to the borrowers to buy these properties, right?
14   A.   Yes.
15   Q.   Was Penelope Whittington aware that Robert Brooks was
16   buying and reselling those properties to other people?
17   A.   As far as I know, yes.
18   Q.   Okay.  Are you aware of Robert having any meeting with
19   officials from AmericaHomeKey?
20   A.   Yes.
21   Q.   Okay.  And so other officials from AmericaHomeKey seemed
22   to understand his business model, right, or be aware of it, I
23   guess?
24            MR. HARRIS:  Objection, unless she's present --
25            THE COURT:  Sustained.  Don't answer.

Cheryl Brooks - Cross

```
1   BY MR. GORDON:
2   Q.   Are you familiar with the name of a gentleman by the name
3   of Lane Terrell?
4   A.   No.
5   Q.   Okay.  Do you remember an occasion where somebody wanted
6   Robert to rebuy one of the properties he had sold to someone?
7   A.   Yes.
8   Q.   Okay.  Was that a Lee Dixon?
9   A.   Lee Dickinson.
10  Q.   Lee Dickinson.  I'm sorry.  Lived on Medallion Street?
11  A.   Yes.
12  Q.   Okay.  So isn't it true one of the lenders wanted Robert
13  to buy the property back from this gentleman, right?
14  A.   Yes.
15  Q.   Okay.  And Robert agreed to do that, right?
16  A.   Yes.
17  Q.   Okay.  And Robert didn't have to do that, right?
18  A.   I guess not.  I don't know what the details were of the
19  deal.  I just know he bought it back from them.
20  Q.   Okay.  And do you know who Anna Lovato is?
21  A.   Yes.
22  Q.   Okay.  Isn't it true that she worked for a company called
23  Alliance Bancorp?
24  A.   Yes.
25  Q.   Okay.  And that was also one of the lenders that put money
```

Cheryl Brooks - Cross

1   up for people to buy these properties, right?

2   A.    Yes.

3   Q.    Now, Anna spent quite a bit of time at Pro Processing,

4   right?

5   A.    Yes.

6   Q.    Okay.  She was there on a regular basis?

7   A.    For the most part.  I didn't work directly with Anna.

8   Q.    Okay.  But you were in the same office building there,

9   right?

10  A.    Yes.

11  Q.    Okay.  So from what you could tell, she was able to look

12  at the files and see what kind of information was in there,

13  right?

14  A.    If she wanted to, yes, she could, yes.

15  Q.    Okay.  And were you aware of any examples of her

16  instructing people on how to fill out the forms there?

17  A.    No.

18  Q.    Okay.  Do you know who Hector Adkins is?

19  A.    Yes.

20  Q.    Okay.  And he was a loan officer, correct?

21  A.    Yes.

22  Q.    He had a company set up called Adkins Financial, right?

23  A.    Yes.

24  Q.    Okay.  And he was one of the people who would -- was

25  supposed to help people prepare those loan applications, right?

Cheryl Brooks - Cross

```
 1   A.    Yes.  He's a broker.
 2   Q.    Okay.  And did you ever see him like personally going over
 3   those documents with the borrowers?
 4   A.    Not -- he would come down twice a week or stay there for a
 5   couple of days and be in the office.  I didn't have any direct
 6   communication with him in regards to that, no.
 7   Q.    Okay.  But you're aware of his presence at the office?
 8   A.    Yes.
 9   Q.    Okay.  And were you ever in a position then to -- let me
10   rephrase that.  Did you ever see any evidence of the bank
11   officials instructing people on how to fill out these
12   documents?
13   A.    No.
14   Q.    You didn't.  Okay.
15              THE WITNESS:  Your Honor.
16              THE COURT:  Hold on.
17              THE WITNESS:  Can I talk to my attorney for a second,
18   please?
19              THE COURT:  Yes.  And that's a good place to -- hold
20   that thought, Mr. Gordon.
21              And, ladies and gentlemen, we'll recess for 40
22   minutes.  Keep in mind your instructions.  Thank you.
23       (Recess at 11:53 a.m. until 12:31 a.m., jury out, defendant
24   present, open court)
25              THE COURT:  Mr. Martinez -- this is on the record --
```

Cheryl Brooks - Cross

```
 1   is your client ready or not, or where are we?
 2              MR. MARTINEZ:  Oh, no.  She's ready, Your Honor.
 3              THE COURT:  All right.  Ms. Brooks, if you'll come
 4   up, please.
 5              And let's see.  Mr. Gordon, you were still
 6   cross-examining?
 7              MR. GORDON:  Yes, Judge, I was.
 8              THE COURT:  You may have a seat there, ma'am.
 9       (Jury enters courtroom)
10              THE COURT:  Mr. Gordon, you may continue with
11   cross-examination.
12              MR. GORDON:  Thank you, Your Honor.
13   BY MR. GORDON:
14   Q.   Ms. Brooks, did you know a Geraldine Williams?
15   A.   Yes.
16   Q.   Okay.  And she was basically in charge of Progressive
17   Title & Abstract, right?
18   A.   Yes.
19   Q.   And she supervised the people that worked there, correct?
20   A.   Yes.
21   Q.   Okay.  And did you understand that the title company's
22   responsible for filling out the HUDs?
23   A.   No.  Well, I don't -- I don't know exactly to the extent
24   what exactly they did or did not to do.
25   Q.   Okay.  That's fair enough.  And at some point -- let me
```

Cheryl Brooks - Cross

```
 1   back up a second.  When Robert was dealing with potential
 2   buyers, did you see any evidence that he, like, tried to
 3   pressure them to buy these properties from him?
 4   A.   No.
 5   Q.   Okay.  You didn't see him actually try to force them or
 6   yell at them to buy the properties, right?
 7   A.   Not that I see, no.
 8           MR. HARRIS:  I'm going to object because the witness
 9   testified, unless I'm mistaken, that she didn't attend those
10   meetings with the buyers.
11           THE COURT:  Sustained.
12   BY MR. GORDON:
13   Q.   You were never present when Robert discussed any of the
14   details of the transactions with the buyer?
15   A.   No.
16   Q.   Okay.  So you have no personal knowledge of the
17   conversations he had with them, right?
18   A.   Correct.
19   Q.   Okay.  Did Robert appear to trust the people that he was
20   doing business with?
21           MR. HARRIS:  Objection.
22           THE COURT:  Sustained.
23   BY MR. GORDON:
24   Q.   Do you know what the purpose was of Robert trying to do
25   business with certain people, like Geraldine?
```

Cheryl Brooks - Cross

```
 1              THE COURT:  That calls for a yes or no.  Do you know
 2   the purpose?
 3              THE WITNESS:  Yes.
 4              THE COURT:  Okay.  Go ahead.
 5   BY MR. GORDON:
 6   Q.   And the purpose of working with Geraldine is that so she
 7   could make sure that the title company was run, correct?
 8              MR. HARRIS:  Objection.
 9              THE COURT:  She may answer.  And then -- and, Mr.
10   Harris, then you may ask her if there were other purposes or
11   whatever you want to ask on redirect.
12              THE WITNESS:  She ran the title company.
13   BY MR. GORDON:
14   Q.   Okay.  And she -- didn't she have authority to hire people
15   at the title company?
16   A.   I'm not totally sure as to what -- if she did or she did
17   not.
18   Q.   Okay.  Now, at one point your mother had purchased some of
19   these properties, right?
20   A.   Yes.
21   Q.   Okay.  And do you know how she became aware of this
22   possibility of investing in these properties?
23   A.   From Robert and I, yes.
24   Q.   Robert and you; is that correct?
25   A.   Yes.  She knew what Robert did, and he explained to her
```

Cheryl Brooks - Cross

1   what she did -- what he did.  And so --
2   Q.   Okay.  And what was your involvement with that purchase
3   that she made?
4   A.   I did sign on the HUDs when she closed.
5   Q.   Okay.
6   A.   But to that -- any other extent, I didn't -- the
7   conversations they had about the properties, I didn't get
8   involved in that.
9   Q.   Okay.  And you did sign off on some verification of
10  employment forms, right?
11  A.   Yes, I did.
12  Q.   Okay.  And one of them was for your mother; is that right?
13  A.   Yes, I did.
14  Q.   Okay.  And those forms apparently had some false
15  information in them, right?
16  A.   Yes, I did.  Yes, they did.
17  Q.   And do you know who Vadim Gazanchiyants was?
18  A.   Yes.
19  Q.   Okay.  And didn't he play some role in managing some of
20  the properties that people bought from Robert's company?
21  A.   Yes.  He managed the houses, yes.
22  Q.   Okay.  So he actually had a management company, right?
23  A.   Yes.
24  Q.   Are you familiar with the name of that company, Amadeus
25  Management?

Cheryl Brooks - Cross

```
 1    A.    I don't recall if it was Amadeus, but I know he managed
 2    properties.
 3              MR. HARRIS:  May we approach?
 4              THE COURT:  Yes.
 5       (At the bench off the record)
 6              THE COURT:  Ladies and gentlemen, you all -- we need
 7    to take up a legal issue, so you all are excused for five or
 8    ten minutes here.  I don't think it will take too long.
 9       (Jury leaves courtroom)
10              THE COURT:  All right.  For the record, though, Mr.
11    Gordon, if you'll repeat the question that Mr. Harris asked to
12    approach on.
13              MR. GORDON:  I believe I was asking if she was
14    familiar with Amadeus SF.
15              MR. HARRIS:  Could we have the question from Mr.
16    Poage, because it contained the fact that Mr. Gazanchiyants had
17    the management company Amadeus SF.  So I'd like Mr. Poage to
18    read the --
19              THE COURT:  Read the exact question back before we
20    approached the bench.
21       (Court reporter reading back questions and answers)
22              QUESTION:  "So he actually had a management company,
23    right?
24              ANSWER:  "Yes.
25              QUESTION:  "Are you familiar with the name of that
```

Chris Poage, RMR, CRR
United States Court Reporter

Cheryl Brooks - Cross

1    company, Amadeus Management?

2         ANSWER:  "I don't recall if it was Amadeus, but I

3    know he managed properties."

4       (End of reading back)

5         THE COURT:  Okay.  So then let Mr. Harris come to the

6    lectern.

7         MR. HARRIS:  Now, this is something Mr. Gordon and I

8    had discussed pretrial, is the fact that Government's Exhibit

9    T-9 -- where do we have the actual exhibit?  Let me hand the

10   Court so the Court can follow along, please?  T-9.

11        Ms. Vela.

12      (Handing document)

13        MR. HARRIS:  The Court will recall that the testimony

14   has been about the notion of coming up with a false management

15   expense to deduct.  If the Court will look, this is an amended

16   tax return for Amadeus that was filed -- well, let me back up.

17   Let me proffer to the Court that what we did not go into,

18   because I felt that it was irrelevant -- because we submit that

19   the tax crimes were committed when the personal return was

20   filed and the Upscale return was filed -- was after the fact

21   when IRS approached Mrs. Brooks, Mr. and Mrs. Brooks and they

22   said, among other things, how these returns came about, Mrs.

23   Brooks began cooperating with the IRS, wore a wire to go meet

24   with Mr. Scheller.  And it was after that that Scheller

25   actually prepared a 1120 corporate return for Amadeus,

Cheryl Brooks - Cross

1    reporting $475,000.

2              THE COURT:  This one or another one?

3              MR. HARRIS:  No, not this one.

4              THE COURT:  Okay.

5              MR. HARRIS:  So that return gets filed.  And because

6    Amadeus was primarily connected with Vadim Gazanchiyants,

7    Gazanchiyants ends up getting word of it because he receives a

8    notice from the IRS that's basically, you know:  Hey, Bubbalo,

9    where's the scratch?  And his response is to file an amended

10   1120 tax return that takes the 475,000 back down to zero.  This

11   is an official record of the IRS.  This falls clearly under a

12   hearsay exception.  I'll ask the Court to read the explanation,

13   which is required -- if a change is required, why is it being

14   amended?

15             And as the Court can clearly see, he's saying it's

16   because Amadeus has no tax liability as it never engaged in any

17   business activity whatsoever.  My former partner, Robert

18   Brooks, et cetera.

19             THE COURT:  Okay.  Couple of things.  Is this already

20   in evidence?

21             MR. HARRIS:  No.

22             THE COURT:  Okay.  Are you planning on --

23             MR. HARRIS:  Well, it was one of those that I think

24   we preadmitted en masse, but I submit that the Amadeus should

25   not go to the jury.

Cheryl Brooks - Cross

```
 1              THE COURT:  Okay.  And the first return was signed by
 2     the accountant?
 3              MR. HARRIS:  The first return is prepared by Mr.
 4     Scheller and signed by Mrs. Brooks.
 5              THE COURT:  Oh.
 6              MR. HARRIS:  And Mrs. Brooks, I believe, from our
 7     discussions, signed it because at that point she was afraid not
 8     to because it might tip Mr. Scheller off that something hinky
 9     is going on, because by that point she was cooperating with the
10     IRS.
11              THE COURT:  Okay.  All right.
12              MR. HARRIS:  So the question that I'm objecting to is
13     the implication that Amadeus was doing something real for Mr.
14     Brooks' companies, such that it's entitled to a management fee
15     of 475.  At least that's where I'm anticipating we're going
16     with this.  But the evidence of which we're aware is that
17     unless we're talking about a different Amadeus, this Amadeus
18     was dormant.
19              THE COURT:  Well, does not Mr. Vadim's statement back
20     here support the government's case?
21              MR. HARRIS:  It does.  But I just want to make sure,
22     because I felt that this is -- I guess what I'm saying is, you
23     know, if they want to open the door and go here, let's go here.
24     But I was trying to prevent extraneous matters from going to
25     the jury.  And here we have, you know, an indicted
```

1    coconspirator basically now, you know, pointing the finger of
2    tax fraud at Mr. Brooks.
3                THE COURT:  All right.  Well, let me hear -- Mr.
4    Gordon, what trail were you going down, I mean, before I make a
5    ruling?
6                MR. GORDON:  Sure.  Well, if I could explain to you.
7    What's probably my question is there has already been evidence
8    admitted.  Ms. Brooks was asked about the tax return.  It was
9    already shown to the jury that there was an expense to Amadeus
10   on the tax return.  That's already been shown.  And the
11   implication was left that there was either no such company or
12   there was no legitimate fees incurred by that company.
13               Now, there can be a dispute about whether fees were
14   incurred.  And, I mean, Mr. Vadim obviously doesn't think there
15   were fees incurred.  And I don't really know the truth.  That's
16   not my role.  But I just -- when the implication's been made
17   that these are all phony and all made up, I wanted to at least
18   ask the witness:  Did you know there was a management company?
19   It was a real company.  It wasn't phony.  And do you know
20   whether or not any fees were paid as management fees?  I mean,
21   I don't think that opened the door to that.
22               THE COURT:  Mr. Harris, did that subject come up in
23   direct as to -- obviously, there was testimony about the
24   475,000.  Was the question asked:  Was it really paid?  I
25   thought it was.

Cheryl Brooks - Cross

1          MR. HARRIS:  The question was asked, and the answer
2   was given that, no, it was not.
3          THE COURT:  All right.  So Mr. Gordon, what -- unless
4   you can get her to change her answer, that yes, it was paid --
5          MR. GORDON:  Well, there's two questions.  Were the
6   fees incurred legitimately?  And were they paid?  And that gets
7   to the idea of the cash versus the accrual basis.  But they're
8   two separate questions.  And in one scenario, part of our
9   defense -- and I don't want to give too much away but -- is the
10  possibility that these were incurred and that it was okay to
11  pay them later, that it was okay for another company to pay
12  them later.
13         THE COURT:  All right.  Mr. Harris, what about that?
14  We've certainly gotten into accrual and cash methods.  And I
15  would -- I don't know what her answer would be.  I'm
16  speculating that she would say no, there wasn't anything --
17  there wasn't anything done but --
18         MR. HARRIS:  That's what I --
19         THE COURT:  Which doesn't help the defense.
20         MR. HARRIS:  I can proffer to the Court that that's
21  what I've been told.
22         THE COURT:  Okay.
23         MR. HARRIS:  I anticipate --
24         THE COURT:  Mr. Gordon, you sure you want to ask that
25  question?

Cheryl Brooks - Cross

```
 1              MR. GORDON:  No, I'm not sure.  There's some risk
 2    involved, and he may very well be right.  That may be what she
 3    answers.  And I don't intend to go beyond that one question,
 4    Your Honor, if that helps.  I mean, that -- she can say she
 5    doesn't know if there were management fees paid, or she thinks
 6    there were, she thinks there weren't.  And that's all I'm --
 7    that's as far as I'm going to go with this issue, if that helps
 8    at all.
 9              THE COURT:  Speaking of that, how much longer do you
10    anticipate on cross?  Now that we're into the tax stuff, that's
11    kind of the end of the deal.
12              MR. GORDON:  No more than 15 minutes, I don't
13    believe.
14              THE COURT:  Okay.  Well, yesterday you told me five
15    or ten, and it ended up being more.
16              MR. GORDON:  You gave me time to think up some more
17    questions.
18              THE COURT:  All right.  Well, I'll let you ask that
19    one question at your client's peril if you want to, but that's
20    up to you.  You may want to change your mind.
21              Ms. Brooks, come on back up.
22              So was there a formal objection?  I don't believe
23    there was.
24              MR. HARRIS:  No.  There was a "may we approach."
25              THE COURT:  Okay.  Yes.
```

Cheryl Brooks - Cross

1              MR. HARRIS:  And if I may retrieve.
2        (Jury enters courtroom)
3              THE COURT:  You may be seated.
4              Mr. Gordon, you may proceed.
5              MR. GORDON:  Thank you, Your Honor.
6    BY MR. GORDON:
7    Q.   Ms. Brooks, let me kind of ask you to go back to some of
8    the testimony you gave earlier in response to Mr. Harris about
9    this deduction on the tax returns.  Okay?
10   A.   Okay.
11   Q.   Do you recall putting it up on the screen, there's a
12   deduction about 475 -- excuse me -- $475,000, correct?
13   A.   Yes.
14   Q.   Okay.  And if I understood you correctly, you said it was
15   actually Mr. Scheller's idea to come up with this type of
16   deduction?
17   A.   Yes.
18   Q.   Okay.  And he was the one who asked about whether there
19   was any companies out there that this might be attributed to,
20   this expense, right?
21   A.   Yes.
22   Q.   Okay.  Now, he didn't specifically tell you to make up a
23   company, did he?
24   A.   No.
25   Q.   Okay.  And didn't he indicate to you that if you actually

Cheryl Brooks - Cross

1    put these fees down there, that they would need to be paid?

2    A.    Yes.

3    Q.    Okay.  Wasn't the whole purpose of what he said, was not

4    to never pay the taxes, but to delay the paying of the taxes

5    until later?

6    A.    Yes.

7    Q.    Okay.  And so at the time that you had filled out these --

8    signed these returns, at that point did you really think that

9    you were doing anything wrong?

10   A.    I went by what he told me it was okay to do.

11   Q.    Okay.  And you trusted him, right?

12   A.    Yes.

13   Q.    Okay.  Did he ever give you any reason not to trust his

14   advice?

15   A.    No.

16   Q.    Now, I believe you were asked earlier about some email

17   accounts that you and Robert had?

18   A.    Yes.

19   Q.    Okay.  And did I understand you to say that you never used

20   Robert's email?

21   A.    Not Robert's personal email, no.

22   Q.    Okay.  Not even once, right?

23   A.    Not that I can recall.

24   Q.    Okay.  And is it possible that maybe you did and just

25   don't recall it?

Cheryl Brooks - Cross

1    A.    Not his personal email, no.

2    Q.    Okay.  And which one is the personal email?

3    A.    He had several different ones, so which one --

4              MR. HARRIS:  Excuse me, Your Honor.  We're getting

5    feedback.

6              THE COURT:  Oh, okay.  Well, Ms. Brooks, why don't --

7    now that you're seated, pull that up a little closer to you.

8    There you go.

9              THE WITNESS:  Okay.

10             THE COURT:  All right.  Let's try it now.

11             THE WITNESS:  Is that better?

12             THE COURT:  Yeah.  That's good.

13   BY MR. GORDON:

14   Q.    Okay.  Well, he had multiple personal accounts; is that

15   correct?

16   A.    Yes.

17   Q.    Okay.  So out of those multiple accounts you never used

18   any of those?  Is that what you're saying?

19   A.    Not his personal, no.

20   Q.    Okay.  So I'm just trying to narrow down, was the personal

21   one or two or how many?

22   A.    He may have three or four.  I couldn't tell you

23   specifically how many.

24   Q.    The one that was -- I don't have the exact ones either,

25   but I think rcbrooks?

Cheryl Brooks - Cross

1    A.   Yes.

2    Q.   Would that have been his personal account?

3    A.   He used it.

4    Q.   Okay.  But was that one that you sometimes used as well?

5    A.   I don't recall myself using it, but it was -- I would get

6    the emails, and so would he.

7    Q.   Okay.  You did, obviously, sign his name from time to time

8    on documents, right?

9    A.   Yes.

10   Q.   Okay.  So if I did something similar to the prosecutor,

11   and I handed you a sheet of paper, you could sign not only your

12   name, but you could sign Mr. Brooks' name, too, right?

13   A.   It wouldn't be his signature, but I would sign his name,

14   yes.

15   Q.   Okay.  Do you recall Robert ever offering to buy back any

16   of the properties from the investors?

17   A.   No, not buy back, no.

18   Q.   Do you recall him helping out a gentleman by the name of

19   Jeff Schroeder with his condo?

20   A.   Yes.

21   Q.   And Jeff Schroeder had his condo foreclosed upon

22   initially; isn't that correct?

23   A.   Yes.

24   Q.   Okay.  And didn't Robert intervene to help him get that

25   foreclosure undone?

Cheryl Brooks - Cross

1  A.   Yes.

2  Q.   Okay.  And that was because of some kind of error on the

3  part of the lender, wasn't it?

4  A.   Yes.

5  Q.   That wasn't because of somebody failing to make the

6  payments, right?

7  A.   No.

8  Q.   Just a moment, please.  The idea of putting extra money in

9  the buyer's account to make the account look bigger, didn't

10  that come from bank officials?

11          MR. HARRIS:  If you -- objection, unless she knows.

12          THE WITNESS:  I don't know.

13          THE COURT:  Objection, what?

14          MR. HARRIS:  I'll withdraw.

15          THE COURT:  Okay.  Go ahead.

16  BY MR. GORDON:

17  Q.   You don't know.

18          Okay.  What about the idea of putting money in the

19  buyer's account so that they could take that money and actually

20  pay the downpayment?  Didn't that idea come from some bank

21  officials?

22  A.   I don't know.

23  Q.   Okay.  And prior to the time that you guys started to

24  become investigated, were there a lot of foreclosures on these

25  properties?

Cheryl Brooks - Cross

```
 1    A.    Which properties?   The townhouse?

 2    Q.    The condos.

 3    A.    Sure.

 4    Q.    Okay.  Isn't it true that until this investigation

 5    started, actually, there really were no foreclosures other than

 6    the one I mentioned earlier, which was unrelated to the

 7    payments, right?

 8    A.    On the ones we managed, no.

 9    Q.    Okay.  And is it fair to say that the real estate market

10    crash, which we've already heard testimony about, had a really

11    negative impact on the business y'all were doing?

12    A.    Yes.

13              MR. GORDON:  Can I have just one moment, Your Honor?

14              THE COURT:  Yes.

15    BY MR. GORDON:

16    Q.    Back to one of the email accounts, I think I asked you

17    about an rcbrooks?

18    A.    Yes.

19    Q.    Wasn't that account shared by both of you?

20    A.    We were both on it, yes.

21    Q.    Okay.  And doesn't RC stand for Robert Cheryl?

22    A.    Yes.

23    Q.    Okay.  Do you remember who took the loan application to

24    your mother to have her sign it?

25    A.    I don't recall.  She's come to the office and signed some
```

Cheryl Brooks - Cross

1    documents --

2    Q.    To the office?

3    A.    -- on occasions.  I know she's been at the house before,

4    but I don't recall her signing anything there.  I think they

5    were all done at the office.  I'm not for sure.

6              MR. GORDON:  I'll pass the witness.

7              THE COURT:  Redirect.

8              MR. HARRIS:  Thank you.

9                      **REDIRECT EXAMINATION**

10   BY MR. HARRIS:

11   Q.    Ms. Brooks, do you recall a company called Arno?

12   A.    Yes.

13   Q.    What is Arno?

14   A.    It was Vadim's management company.

15   Q.    That was Vadim's management company for which you

16   sometimes wrote checks to pay for managing property?

17   A.    Yes, sir.

18   Q.    Okay.  What led to the foreclosures?

19   A.    We weren't able to make the payments, and the market

20   crashed.

21   Q.    So the market crashed.  And without new deals being able

22   to be done, you couldn't keep the boat afloat, correct?

23   A.    Correct.

24              MR. HARRIS:  If I may have a moment, please?

25              THE COURT:  Yes.

1           MR. HARRIS:   Thank you, Your Honor.   We'll pass the

2    witness.

3           THE COURT:   Recross.

4           MR. GORDON:   Just one second.

5       (Discussion off the record)

6           MR. GORDON:   Nothing further, Your Honor.

7           THE COURT:   Thank you, ma'am.   You may step down.

8           Next witness.

9       (End of excerpt)

10   * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                -oOo-

2              I certify that the foregoing is a correct transcript

3      from the record of proceedings in the above-entitled matter.  I

4      further certify that the transcript fees and format comply with

5      those prescribed by the Court and the Judicial Conference of

6      the United States.

7

8      Date:   2/1/2013
                                /s/ Chris Poage
9                               United States Court Reporter
                                655 E. Cesar E. Chavez Blvd., Rm. 314
10                              San Antonio, TX  78206
                                Telephone:  (210) 244-5036
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25