1           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3   UNITED STATES OF AMERICA,    )
                                 )
4        Plaintiff,              )
                                 )
5          vs.                   )   Docket No. SA-10-CR-536(1)-FB
                                 )
6   ROBERT BROOKS,               )   San Antonio, Texas
                                 )   January 29, 2013
7        Defendant.              )
    _____)

8                   **REDACTED** TRANSCRIPT OF TRIAL
9              BEFORE THE HONORABLE FRED BIERY
              CHIEF UNITED STATES DISTRICT JUDGE
10                      AND A JURY

11  A P P E A R A N C E S:

12  FOR THE PLAINTIFF:
         UNITED STATES ATTORNEY'S OFFICE
13       By:  William R. Harris, Esquire
         601 N.W. Loop 410, Suite 600
14       San Antonio, TX  78216

15  FOR THE DEFENDANT:
         GORDON LAW FIRM, PC
16       By:  Stephen Gordon, Esquire
         5820 IH-10 West, Suite 400
17       San Antonio, TX  78201

18       LAW OFFICE OF ALLEN K. LOWE
         By:  Allen K. Lowe, Esquire
19       800 Broadway
         San Antonio, TX  78215
20
    COURT REPORTER:
21       CHRIS POAGE
         United States Court Reporter
22       655 E. Cesar E. Chavez Blvd., Rm. 314
         San Antonio, TX  78206
23       Telephone:  (210) 244-5036
         chris_poage@txwd.uscourts.gov
24
    Proceedings reported by stenotype, transcript produced by
25  computer-aided transcription.

1                              **INDEX**

2                                                              PAGE

3    JENNIFER COLEMAN

4    Direct Examination by Mr. Gordon ...................... 1169

5    Cross-Examination by Mr. Harris ...................... 1175

6    Redirect Examination by Mr. Gordon ................... 1191

7

8    Court's Instructions ................................. 1201

9    Closing Statement by Mr. Harris  ..................... 1238

10   Closing Statement by Mr. Gordon  ..................... 1262

11   Closing Statement by Mr. Harris  ..................... 1293

12   Verdict .............................................. 1306

13

14                          **EXHIBIT INDEX**

15   Government's Exhibit No. 35-15 admitted .............. 1187

16   Defendant's Exhibit No. 51-05-Z admitted ............. 1200

17

18

19

20

21

22

23

24

25

```
 1        (January 29, 2013, 8:35 a.m., jury out, defendant not
 2   present, open court)
 3             THE COURT:  Mr. Harris, you wanted to bring something
 4   up?
 5             MR. HARRIS:  Yes.  May it please the Court.  Good
 6   morning, Your Honor.  You may recall that during opening
 7   statement I had told the jury that there was one count for
 8   which we might not put on proof of mailing.  At the close of
 9   the government's case, when the defense made its Rule 29
10   motion, which I opposed in toto, I was thinking that the
11   document that we had in support of a shipment from Flower
12   Mound, Texas to Austin, Texas, on Count 6, on its face
13   indicated it was a commercial carrier.
14             In preparing -- in reviewing exhibits last night to
15   prepare my closing argument, I realized I was in error and I
16   misled the Court in opposing the dismissal of Count 6.
17             So at this time the United States seeks leave of
18   Court to dismiss Count 6 or, in the alternative, asks the Court
19   to rule nunc pro tunc in granting the defense's Rule 29 motion
20   as to Count 6, or ask the Court prospectively to grant the Rule
21   29 motion at the close of all the evidence, whichever method
22   the Court deems to bring about the just result of the dismissal
23   of Count 6.
24             THE COURT:  That's fine.  All right.  But now, tell
25   me -- and, of course, I forgot about that, also.  The charge is
```

 1    ready.  What does that do to the charge?  Is it just the

 2    verdict form?  Actually, though, the indictment has Count 6 in

 3    it.

 4              MR. HARRIS:  It does.

 5              THE COURT:  And then it talks -- the elements, of

 6    course, of all of those counts are the same.

 7              MR. HARRIS:  Which are identical.  So I don't think

 8    it affects the charge, other than you may have to say, rather

 9    than Counts 2 through 9, you may need to add, with the

10    exception of Count 6.

11              THE COURT:  And right now the verdict form has a

12    place for Count 6, so we probably need to --

13              MR. HARRIS:  We need to delete that.

14              THE COURT:  -- take that out.

15              MR. HARRIS:  Yes.

16              THE COURT:  But the indictment is what the indictment

17    is.  I can tell them Count 6 is no longer in the case.

18              MR. HARRIS:  True.

19              THE COURT:  So we only need to change the verdict

20    form.

21              MR. HARRIS:  Correct.  And the same transaction was

22    charged as overt acts of Count 1, so it's still relevant

23    evidence for that purpose.

24              THE COURT:  Okay.

25              MR. HARRIS:  But as to a substantive count, we blew

```
 1    that one.
 2              THE COURT:  Well, there's plenty of others.
 3              You heard all that.
 4              LAW CLERK:  I did, Judge.  On Page 12 we talk about
 5    Count 6, and it goes into the details.  I'll also delete that.
 6              THE COURT:  No.
 7              MR. HARRIS:  Excellent.  Thank you.
 8              THE COURT:  Okay.  That's the closing document.
 9    Well, is that in the charge or the indictment?
10              LAW CLERK:  It's in the indictment.  And then here's
11    the charge for Counts 2 through 9.  And it's got "to wit" --
12              THE COURT:  Leave it in the indictment.  It is what
13    it is.
14              LAW CLERK:  Right.
15              THE COURT:  But, yes, and then take it out there.
16              LAW CLERK:  And then the verdict form.
17              THE COURT:  And the verdict form.  Okay.  So it's two
18    pages that have to be changed.
19              LAW CLERK:  Yes, sir.
20              THE COURT:  All right.  By the way, one last time for
21    the record -- and Mr. Brooks, I guess, is on the way?
22              MR. GORDON:  Yes.  I presume so, Your Honor.
23              MR. HARRIS:  I remind the Court that we weren't
24    starting till 8:45.
25              THE COURT:  Yeah.  And that's why we've got a couple
```

```
 1    of jurors missing, also.  But one last time, there hasn't been

 2    any change by Mr. Brooks as far as testifying?

 3              MR. GORDON:  Oh, no, Your Honor.  No change in that.

 4              THE COURT:  All right.  So just make those changes.

 5    And then y'all can start stapling together.

 6              LAW CLERK:  Yes, sir.

 7              MR. HARRIS:  And, again, my apologies to the Court.

 8              THE COURT:  Well, that's all right.  That's why we

 9    don't staple until the very end.

10              MR. GORDON:  There was one issue I'd like to bring

11    up, Judge.

12              THE COURT:  Sure.

13              MR. GORDON:  Mr. Harris had objected to some of my

14    evidence I was going to bring in the other day, some of my,

15    like, charts and stuff for my expert.  So I would like to be

16    allowed the option to present them as demonstrative evidence in

17    my closing summary of our position of the case.

18              THE COURT:  No, they're not evidence.  They're your

19    argument.  If you want to -- I assume Mr. Harris is going to

20    put up things on the screen of evidence.  Let me see that and

21    make sure that -- they can be used to exemplify your argument,

22    but they're not evidence.

23              MR. GORDON:  Right, Judge.  I'm not offering to

24    introduce them into evidence.  I just want to be able to show

25    it to the jury, put it on the screen to amplify my argument.
```

1    THE COURT:  Yeah.  You're arguing that he relied on
2  other professionals to do their part.  That's argument.
3     (Defendant enters courtroom)
4    THE COURT:  All right.  This one about Mr. Howard, it
5  says, "Reviewed legal papers, provided legal advice to Robert."
6  Is there enough in the record, Mr. Harris, to support that
7  argument?
8    MR. HARRIS:  Those words by themselves, I think it's
9  fair argument.  I think it's, you know, no great state secret
10  in rebuttal I'm going to argue that it twists the evidence.
11  But I think it's fair argument.
12    THE COURT:  Okay.  Joseph Cooper, Lisa Richardson not
13  indicted.  Okay.  That's true.
14    MR. HARRIS:  I think my same arguments would apply to
15  the help the borrowers -- helped the borrowers fill out
16  applications.  I think, you know, same argument applies to
17  that.  But I think it's fair argument.
18    THE COURT:  Then the buyers, the loan officers.  And
19  so your argument basically is that Mr. Brooks was relying on
20  these licensed professionals and so forth?
21    MR. GORDON:  Yes, Judge.
22    THE COURT:  They might -- they might buy that
23  argument.  Appraisers.  Okay.  All right.  Do you have another
24  copy of this that doesn't have D-28 on it -- or D-98 or you can
25  white it out.

 1              MR. GORDON:  It won't show up on the screen, D-98,
 2   when I show it to the jury.
 3              THE COURT:  Well, are you sure?
 4              MR. GORDON:  Yes.  That D-98 was just handwritten on
 5   the paper version.  I would use my computer to put it on the
 6   screen.
 7              THE COURT:  Oh, I see.  You're not putting this up
 8   there?
 9              MR. GORDON:  No, not that actual paper.
10              THE COURT:  That's fine.  All right.  And then, of
11   course, that's -- the difference between evidence and this sort
12   of thing is that that -- those documents are not going into the
13   jury room like evidence would.
14              MR. GORDON:  Yes, Judge.
15              THE COURT:  Anything else?
16              MR. GORDON:  Well, I have some other things on the
17   screen that basically are the jury charge, just excerpts of the
18   jury charge and my argument about how they should rule, and
19   that's basically it.
20              THE COURT:  That's fine.
21              MR. GORDON:  Okay.  Thank you, Judge.
22              THE COURT:  All right.  Mr. Harris, anything further?
23              MR. HARRIS:  Uncharacteristically unprepared, if I
24   may say, I don't think I have a copy of the final jury charge.
25   I assume the Court will be providing that for us?

```
 1              THE COURT:  You're going to -- the final copy?
 2              MR. HARRIS:  Yeah, at the time that it's being read
 3   to the jury.
 4              THE COURT:  Oh, yeah, we'll get that.  They are all
 5   copied.  They just need to be tweaked and stapled.
 6              MR. HARRIS:  Okay.  Thank you.
 7              THE COURT:  All right.  We're missing one juror.
 8              COURT SECURITY OFFICER:  Let me check.
 9              THE COURT:  Or were.
10       (Discussion off the record)
11       (Witness enters courtroom)
12              THE COURT:  Ms. Coleman, if you'll come up here to
13   the witness stand, and we'll be ready when the jury comes in.
14   You can wind your way through there.  That's fine.  No, up
15   here, right here.  And just have a seat there.  When the jury
16   comes in, everyone will rise.  And then after I say "be
17   seated," that means everybody except you and me.
18              THE WITNESS:  Okay.
19              THE COURT:  And then I'll give you the oath, and then
20   you'll be seated.  Okay.
21              THE WITNESS:  Okay.
22              THE COURT:  And then Mr. Gordon is going to ask
23   questions first, and then Mr. Harris on cross-examination.
24       (Discussion off the record)
25       (Jury enters courtroom)
```

Jennifer Coleman - Direct

```
 1                THE COURT:  You may be seated.
 2                Raise your right hand, please.
 3        (The oath was administered)
 4                THE COURT:  All right.  You may be seated.
 5                Mr. Gordon, you may proceed.  And for the record,
 6   this is Ms. Jennifer Coleman of Pinnacle Appraisers.
 7                MR. GORDON:  Yes.  Thank you.
 8            JENNIFER COLEMAN, DEFENDANT'S WITNESS, SWORN
 9                        DIRECT EXAMINATION
10   BY MR. GORDON:
11   Q.   Good morning, Ms. Coleman.  Can you tell us what you do
12   for a living, Ms. Coleman?
13   A.   I work at a law office.  I used to be a real estate
14   appraiser.
15   Q.   Okay.  What time period were you an appraiser, roughly?
16   A.   Up until '09, so about five years before that, so most of
17   the 2000s.
18   Q.   2004 to 2009, approximately?  Okay.
19   A.   '03, I think, to '09.
20   Q.   Okay.  Can you tell me generally what kind of training you
21   have to have to be a real estate appraiser?
22   A.   You have to have -- you're an apprentice generally the
23   first year.  You have a sponsor that reviews your work, and you
24   have many hours of class time.  And someone has to sign off on
25   all of your work until you actually get your license.  And then
```

Jennifer Coleman - Direct

1    you've got to go take a test and get your license and then --
2    Q.   And, generally speaking, what kind of things are they
3    teaching you during your training?
4    A.   Just how to value a property, you know, how to look at the
5    market and figure out the value based on sales in the
6    neighborhood or rental properties or, you know, whatever the
7    case is.  They teach you how to measure homes, just how to read
8    the MLS documents that you can pull up online so that you know
9    what the sales are about.
10   Q.   Okay.  And they teach you how to prepare appraisal
11   reports?
12   A.   Certainly.
13   Q.   Okay.  Do they teach you how to research property owners?
14   A.   Yes.
15   Q.   Okay.  And you mentioned before about looking at other
16   sales in the area.  Did they teach you how to come up with
17   something called comparables?
18   A.   Sure.
19   Q.   Okay.  And just explain to us in general terms what a
20   comparable is?
21   A.   So you have a subject property that you need to get a
22   value for because you're going to get a loan or refinance a
23   home.  And so you see what sales -- or what homes have sold in
24   the neighborhood.  So you want to get something that's close to
25   the subject property, and you want to get something that's

Jennifer Coleman - Direct

1   similar in size, similar in updating, you know, similar in age.
2   But sometimes, if you can't find that, you get something as
3   best you can, and then you adjust them to make them similar to
4   the subject properties so that once all the adjustments are
5   made, you can come -- you can come up with a value based on
6   several different comparables after you've made adjustments.
7   Q.   And where were you working, what city were you working in
8   around that time period, 2003 to 2009?
9   A.   We had appraisals as far north as Sherman.  We lived -- I
10  lived in Rowlett.  But as far south -- I believe I even did
11  some appraisals in Waco, as far east as Tyler and as far west
12  as I believe Kennedale, which is west of Fort Worth.  So all
13  over the Metroplex.
14  Q.   Okay.  So are you familiar with the general types of
15  property in the Dallas area?
16  A.   Certainly.
17  Q.   And the property values in the Dallas area, generally?
18  A.   Yes.
19  Q.   What about the downtown area at that time?  Were you
20  familiar with the property values in that area?
21  A.   You can look them up and make yourself familiar, you know,
22  wherever you are, so I was.
23  Q.   Okay.  And did you at some point come to do some
24  appraisals for a place called Topaz Townhomes condos?
25  A.   Yes.

Jennifer Coleman - Direct

1    Q.    Okay.  And do you remember what time period, roughly, any

2    closer than what we have already described?

3    A.    In '07, mid-'07 to late '07.  So July to December, I

4    believe.

5    Q.    Okay.  And do you remember approximately how many

6    appraisals you did in, let's say, 2007 in regards to these

7    condos?

8    A.    At least 53 that I have found records of, but at least 53.

9    Q.    Now, is that 53 just on these condos, or does that include

10   some other properties?

11   A.    Including other properties.

12   Q.    Okay.  And how much did you typically charge for your

13   appraisals?

14   A.    Depending on what kind of appraisal they were, if they

15   were condominiums, a lot of times -- well, you need a rent

16   schedule and an operating income statement, so those are $50

17   apiece.  Appraisals are 450.  Some appraisals are 350.  If they

18   were FHA appraisals, they were 450.  So they varied depending

19   on what type of appraisal they were.

20   Q.    Okay.  Now, were you always paid separately for each

21   individual appraisal, or did you sometimes get paid in bulk for

22   multiple appraisals?

23   A.    Paid in bulk for multiple appraisals, sometimes.

24   Q.    Okay.  I'd like to direct your attention to the exhibit in

25   front of you, Defendant's Exhibit 51-05-Z.  And just take a

Jennifer Coleman - Direct

```
 1  moment to look that over.  We'll start with the first page and
 2  see if you recognize that.
 3  A.    Yes.
 4  Q.    Do you recognize it?
 5  A.    It's an invoice.
 6  Q.    Okay.  And who is the invoice from?
 7  A.    Pinnacle Appraisal Group.
 8  Q.    Okay.  And so is that in regards to an appraisal that was
 9  done by your company?
10  A.    Yes.
11  Q.    Okay.  And do you know who the specific appraiser was on
12  this property?
13  A.    It was me.
14  Q.    Okay.  And the total amount that was charged to do this
15  appraisal?
16  A.    400 for the appraisal, 50 for the rent schedule and 50 for
17  the operating income statement, so 500 total.
18  Q.    Okay.  And have you had a chance to review this appraisal
19  in the last few days?
20  A.    Yes.  I looked at it.
21  Q.    Okay.  And so in terms of the -- let's talk about the
22  value that you came up with.  Sorry.  Let me just grab a page
23  that's on -- looks like it's about Page 6 of the appraisal.
24  The heading says "summary of salient features."
25  A.    Oh, okay.
```

Jennifer Coleman - Direct

1    Q.    Do you see that section?

2    A.    Uh-huh.

3    Q.    Okay.  And down near the bottom do you see where it says

4    "final estimate of value"?

5    A.    Yes.

6    Q.    Okay.  And what was the value that you came up with?

7    A.    445.

8    Q.    Okay.  Now, do you know Mr. Robert Brooks?

9    A.    Yes.

10   Q.    And how did you get to know him?

11   A.    He ordered appraisals from my company.

12   Q.    Okay.  And did he pay you for these appraisals?

13   A.    He did.

14   Q.    Okay.  All right.  Did he ever pay you any money on the

15   side to do other work besides these appraisals?

16   A.    No.

17   Q.    Okay.  Did he ever try to offer to pay you extra money to

18   inflate your appraisals?

19   A.    No.

20   Q.    Did he ever even insinuate that, you know, you better give

21   him the value that you want on these appraisals?

22   A.    No.

23   Q.    If he had tried to do that, would you have agreed to?

24   A.    No.

25   Q.    And were you familiar with other condominiums that were in

Jennifer Coleman - Cross

1    the area around that time?

2    A.   Yes.

3    Q.   Are you familiar with the condo unit by the name of the

4    Azure?

5    A.   I don't recall.

6    Q.   Do you recall another condo unit going up close by the

7    Topaz units?

8    A.   Oh, yes, they were just building it.  Yes, I didn't

9    remember the name.

10   Q.   Okay.  So it had not been yet completed by the time you

11   did your appraisal; is that right?

12   A.   I don't believe so.

13   Q.   Okay.  Do you have any idea what the value of those condos

14   were?

15   A.   You know, I don't know.  I don't think there were any

16   sales yet because they were -- they weren't finished.

17   Q.   Do you recall seeing even the sales price of those condos,

18   or no?

19   A.   I don't.

20          MR. GORDON:  Okay.  Pass the witness.

21          THE COURT:  Cross.

22                      **CROSS-EXAMINATION**

23   BY MR. HARRIS:

24   Q.   Good morning, Ms. Coleman.  My name is Bill Harris.  I

25   represent the United States.  We've never met or spoken,

Jennifer Coleman - Cross

1  correct?

2  A.   Correct.

3  Q.   Now, you testified that you've been working as an

4  appraiser from somewhere around '03 to '09.  Why did you move

5  on from appraisal work?

6  A.   In 2009 there was -- actually, I believe the government

7  made it so that appraisal -- loan officers could not -- could

8  no longer order appraisals directly from appraisers, because

9  they were putting a wall between so there would be no, I guess,

10  whatever; so that loan people couldn't tell the appraisers to

11  get a certain value.

12         So at that time you had to get on a list in order

13  to -- a rotation list.  I had, you know, cultivated my clients.

14  You know, I did good customer service.  And now, one day, that

15  day that happened, they no longer could order appraisals from

16  me.  They had to order them from the list of appraisers.  I

17  could do the appraisals.

18  Q.   Excuse me.  The list of appraisers that the banks had

19  approved; that the lenders had approved?

20  A.    No.  That Fannie Mae, Freddie Mac said you have to -- if

21  this appraiser doesn't come from this list that we've created,

22  we won't buy the loan.  And as you know, they buy -- they

23  bought 95 percent of all loans.  And so mortgage people

24  followed those rules.  And so, overnight, my business was over.

25  So I looked for another job so I could, you know, sustain my

Jennifer Coleman - Cross

1    life.  And so that's why I work at the law office now.
2    Q.   Okay.  Prior to that, Pinnacle -- prior to you taking over
3    Pinnacle, the principal had been a fellow named Chris Bartlett,
4    correct?
5    A.   Correct.
6    Q.   And you were his trainee until April 5th of '07, at which
7    time you became certified, correct?
8    A.   Yes.
9    Q.   Now, you were saying that your work for Mr. Brooks'
10   properties were from the summer of '07, pretty much through the
11   end of the year.
12              MR. HARRIS:  If I may approach the witness?
13              THE COURT:  Yes.
14   BY MR. HARRIS:
15   Q.   I'm not going to mark this as an exhibit at this time.
16   I'm just going to show you a check and show you the date and
17   ask you if perhaps seeing this refreshes your recollection now,
18   yeesh, almost five years later, that it was much earlier in the
19   year?
20   A.   Possibly so.  I assumed it was around July, but I don't
21   know.
22   Q.   March -- this indicates March 8th of '07 that you're
23   receiving money from Texas Residential Properties, correct?
24   A.   It does.
25   Q.   And I believe you said your only work was as an appraiser?

Jennifer Coleman - Cross

1  A.   Right.  That is correct.

2  Q.   Okay.  Now, at that time you were not yet certified as an

3  appraiser, correct?

4  A.   Correct.

5  Q.   You were working under Mr. Coleman?

6  A.   No.

7  Q.   I'm sorry.  You are Ms. Coleman.  You were working under

8  Mr. Bartlett's license?

9  A.   Correct.

10 Q.   Now, you had access to the computer, such that you could

11 put signatures electronically on appraisals, correct?

12 A.   Correct, correct.

13 Q.   And, in fact, you did that with several appraisals that

14 you had done for Mr. Brooks without Mr. Bartlett's review or

15 knowledge?

16 A.   Well, he knew that we were doing that.  He didn't get to

17 review them.

18 Q.   He did not get to review them.  So you submitted them

19 without his review, correct?

20 A.   Correct.  But permission.

21 Q.   Understood.  Now, you went to the Topaz condominiums and

22 met with Mr. Brooks on two occasions, correct?

23 A.   I believe so.

24 Q.   And that was to review approximately 30 appraisals,

25 correct -- or 30 units for appraisals?

Jennifer Coleman - Cross

```
 1    A.   Right.  Correct.
 2    Q.   Okay.  And at the Topaz Mr. Brooks gave you three HUD-1s
 3    of condos that had recently sold in Topaz, correct?
 4    A.   I believe so.
 5    Q.   And those each showed that they had sold for approximately
 6    $445,000, correct?
 7    A.   Correct.
 8    Q.   He also gave you copies of appraisals that had been
 9    completed by other appraisers, including Casey Vaughn, correct?
10    A.   I don't recall that.
11    Q.   You don't recall receiving other appraisals, or you don't
12    recall the name?
13    A.   Either.
14    Q.   You don't recall receiving appraisals?
15    A.   I don't.
16    Q.   If, indeed, on April 15th of 2009 you were interviewed by
17    the FBI and IRS, excuse me, and told them that he had provided
18    you with those appraisals, you would not dispute that?
19    A.   No.  I mean, I just don't recall.
20    Q.   Okay.  Now, in preparing an appraisal, you are supposed to
21    research -- you're supposed to be independent, correct?
22    A.   Absolutely.
23    Q.   And you're supposed to research independently who the
24    titleholder of record of real estate is, correct?
25    A.   I don't understand the question.  What do you mean
```

Jennifer Coleman - Cross

1    research independently?

2    Q.    You're not supposed to take somebody's word for it.

3    You're supposed to actually check the county records?

4    A.    Okay.

5    Q.    Correct?

6    A.    Yes.

7    Q.    And, indeed, you did that, and you found that the Dallas

8    County records listed Pearl Street Residential as the owner of

9    the properties, correct?

10   A.    I don't recall that, but I -- is it -- is it -- I assume

11   so.

12   Q.    Well, take a look at your appraisal, and I think you're

13   going to find that it shows Texas Residential Properties is the

14   seller.  And the reason that you put that is that because,

15   although you had seen Pearl Street Residential, Mr. Brooks

16   assured you that he had recently purchased the properties, and

17   it just wasn't showing up.  Do you recall that?

18   A.    I don't.  But the HUD-1 would tell you who the owner is.

19   And sometimes it takes months for those types of things to get

20   into the system.  And so that's not -- that's not unusual.

21   Q.    Unusual.  So, again, if you told the federal agents who

22   interviewed you in March -- I'm sorry -- in April of '09 that,

23   indeed, that's what occurred, you would not dispute that?

24   A.    No.

25   Q.    Correct?

Jennifer Coleman - Cross

```
 1   A.    I would not.
 2   Q.    Isn't it a fact that you also determined the appraised
 3   values at 460,000 for the condo units based on the HUD-1
 4   settlement statements that Mr. Brooks provided, the appraisals
 5   that Mr. Brooks provided and by pulling four comparables off
 6   the MLS, two of which were Topaz Townhomes units, two of which
 7   were from the Plaza at Turtle Creek?
 8   A.    So how many were there total?
 9   Q.    Four.  Four comparables.
10   A.    Plus the three HUD-1s?
11   Q.    Plus the HUD-1s.
12   A.    So there were seven comparables?
13   Q.    Yes.
14   A.    Yes.  So that -- I would agree with that.  Are we talking
15   about this appraisal that I have in front of me?  Because --
16   Q.    I'm not -- we didn't cover with Mr. Gordon what property
17   that appraisal is for.  So could you tell me, please?
18   A.    5105.
19   Q.    Condo 5105.  Let me approach you with a different one.
20   Just, again, not -- yeah, let's go ahead and mark this as an
21   exhibit, please.
22        (Discussion off the record)
23   BY MR. HARRIS:
24   Q.    Let me go ahead and hand you the appraisal.  We'll mark it
25   momentarily and bring it to you.  And I'll ask you if this is
```

Jennifer Coleman - Cross

1   an appraisal that you prepared for condo unit number 5102, the

2   borrower -- purchaser/borrower being Bettie Artis?

3   A.   Yes.

4   Q.   And let's take a look at -- let's wait till we get it

5   marked and entered before we -- we're going to mark it as

6   Government's Exhibit 35-15.  If you'll place it flat, please.

7            All right.  So this is an appraisal that's dated

8   what, please?

9   A.   3 of '07.

10  Q.   3 of '07.  So this is during that period before you became

11  licensed, correct?

12  A.   No.  I did have a trainee license.

13  Q.   Trainee license, but you weren't authorized to sign off on

14  your own without Mr. Bartlett?

15  A.   Right.

16  Q.   Okay.  And it shows Pinnacle Appraisal Group to Adkins

17  Financial Group; contact, Yvonne Salazar; as I indicated,

18  purchaser/borrower, Bettie -- shoot.  I'm getting ahead of

19  myself.  Real quick again.  Looking at the thing in wide view,

20  this one lacks the exhibit sticker, which will be right here.

21  Invoice, March of '07, correct?

22  A.   Yes.

23  Q.   To Adkins Financial Group; attention, Yvonne Salazar,

24  correct?

25  A.   Yes.

Jennifer Coleman - Cross

1    Q.   And it's lender, Adkins Financial Group;

2    purchaser/borrower, Bettie Artis; unit 5102, correct?

3    A.   Yes.

4    Q.   Now, I was asking you about the comparables that you used.

5    So if we could please go to -- well, first, I was asking about

6    the owner of public record on the condominiums.  So if we go

7    several pages in.

8    A.   It's Page 6.

9    Q.   Thank you.

10   A.   Welcome.

11   Q.   We show owner of public record as Texas Residential

12   Properties, correct?

13   A.   Yes.

14   Q.   And do you recall that that was based on a HUD-1 given to

15   you by Mr. Brooks in essence saying, see, look, I already

16   bought it?

17   A.   It's likely.

18   Q.   If we go to Page 7, towards the bottom, there's a portion

19   that talks about your research, correct?

20   A.   Correct.

21   Q.   And in this portion, down toward the bottom, it says:  My

22   research did not reveal any prior sales or transfers of the

23   subject property for the three years prior to the effective

24   date of this appraisal.  Correct?

25   A.   Yes.

Jennifer Coleman - Cross

1    Q.    Similarly, right below it, it says:  My research did not

2    reveal any prior sales or transfers of the comparable sales for

3    the year prior to the date of sale of the comparable sale,

4    correct?

5    A.    Correct.

6    Q.    So that means neither condo -- your research, your

7    certifying to this lender is that neither 5102, nor the two you

8    used as comparables had sold certainly within the prior year

9    and certainly within -- you know, for the condo the three

10   years?

11   A.    Sure.

12   Q.    This jury has seen evidence that Pearl Street Residential

13   sold the Topaz condo in question, 5102, as well as the two

14   units you're using as comparable, within months of this

15   appraisal.  Your appraisal is incorrect, is it not?

16   A.    It is.

17   Q.    Let's take a look at Page 11.  And is that your electronic

18   signature?

19   A.    Yes.

20   Q.    And is that Mr. Bartlett's electronic signature?

21   A.    Yes.

22   Q.    And you caused his to appear on there, correct?

23   A.    With his approval, yes.

24   Q.    With his approval.  Did he know the details of how you had

25   prepared this report?

Jennifer Coleman - Cross

1    A.    No.

2    Q.    No.  Let's go to the very next page when we talk about the

3    comparables.  And the comparables that you're using -- first,

4    we look -- and the first column down is the -- the first couple

5    of columns down is the subject property, correct?

6    A.    Correct.

7    Q.    The next two columns is comparable sale number 4, which is

8    not a Topaz unit.  It's something at Plaza at Turtle Creek,

9    correct?

10   A.    Correct.

11   Q.    And ditto with comparable 5, correct?

12   A.    Correct.

13   Q.    Now, just looking at it in terms of homeowner's

14   assessment, for the subject property it's $303, correct?

15   A.    Correct.

16   Q.    For the first Plaza at Turtle Creek it's $865, correct?

17   A.    Correct.

18   Q.    So more than twice.  And then for comparable number 5,

19   it's over -- well over -- well, change over a thousand dollars,

20   shall we say?

21   A.    Yes.

22   Q.    When we go to Page 17, we analyze the comparable rents,

23   correct?

24   A.    Correct.

25   Q.    What the market will bear for renting this property out,

Jennifer Coleman - Cross

1    correct?

2    A.   Correct.

3    Q.   And for comparable 1, let's go a little bit wider.  And

4    again, this is the same two column, kind of two column, kind of

5    two column, kind of two column for the three comparables,

6    correct?

7    A.   Yes.

8    Q.   And each of these comparables are showing rents ranging

9    from 3500 on Comp 1 to 3800 on Comp 2, correct?

10   A.   Correct.

11   Q.   We also have a comparison of square footage, showing Topaz

12   at unit 5102 is just over a thousand square feet.  Comparable 1

13   is just shy of 2000 square feet.  Comparable 3 is -- or I'm

14   sorry -- Comparable 2 is a little larger than Topaz.  But Comp

15   3 is -- I need to move over -- is well over -- is over 2,000

16   square feet, so nearly twice the size, correct?

17   A.   Correct.

18   Q.   Now, I mentioned that you had also used two MLS listings.

19   A.   Yes.

20   Q.   And do you recall telling the agents at the time of the

21   interview that they were for townhome units numbers 7203 and

22   7202?

23   A.   Well, I don't recall telling them that, but it's right

24   here.  So I did.

25   Q.   It's right there in the government exhibit we just went

Jennifer Coleman - Cross

1    through, correct?

2    A.    Correct.  Yeah, Page 8.

3    Q.    So let's briefly look at what you may have received -- not

4    what you may have received, but just to remind the jury what

5    properties we are talking about.  Excuse me.  Even at that I

6    misstate, because I don't believe the jury has actually seen

7    these before.

8                  Let's go to Government's Exhibit 26-02, which you

9    would not -- which you would have seen as a comparable.  And

10   can you see it on the screen?

11   A.    No.

12   Q.    We may have to dig out -- if you would please, Mr. Vigil,

13   dig out 26-02, 26-03, 25-02, 25-03.

14                MR. HARRIS:  Your Honor, I neglected -- I marked, I

15   identified, we talked about; I neglected to offer Government's

16   Exhibit 35-15, the appraisal report in evidence.

17                THE COURT:  Any objection?

18                MR. GORDON:  No objection, Your Honor.

19                THE COURT:  Admitted.

20      (Government's Exhibit No. 35-15 admitted)

21   BY MR. HARRIS:

22   Q.    Okay.  If I may briefly question from here.  First, 25-02

23   is a HUD-1 for condo unit 7202, correct?

24   A.    May I look at it?

25   Q.    Sure, please.

Jennifer Coleman - Cross

1    A.    Yes.

2    Q.    And that's one of the ones that you were given by -- one

3    of the ones you found in the MLS, correct?

4    A.    Yes.

5    Q.    Okay.  The HUD-1 indicates a contract sales price of

6    460,000, correct?

7    A.    Correct.

8    Q.    So is it fair to say that you took it that if another

9    comparable unit in the same development is going for 460,

10   similar square footage, et cetera, then 5102 would be worth

11   460?  Is it a factor?

12   A.    Yeah.  Yeah, absolutely.

13   Q.    Okay.

14   A.    Did you say 402?  7202?

15   Q.    7202?

16   A.    Okay.  Would be the same as --

17   Q.    As 5102?

18   A.    Okay.  Yes, yes.

19   Q.    Now, I believe you indicated that you also reviewed an

20   appraisal for that unit as well, correct?

21   A.    Possibly.

22   Q.    And let's take a look at Government's Exhibit 25-03.  And

23   just in its wide view this is a standard form for the

24   appraisal, correct?

25   A.    Yes.

Jennifer Coleman - Cross

1    Q.   And not to bother zooming in, but in the upper middle

2    portion it's for unit 7202, correct?

3    A.   Yes.

4    Q.   The bottom line on this one is going to be toward the

5    back, correct, before all the plats and stuff?

6    A.   Are you talking about the value?

7    Q.   Yes, ma'am.

8    A.   No, it's before that.

9    Q.   Okay.

10   A.   Here.

11   Q.   460,000 on the third page of the exhibit in the lower

12   right, correct?

13   A.   Correct.

14   Q.   And for the jury's benefit, this appraisal was prepared by

15   a Mark Whisenhunt, or at least that's the name that appears,

16   correct?

17   A.   Yes.

18   Q.   Why are you snickering?

19   A.   Because he was my first sponsor.  That's funny.

20   Q.   Small world?

21   A.   Very small world.

22   Q.   Okay.  Let's take a look at Exhibit 26-02, which is the

23   HUD-1 for unit 7203, the other Topaz that you used as an MLS

24   comparable.

25   A.   Right.  Correct.

Jennifer Coleman - Cross

1    Q.    Multilist Service, MLS, right?

2    A.    Multiple listing.

3    Q.    Thank you.

4    A.    Sure.

5    Q.    This one, likewise, indicates a contract sales price of

6    460, correct?

7    A.    Correct.

8    Q.    And going to Government's Exhibit 26-03, it, too, is

9    backed by an appraisal showing 460,000 as its value.  And this

10   one also appears to be prepared by Mark Whisenhunt, correct?

11   A.    Correct.

12   Q.    So having been given these HUD-1s by Mr. Brooks; possibly

13   other appraisals for the units done by Mr. Brooks; you,

14   yourself, finding in the MLS recent sales in the same

15   ballpark -- actually, not the same ballpark, same price; you

16   felt comfortable using 460,000 as the valuation, correct?

17   A.    Based on the MLS and comparables, yes.

18   Q.    Now, you did not go into the sales office at Topaz, did

19   you?

20   A.    I believe I did.

21   Q.    Did you see that those units were going for -- very

22   comparable units were going in the mid-200 to not more than

23   $300,000 price range?

24   A.    I don't think they had them listed.

25   Q.    You don't think they had them listed.  In any event, you

Jennifer Coleman - Redirect

1  don't recall seeing that, correct?

2  A.   No.

3        MR. HARRIS:  If I may have a moment, please, Your

4  Honor?

5        THE COURT:  All right.

6        MR. HARRIS:  Pass the witness.

7        THE COURT:  Redirect.

8              **REDIRECT EXAMINATION**

9  BY MR. GORDON:

10 Q.   Did Mr. Brooks go over those comparables with you?

11 A.   What are you talking -- like on --

12 Q.   Did he tell you what comparables to pick, what to do?

13 A.   Absolutely not, no.

14 Q.   And do people sometimes make mistakes in reports

15 legitimately?

16 A.   All the time.

17 Q.   Okay.  Did you make these mistakes because Mr. Brooks

18 directed you to put those things in there or just on your own?

19 A.   Absolutely not.

20 Q.   And I believe on the -- one of the papers that was put up

21 there's paperwork sent to you by Yvonne.  Does that ring a

22 bell?

23 A.   Yes.

24 Q.   Okay.  Do you recall Yvonne Salazar Quintanilla?

25 A.   Yes.

Jennifer Coleman - Redirect

```
1    Q.    And do you recall Pro Processing?

2    A.    Pro Processing?

3    Q.    Pro Processing.

4    A.    No.

5              MR. GORDON:  Okay.  All right.  Pass the witness.

6              THE COURT:  Recross.

7              MR. HARRIS:  No, thank you.

8              THE COURT:  Thank you, ma'am.  You may step down.

9              Next witness?

10             THE WITNESS:  Do these stay here?

11             THE COURT:  Yes.  Why don't you leave those there for

12   right now.  Thank you, ma'am.

13             THE WITNESS:  You're welcome.

14             MR. GORDON:  Defense calls Karen Coleman, Your Honor.

15             THE COURT:  All right.

16      (Witness enters courtroom)

17             MR. GORDON:  Actually, Judge, can I have just a

18   moment?

19             THE COURT:  Yes.

20             Ma'am, come on up here for right now, please.  Right

21   up here.  Hi.

22             THE WITNESS:  Hi.

23             THE COURT:  You can have a seat for right now, I

24   think.

25             MR. GORDON:  Actually, Your Honor, we are not going
```

```
 1    to call Ms. Coleman at this time, actually.
 2              THE COURT:  Oh, you're not going to call her?
 3              MR. GORDON:  No.  We talked --
 4              THE COURT:  Okay.  All right.  Well, very well.  Ms.
 5    Coleman, you're done.
 6              THE WITNESS:  Okay.
 7              THE COURT:  Thank you.
 8              All right.  Mr. Gordon, do you wish to call another
 9    witness?
10              MR. GORDON:  No, Your Honor.
11              THE COURT:  And so does the defense rest?
12              MR. GORDON:  Yes, Your Honor.
13              THE COURT:  All right.  The defense having rested,
14    Mr. Harris, do you wish to call any rebuttal witnesses?
15              MR. HARRIS:  No, Your Honor.  The United States rests
16    and closes.
17              THE COURT:  All right.  The defense closes, Mr.
18    Gordon?
19              MR. GORDON:  Yes, Your Honor.
20              THE COURT:  All right.  Ladies and gentlemen, you
21    have now heard the evidence portion of the trial.  And while --
22    we'll need to take a short break here to get set up for the
23    closing statements.  And first, I will be reading to you your
24    final instructions.
25              While we do that, you-all please keep in mind your
```

```
1    instructions.  Even though you've heard all of the evidence, do
2    not begin talking about the case until after the closing
3    statements and all of you are in the jury room together to
4    deliberate as a collective body.  So with that reminder,
5    you-all will be in recess for 15 minutes, and then we'll have
6    the closing statements.  Thank you.
7         (Jury leaves courtroom)
8              THE COURT:  All right.  You may be at ease.  Be
9    seated.  While Ms. Noble is getting the charges distributed,
10   Mr. Gordon, just pro forma, do you want to renew your motion
11   for acquittal?
12             MR. GORDON:  Yes, Judge.
13             THE COURT:  All right.  And that motion as to Count 6
14   is granted and as to all other counts is denied.  So that takes
15   care of that.
16             Anything else right now before we take a short break
17   before you-all begin your arguments, Mr. Gordon?
18             MR. GORDON:  No, Your Honor.  I don't think so.
19             THE COURT:  And, Mr. Harris, first of all, anything
20   further at this time?
21             MR. HARRIS:  No, Your Honor.
22             THE COURT:  Do you think you're going to use the full
23   hour?
24             MR. HARRIS:  I'm a windbag, yeah.
25             THE COURT:  That's fine.  I'm just trying to -- we
```

```
 1    might need to take -- give the jury a break if we're going to
 2    use -- Mr. Gordon, you think you're going to use a full hour?
 3              MR. GORDON:  No, Your Honor.
 4              THE COURT:  Okay.  Well, my hope is, read the charge,
 5    which obviously is going to take a while because it's 30 pages,
 6    and then to go straight in and get the arguments done, and then
 7    they can have a lunch break.
 8              MR. HARRIS:  Yeah.  I don't know that I'll be 45 and
 9    15.  I may be a little shorter on the front end and then add a
10    little bit on the back end.
11              THE COURT:  All right.  Well, we'll play it by ear.
12    But hopefully -- that way it doesn't lose the flow for the jury
13    if we can do it without taking a break.
14              MR. HARRIS:  But if I may ask for a notice at the
15    40-minute mark --
16              THE COURT:  Okay.
17              MR. HARRIS:  -- I would appreciate that, even though
18    there's a clock.
19              THE COURT:  All right.  And, Mr. Gordon, you want a
20    warning at -- what?  50, if you use that long.
21              MR. GORDON:  Yes, Judge.  I appreciate that.
22              THE COURT:  Okay.  All right.  Well, we'll be in
23    recess for about ten more minutes.  You-all get set up, move
24    the lectern, take a restroom break, and then we'll start.
25    Thank you.
```

```
 1        (Recess at 9:39 a.m. until 9:52 a.m., jury out, defendant
 2   present, open court)
 3            THE COURT:  You may be seated.  We had sent notice
 4   out yesterday to the other lawyers involved and the other
 5   defendants about having closing statements today.  And Mr. Wood
 6   is here, of course.  I think we said about 10:00.  So we may
 7   have some other lawyers come in from time to time during the
 8   closing statement.
 9            All right.  Everyone's present.  Jury's ready.  All
10   right.  For the record, before we bring the jury in, Mr.
11   Harris, anything else for the United States?
12            MR. HARRIS:  No, Your Honor.
13            THE COURT:  Mr. Gordon, for the defense?
14            MR. GORDON:  No, Your Honor.
15            MR. HARRIS:  Actually --
16            MR. GORDON:  No, I'm sorry.
17            MR. HARRIS:  Yes, Your Honor, although I'm not sure
18   that it makes a technical matter to the jury instructions, but
19   I see on Page 13 --
20            THE COURT:  13.  Oh, man.  Don't tell me.  All right.
21   Go ahead.
22            MR. HARRIS:  Italic, fifth, the scheme affected a
23   financial -- let me get to the microphones.  The scheme
24   affected a financial institution in Count 2 and Count 8.  The
25   parties have stipulated for purposes of Count 2 that Supreme
```

1     Mortgage Group --

2              THE COURT:  Okay.  Hold on.  I'm not -- did you say

3     Page 13?

4              MR. HARRIS:  Page 13 of the charge.

5              THE COURT:  Oh, okay.  Well, wait a minute.  Maybe

6     I'm in the indictment.

7              MR. HARRIS:  You're probably in the indictment.

8              THE COURT:  Yes, yes, yes.  Hold on.  Okay.  Page 13

9     of the charge.  Go ahead.

10             MR. HARRIS:  Page 13 of the charge, the italic fifth

11    element.

12             THE COURT:  Okay.

13             MR. HARRIS:  That the scheme affected a financial

14    institution in Count 2 and Count 8.  The parties have

15    stipulated for purposes of Count 2 that Supreme Mortgage Group

16    in San Antonio, Texas is a financial institution.

17             At that point in time Supreme Mortgage would not have

18    fallen in 18 USC Section 12's definition of a financial

19    institution for purposes of the Title 18 crimes.  So it

20    really -- it's really only a matter that affects sentencing.

21             THE COURT:  Okay.

22             MR. HARRIS:  It really doesn't matter as far as the

23    true element of the offense as to the jury.

24             THE COURT:  And that was just discovered now, after

25    we have gone through all of this.  Is there any problem with

 1    the charge?  Okay.

 2              MR. HARRIS:  There is no problem with the charge, but

 3    that is a technical item --

 4              THE COURT:  Okay.  Well --

 5              MR. HARRIS:  -- in that, you know, were he only to be

 6    convicted of Count 2, it would be a lesser sentence than if

 7    Supreme Mortgage were a financial institution.

 8              THE COURT:  Okay.

 9              MR. HARRIS:  That's all.

10              THE COURT:  Well, do you think -- we can't go back

11    right now and white them all out.  I'm inclined to just go

12    ahead and read it, with the understanding that it doesn't

13    matter as far as what the jury is doing.

14              MR. HARRIS:  It does not matter as to what the

15    jury --

16              THE COURT:  Because then, otherwise, if I skip over

17    it, they'll question, well, why didn't you read that and so

18    forth, just -- it makes it more confusing.

19              MR. HARRIS:  But I'd like a response from the defense

20    on that issue.

21              THE COURT:  All right.  Mr. Gordon, for the record,

22    do you have any objection to the Court going ahead and reading

23    it, with the understanding that it will be taken up later to

24    the extent it may affect other issues?

25              MR. GORDON:  Judge, if it's not technically accurate,

                        Chris Poage, RMR, CRR
                      United States Court Reporter

1   I feel like I have to object for the record on that.

2          THE COURT:  All right.  Mr. Harris, what do you want

3   to do?  I don't think it -- I think it's harmless error, if

4   it's error at all.  But it will take us another 30 minutes to

5   do this.

6          MR. HARRIS:  I also concur that it is an

7   immaterial -- well, were it in the indictment -- even in the

8   indictment, since we charged 1341, if that count were to have

9   said it, it would be an immaterial variance.  Had we charged

10  1344, it would be a fatal flaw.  We have charged 1341 as to

11  that count; ergo, had it been named as a financial institution

12  in the count, it would be an immaterial variance; ergo, we

13  believe that the charge is an immaterial variance.

14         THE COURT:  Okay.  And even if it is not immaterial,

15  that doesn't do away with all the other -- doesn't taint all

16  the other instructions?

17         MR. HARRIS:  Not at all.

18         THE COURT:  All right.  The objection is noted and

19  overruled.

20         Now, was there something else, Mr. Gordon, you wanted

21  to raise?

22         MR. GORDON:  Yes, Judge.  I think I neglected to

23  officially offer into evidence Defendant's Exhibit 51-05-Z.

24  That was the appraisal report my witness was just looking at.

25  So I offer that into evidence.

1    MR. HARRIS:  Without objection.

2    THE COURT:  Admitted.

3    (Defendant's Exhibit No. 51-05-Z admitted)

4    THE COURT:  All right.  Okay.  Now we're ready.

5    (Jury enters courtroom)

6    THE COURT:  You may be seated.

7    Ladies and gentlemen, before I give you the Court's

8    charge, let me make a few comments and observations.  First of

9    all, you-all have been very attentive.  There have been many

10   comments from court observers and people involved in this case

11   about how attentive you have been and what a good jury this is.

12   And all of our juries are good, but this one is especially good

13   in the sense that this is a very complicated case, obviously.

14   It's not your run-of-the-mill, two or three day case that we

15   often see.  And so we appreciate your attentiveness to all of

16   this.

17   Secondly, as I told you during the voir dire

18   selection, that this will be the production and presentation

19   like a Broadway play, like a drama.  And I think you have seen

20   good quality on that presentation.  And that has been aided in

21   large part by the support staff for both the lawyers and the

22   Court who have put all this together.  As you can imagine, all

23   of this doesn't just happen.  It takes a lot of people behind

24   the scenes, just like in a movie production or a Broadway play

25   production.  And these folks that you have seen, although their

1    participation has been silent, they don't get to get up and ask

2    questions or make speeches.  But without them and the support

3    that they've given to the people presenting, this would not

4    have gotten to this point.

5             At this point in the production it's the Court's

6    responsibility to give you your final instructions.  And then

7    Mr. Harris and Mr. Gordon will summarize for you why they

8    believe you should answer the questions for their side of the

9    case.

10            Each of you has a copy of the Court's final

11   instructions for your use during your deliberations and as you

12   are hearing the closing statements by the lawyers.

13            I will ask at the end of the case that -- you may, if

14   you like, take those home with you.  They will be your

15   property.  The only difference between the one that will be the

16   official record of the Court and the one that I'm reading from

17   and the one that you have -- the only difference is that Ms.

18   Vela has put the district clerk's file mark in this corner.

19   This is the one that will be signed and become an official

20   verdict of the Court once you have reached your unanimous

21   verdict.

22            So if you will, follow along with me, and I will read

23   this to you.

                         **COURT'S INSTRUCTIONS**

24

25            THE COURT:  Members of the jury, in any jury trial

1     there are, in effect, two judges.  I am one of the judges, and

2     the other is you, the jury.  It is my duty to preside over the

3     trial to decide what evidence is proper for your consideration.

4     It is also my duty at the end of the trial to explain to you

5     the rules of law that you must follow and apply in arriving at

6     your verdict.

7            First, I will give you some general instructions

8     which apply in every case, for example, instructions about

9     burden of proof and how to judge the believability of

10    witnesses.  Then I will give you some specific rules of law

11    about this particular case.  And, finally, I will explain to

12    you the procedures you should follow in your deliberations.

13           You, as jurors, are the judges of the facts.  But in

14    determining what actually happened -- that is, in reaching your

15    decision as to the facts -- it is your sworn duty to follow all

16    of the rules of law as I explain them to you.

17           You have no right to disregard or give special

18    attention to any one instruction or to question the wisdom or

19    correctness of any rule that I may state to you.  You must not

20    substitute or follow your own notion or opinion as to what the

21    law is or ought to be.  It is your duty to apply the law as I

22    explain it to you, regardless of the consequences.

23           It is also your duty to base your verdict solely upon

24    the evidence, without prejudice or sympathy.  That was the

25    promise you made and the oath you took before being accepted by

1  the parties as jurors.  And they have the right to expect

2  nothing less.

3          The indictment, or formal charges against the

4  defendant, are not evidence of guilt.  Indeed, the defendant is

5  presumed by the law to be innocent.  The law does not require

6  the defendant to prove his innocence or produce any evidence at

7  all.  And no inference whatever may be drawn from the election

8  of the defendant not to testify.  The government has the burden

9  of proving the defendant guilty beyond a reasonable doubt.  And

10  if it fails to do so, you must acquit the defendant.

11          While the government's burden of proof is a strict or

12  heavy burden, it is not necessary that the defendant's guilt be

13  proved beyond all possible doubt.  It is only required that the

14  government's proof exclude any reasonable doubt concerning the

15  defendant's guilt.

16          A reasonable doubt is a doubt based upon reason and

17  common sense, after careful and impartial consideration of all

18  the evidence in the case.  Proof beyond a reasonable doubt,

19  therefore, is proof of such a convincing character that you

20  would be willing to rely and act upon it without hesitation in

21  the most important of your own affairs.

22          As I told you earlier, it is your duty to determine

23  the facts.  In doing so, you must consider only the evidence

24  presented during the trial, including the sworn testimony of

25  the witnesses and the exhibits.  Remember that any statements,

1    objections or arguments made by the lawyers are not evidence.

2    The function of the lawyers is to point out those things that

3    are most significant or most helpful to their side of the case,

4    and in so doing to call your attention to certain facts or

5    inferences that might otherwise escape your notice.  In the

6    final analysis, however, it is your own recollection and

7    interpretation of the evidence that controls in the case.  What

8    the lawyers say is not binding upon you.

9              During the trial I may have sustained objections to

10   certain questions and exhibits.  You must disregard those

11   questions and exhibits entirely.  Do not speculate as to what

12   the witness would have said if permitted to answer the question

13   or as to the contents of an exhibit.  Also, certain testimony

14   or other evidence may have been ordered stricken from the

15   record, and you may have been instructed to disregard this

16   evidence.  Do not consider any testimony or other evidence

17   which has been stricken in reaching your decision.

18             Your verdict must be based solely on the legally

19   admissible evidence and testimony.  Also, do not assume from

20   anything I may have done or said during the trial that I have

21   any opinion concerning any issues in this case.  Except for the

22   instructions to you on the law, you should disregard anything I

23   may have said during the trial in arriving at your own findings

24   as to the facts.

25             While you should consider only the evidence, you are

 1    permitted to draw such reasonable inferences from the testimony

 2    and exhibits as you feel are justified in the light of common

 3    experience.   In other words, you may make deductions and reach

 4    conclusions that reason and common sense lead you to draw from

 5    the facts which have been established by the evidence.

 6          In considering the evidence, you may make deductions

 7    and reach conclusions which reason and common sense lead you to

 8    make, and you should not be concerned about whether the

 9    evidence is direct or circumstantial.

10          Direct evidence is the testimony of one who asserts

11    actual knowledge of a fact, such as an eyewitness.

12    Circumstantial evidence is proof of a chain of events and

13    circumstances indicating that something is or is not a fact.

14    The law makes no distinction between the weight you may give to

15    either direct or circumstantial evidence.

16          I remind you that it is your job to decide whether

17    the government has proved the guilt of the defendant beyond a

18    reasonable doubt.   In doing so you must consider all of the

19    evidence.   This does not mean, however, that you must accept

20    all of the evidence as true or accurate.   You are the sole

21    judges of the credibility or believability of each witness and

22    the weight to be given the witness' testimony.

23          An important part of your job will be making

24    judgments about the testimony of the witnesses who testified in

25    this case.   You should decide whether you believe all or any

1    part of what each person had to say and how important that

2    testimony was.

3              In making that decision, I suggest that you ask

4    yourself a few questions.  Did the person impress you as

5    honest?  Did the witness have any particular reason not to tell

6    the truth?  Did the witness have a personal interest in the

7    outcome of the case?  Did the witness have any relationship

8    with either the government or the defense?  Did the witness

9    seem to have a good memory?  Did the witness clearly see or

10   hear the things about which he or she testified?  Did the

11   witness have the opportunity and ability to understand the

12   questions clearly and answer them directly?  Did the witness'

13   testimony differ from the testimony of other witnesses?

14             These are a few of the considerations that will help

15   you determine the accuracy of what each witness said.  Your job

16   is to think about the testimony of each witness you have heard

17   and decide how much you believe of what each witness had to

18   say.

19             In making up your mind in reaching a verdict, do not

20   make any decisions simply because there were more witnesses on

21   one side than on the other.  Do not reach a conclusion on a

22   particular point just because there were more witnesses

23   testifying for one side on that point.

24             In this case the government called as witnesses

25   alleged accomplices named as codefendants in the indictments,

with whom the government has entered into plea agreements
providing for lesser charges or a lesser sentence than the
codefendant would otherwise be exposed to for the offense to
which the codefendant pleaded guilty.

Such plea bargaining, as it is called, has been
approved as lawful and proper and is expressly provided for in
the rules of this Court.  An alleged accomplice, including one
who has entered into a plea agreement with the government, is
not prohibited from testifying.  On the contrary, the testimony
of such a witness may alone be of sufficient weight to sustain
a verdict of guilty.  You should keep in mind that such
testimony is always to be received with caution and weighed
with great care.  You should never convict a defendant upon the
unsupported testimony of an alleged accomplice unless you
believe that testimony beyond a reasonable doubt.

The fact that an accomplice has entered a plea of
guilty to the offense charged is not evidence of the guilt of
any other person.  The testimony of an alleged accomplice and
the testimony of one who provides evidence against the
defendant for immunity from punishment or for personal
advantage or vindication must always be examined and weighed by
the jury with greater care and caution than the testimony of
ordinary witnesses.  You, the jury, must decide whether the
witness' testimony has been affected by any of those
circumstances or by the witness' interest in the outcome of the

1   case or by prejudice against the defendant or by the benefits

2   that the witness has received as a result of being immunized

3   from prosecution.

4           You should keep in mind that such testimony is always

5   to be received with caution and weighed with great care.  You

6   should never convict the defendant upon the unsupported

7   testimony of such a witness unless you believe that testimony

8   beyond a reasonable doubt.

9           The testimony of a witness may be discredited by

10  showing that the witness testified falsely concerning a

11  material matter or by evidence that at some other time the

12  witness said or did something or failed to say or do something

13  which is inconsistent with the testimony the witness gave at

14  this trial.

15          Earlier statements of a witness were not admitted

16  into evidence to prove that the contents of those statements

17  are true.  You may consider the earlier statements only to

18  determine whether you think they are consistent or inconsistent

19  with the trial testimony of the witness and, therefore, whether

20  they affect the credibility of that witness.

21          If you believe that a witness has been discredited in

22  this manner, it is your exclusive right to give the witness --

23  the testimony of that witness whatever weight you think it

24  deserves.

25          During the trial you have heard testimony of

```
 1    witnesses who have expressed opinions on general background

 2    information on the United States tax code and the types of

 3    deductions which are generally allowed and not allowed.  If

 4    scientific, technical or other specialized knowledge might

 5    assist the jury in understanding the evidence or in determining

 6    a fact in issue, a witness qualified by knowledge, skill,

 7    experience, training or education may testify and state an

 8    opinion concerning such matters.

 9            Merely because such a witness has expressed an

10    opinion does not mean, however, that you must accept this

11    opinion.  You should judge such testimony like any other

12    testimony.  You may accept it or reject it and give it as much

13    weight as you think it deserves, considering the witness'

14    education and experience, the soundness of the reasons given

15    for the opinion and all other evidence in the case.

16            You will note that the indictments charge that the

17    offenses were committed on or about a specified date or dates.

18    The government does not have to prove that the crimes were

19    committed on that exact date or dates so long as the government

20    proves beyond a reasonable doubt that the defendant committed

21    the crimes on dates reasonably near the dates stated in the

22    indictments.

23            You are here to decide whether the government has

24    proved beyond a reasonable doubt that the defendant is guilty

25    of the crimes charged.  The defendant is not on trial for any
```

act, conduct or offense not alleged in the indictments.
Neither are you concerned with the guilt of any other person or
persons not on trial as a defendant in this case, except as you
are otherwise instructed.

A separate crime is charged in each count of the two
indictments.  Each count in each indictment and the evidence
pertaining to it should be considered separately.  The fact
that you may find the defendant guilty or not guilty as to one
of the crimes charged in either indictment should not control
your verdict as to any other crime charged in either
indictment.

If the defendant is found guilty, it will be my duty
to decide what the punishment will be.  You should not be
concerned with punishment in any way.  It should not enter your
consideration or discussion.  Now I will read to you the
indictments, give you my instructions with reference to the
essential element of the counts alleged which must be proven by
the government beyond a reasonable doubt before you can convict
the defendant of the counts of the indictments.  And you will
have a copy of the indictment in the jury room, and I remind
you that the indictments are not evidence of guilt.

Looking at the indictment, which, of course, you have
seen and heard all through this trial, so I'm going to try to
abbreviate to the extent possible.  First of all, the defendant
Robert Brooks, was a defendant -- was a resident of Dallas,

1    Texas and the husband of Cheryl Brooks.  He was the *de facto*

2    principal of Relocation Studio, Texas Residential Properties

3    and Upscale Realty, entities in whose names he bought and sold

4    real estate.

5          He provided the startup funds for and controlled Pro

6    Processing, which prepared mortgage applications; and

7    Progressive Title & Abstract, a real estate title company

8    engaged in the business of real estate closings and

9    settlements.  He provided startup funds for Bronco Mortgage and

10   Supreme Mortgage, each of which were mortgage brokers.

11         Defendant Cheryl Brooks was a resident of Dallas,

12   Texas and the wife of defendant Robert Brooks.  Defendant

13   Richard Howard was a resident of McKinney, Texas, and an

14   attorney at law.  He was principal of Progressive Title &

15   Abstract.  A person known to the grand jury but identified here

16   only as L.C. was a resident of San Antonio and operated Supreme

17   Mortgage Group.  Supreme Mortgage Group, a San Antonio, Texas

18   entity, engaged in the business of arranging residential

19   mortgage loans for customers with various mortgage lenders.

20         Defendant Yvonne Salazar Quintanilla was a resident

21   first of San Antonio, Texas, and later Dallas, Texas; principal

22   of Pro Processing, senior processor.  As a mortgage processor,

23   she put together mortgage files for review by underwriters.

24   Defendant Niesha Manuel was a resident of Dallas and an

25   employee of Pro Processing.  As a mortgage processor, she put

1   together mortgage files for review by underwriters.

2           Defendant Tamatha Buckholt was a resident of Dallas,

3   Texas, and an employee of Pro Processing.  As a mortgage

4   processor, she put together mortgage files for review by

5   underwriters.

6           Defendant Stacey Owens was a resident of Dallas,

7   Texas and the branch manager and escrow officer of Equity Title

8   of Texas.  Her duties included the preparation of the HUD-1

9   settlement statement and conducting real estate transaction

10  closings.

11          Defendant Geraldine Williams was a resident of

12  Dallas, Texas, and the branch manager and escrow officer of

13  Progressive Title & Abstract.  Her duties included the

14  preparation of HUD-1 settlement statement and conducting real

15  estate transaction closings.

16          Defendant Cesar Gonzales was a resident of Dallas,

17  Texas, and an escrow officer at Progressive Title & Abstract.

18  His duties included the preparation of the HUD-1 settlement

19  statement and conducting real estate transaction closings.

20          Defendant Cedric Lester was a resident of Dallas,

21  Texas, an appraiser trainee working under the supervision of a

22  state certified appraiser.

23          Defendant Casey Vaughn was a resident of Houston,

24  Texas, and a state certified appraiser.

25          Defendant Joseph Cooper was a resident of San

1    Antonio, Texas, and a real estate agent.

2            Defendant Vadim Gazanchiyants was a resident of Las

3    Vegas, Nevada, and a property manager working on behalf of

4    Robert Brooks, the defendant.

5            Defendant George Autobee was a resident of San

6    Antonio, Texas.

7            And then these other -- Defendant Deborah Allen was a

8    resident of Bulverde, Texas, and at various times worked for

9    Adkins Financial and Defendant Cheryl Brooks.

10           And then the next few, Defendants Mauricio Betes,

11   Stephen Brott, Rick Russell, Anthony Lorek, Claude Vaughn,

12   Glynnwood Bowman, Stanley Roos, were people that -- the

13   evidence has shown some of those were the people who bought

14   these properties.

15           JPMorgan Chase was a federally-insured bank whose

16   deposits were insured by the Federal Deposit Insurance

17   Corporation.  Similarly, were Wells Fargo Bank, federally

18   insured and Countrywide Bank, federally insured.

19           I'm now at paragraph 27.  AmericaHomeKey; WNC

20   Mortgage Corporation; Taylor, Bean & Whittaker; Freedom

21   Mortgage; GMAC Mortgage; Option One Mortgage; Long Beach

22   Mortgage; Ampro Mortgage and Trian were companies engaged in

23   the business of mortgage lending nationwide.

24           Trian was located in Austin, Texas.  Equity Title of

25   Texas was a title company engaged in the business of real

```
1   estate closings.  Adkins Financial Group was an entity located
2   in San Antonio, Texas, engaged in the business of arranging
3   residential mortgage loans for various mortgage lenders.
4           Supreme Mortgage Group was an entity located in San
5   Antonio, Texas, engaged in the business of arranging
6   residential mortgage loans for customers with various mortgage
7   lenders.
8           Bronco Mortgage was an entity located in Houston,
9   Texas, engaged in business of arranging residential mortgage
10  loans for customers with mortgage -- with various mortgage
11  lenders.  And, similarly, Alethus dba AmeriNet was that type of
12  mortgage loan, residential, entity as well.
13          Count 1 of the indictment alleges, by the grand jury,
14  that from on or about May 17, 2005, to on or about February
15  21st, 2008, in the Western District of Texas, the Northern
16  District of Texas and elsewhere, that the defendants, including
17  Robert Brooks, who is the only defendant on trial in this
18  matter, and all of these other defendants named here, and going
19  to Page 6 then, that those people and others known and unknown
20  to the grand jury did willfully and knowingly combine,
21  conspire, confederate and agree together and with each other
22  and other persons to devise a scheme to defraud one or more
23  federally-insured financial institutions and other mortgage
24  companies, and to obtain money and property by means of false
25  and fraudulent pretenses, representations and promises, and to
```

cause the use of the mails and interstate wire transfers for
the purpose of executing and attempting to execute their
fraudulent scheme.

It was the object of the conspiracy to obtain money
from mortgage proceeds through the use of simultaneous purchase
at or about fair market value and sale, and then sell at an
artificially inflated price known as a land flip or property
flip.

The conspiracy and scheme to defraud were
accomplished through the following means:  The Defendants
Robert Brooks and Cheryl Brooks engaged in the business of
buying and simultaneously selling condos and conventional
residences, otherwise known as "flipping."  Defendant Robert
Brooks, directly or with the assistance of others, located
residential property which was for sale.  Defendant Robert
Brooks and others recruited persons to act as nominee buyers of
the properties.

Defendant Robert Brooks told the nominee buyers that
mortgages would be arranged for them; that no fees or
downpayments would be required from them; that they would
receive a large sum of money, $10,000 plus, at the real estate
closing for their participation; that all closing costs would
be paid; that monthly mortgage payments for the first 12 months
of the mortgage would be paid with funds set aside at the time
of closing, and that occupancy use and subsequent resale of the

```
1    properties would be handled by Defendant Robert Brooks.

2            Defendant Robert Brooks and appraisers, or in some

3    instances appraiser trainees, specifically Defendant Cedric

4    Lester and Casey Vaughn, for -- inflated real estate

5    appraisals, which would support the amount of mortgages which

6    Defendant Robert Brooks and various others were fraudulently

7    attempting to obtain.

8            Defendant Robert Brooks and Cheryl Brooks engaged

9    Supreme Mortgage Group, Adkins Financial, Bronco Mortgage and

10   Alethus dba AmeriNet to obtain mortgage loans for condo

11   purchaser nominees and several conventional residents purchaser

12   nominees.

13           Defendant Robert Brooks and Cheryl Brooks engaged

14   Defendants Quintanilla, Manuel and Buckholt as loan processors

15   to prepare mortgage loan applications for the nominees which

16   contained false and fictitious information and material

17   omissions necessary to get the mortgage loan approved, such as

18   bank statements that materially overstated or completely

19   fabricated applicant bank balances.  Other falsities included

20   income, assets, liabilities, employment, marital status and

21   intended occupancy of the properties.

22           Defendants Robert Brooks, Cheryl Brooks, Joseph

23   Cooper, Vadim Gazanchiyants, George Autobee, Deborah Allen,

24   Mauricio Betes, Stephen Brott, Rick Russell, Anthony Lorek,

25   Claude Vaughn, Glynnwood Bowman falsified information on
```

```
 1    mortgage loan applications.
 2            Defendants Robert Brooks, Cheryl Brooks, Quintanilla,
 3    Manuel, Buckholt, Bettes, Brott, Russell, Lorek, Vaughn and
 4    Roos caused moneys to be temporarily deposited into nominees'
 5    bank accounts to make it appear the nominees had sufficient
 6    funds on hand to qualify for the mortgage loan being sought.
 7    These moneys were returned to Defendant Cheryl Brooks or
 8    forwarded to yet another nominee's account, once the nominee's
 9    bank had completed a verification of deposit to be submitted to
10    the mortgage lender.
11            Defendant Robert Brooks and Yvonne Quintanilla caused
12    changes to be made in commitments for title insurance documents
13    that were prepared by the title companies, closing the real
14    estate purchases.  The original commitment for title insurance
15    documents listed the actual developer/seller of the real estate
16    as the owner of the record -- of record.  Prior to submitting
17    the commitment documents to the mortgage company, as part of
18    the loan application package, the name of the actual
19    developer/seller was whited out and replaced with Relocation
20    Studio, Texas Residential Properties or Upscale Realty.
21            These deceptions concealed from mortgage lenders the
22    fact that Defendant Robert Brooks was simultaneously buying and
23    selling the real estate in flip transactions, and concealed the
24    true market values of the real estate from the mortgage lender.
25            Defendants Geraldine Williams and Cesar Gonzales
```

1   caused commitments for title insurance documents to be
2   falsified by stating that Upscale Realty was the owner of the
3   property for the subsequent sale, when, in fact, it had not yet
4   purchased the property.
5           Defendant Robert Brooks used the proceeds from the
6   purported sales to various nominees to pay for his initial
7   purchase of the real estate, to pay closing costs for both his
8   purchase and sale to the nominee, to pay the nominee's
9   downpayment, to pay the nominee for the nominee's participation
10  and to pay the mortgage for the first 12 months, after which
11  each mortgage went into default.
12          To effect the purpose and object of this conspiracy,
13  and the scheme to defraud, the following overt acts, among
14  others, were committed in the Western District of Texas, the
15  Northern District of Texas or elsewhere.  Beginning on or about
16  May 17, 2005, Robert Brooks and Richard Howard conducted a
17  simultaneous flip for number XXXX XXXXXXXXX XXXX in McKinney,
18  Texas.
19          And then it goes on, on each of these dates, and it
20  mentions Robert Brooks and other people conducting a
21  simultaneous flip.  Paragraph 15 is number XXXX XXXXXXX XXX,
22  Heath, Texas.  Number -- paragraph 16 is number XXXX XXXXX XX
23  in Dallas.  On or -- and then paragraph 17, on or about
24  September 29, 2006, L.C. caused a nominee to sign a Uniform
25  Residential Loan Application.

```
 1              On October 3rd, 2006, Stacey Owens sent documents via
 2    UPS.
 3              October 2nd Robert Brooks, et al, conducted a
 4    simultaneous flip on number XXXX XXXXX XXXX XXXX in Dallas,
 5    Texas.
 6              September 13, 2006, Defendants Cooper and Autobee
 7    signed a residential sales contract.
 8              September 19, 2006, Defendant Autobee signed a
 9    Uniform Residential Loan Application.
10              October 4, 2006, Defendants Cooper and Autobee signed
11    HUD-1 settlement statement.
12              October 4, 2006, Robert Brooks and others conducted a
13    simultaneous closing of a flip in connection with number XXXX
14    XXXXXXXX XXXX in Heath, Texas.
15              Paragraph 24, October 4, 2006, Robert Brooks, Richard
16    Howard, Stacey Owens and Cedric Lester conducted a simultaneous
17    flip on XXXX XXXXX XXX in Rockwall, Texas.
18              November 17, 2006, Defendant Brooks and others
19    conducted the flip on Condo 7202 in Dallas, Texas.
20              And then we get into those condos with just the condo
21    numbers.  The next date -- on the same date, November 17, 2006,
22    Defendant Brooks and others did the flip on 7203.
23              January 26, 2007, Defendant Robert Brooks did the
24    flip on XXXX XXXXX XX in Dallas, Texas.
25              January 18, George Autobee signed another Uniform
```

1    Residential Loan Application.

2            January 18, 2007, Defendant Autobee signed the HUD-1

3    settlement.

4            January 22nd, 2007, L.C. sent documents via Lone Star

5    Overnight to Defendant Stacey Owens.

6            January 26, 2007, Defendant Robert Brooks and others

7    conducted a flip in connection with Condo 7103.

8            February 26, 2007, Robert Brooks conducted -- and

9    others conducted a simultaneous flip with a house in XXXX

10   XXXXXXXX in Heath, Texas.

11           February 27, 2007, Robert Brooks, the defendant,

12   conducted a simultaneous closing or flip on Condo 1107 in

13   Dallas, Texas.

14           March 8, 2007, Defendant Robert Brooks did a

15   simultaneous flip on Condo 4102 in Dallas, Texas.

16           March 30th, 2007, Defendant Robert Brooks and others

17   did a simultaneous closing flip on Condo 5102 in Dallas, Texas.

18           June 15, 2007, Defendants Quintanilla, Manuel and

19   Buckholt caused documents to be sent to Bulverde, Texas via DHL

20   Express.

21           June 15, Robert Brooks, the defendant, and others

22   conducted a simultaneous flip on Condo 1103 in Dallas, Texas.

23           January -- June 18, 2007, Robert Brooks signed a

24   HUD-1 settlement statement.

25           July 5th, 2007, Robert Brooks and others conducted a

 1   simultaneous flip on Condo 1203 in Dallas, Texas.

 2           July 6, 2007, Robert Brooks and others conducted a

 3   simultaneous closing flip in connection with Condo 5206.

 4           July 9, 2007, Defendant Stacey Owens sent documents

 5   via UPS to a mortgage lender in Austin, Texas.

 6           July 9, 2007, Robert Brooks, the defendant, and

 7   others conducted a simultaneous flip on Condo 3105.

 8           July 18, 2007, Defendant Robert Brooks and others

 9   conducted a simultaneous flip on Condo 3206.

10           July 18, 2007, Stacey Owens sent documents -- you

11   know, Mr. Miller, you read and I'll pour.  Y'all just think

12   this is water.

13           All right.  Where was I?  July 18, 2007, Robert

14   Brooks, et al, the defendants, conducted a simultaneous --

15           MR. HARRIS:  Excuse me, Your Honor.

16           THE COURT:  -- closing flip on Condo 3206.

17           MR. HARRIS:  Your Honor, I believe that you skipped

18   over 44.  You stopped for water as you were about to begin

19   paragraph 44.

20           THE COURT:  Yes.  Right.  Okay.  July 18, Stacey

21   Owens sends documents via UPS to AFM in Austin, Texas.

22           July 26, 2007, Defendant Brooks, et al, conducted a

23   simultaneous flip on Condo 5208 in Dallas, Texas.

24           July 31, 2007, Defendant Robert Brooks and others

25   conducted a simultaneous closing or flip in Condo 6206 in

1    Dallas, Texas.

2              July 10, 2007, Defendant Deborah Allen faxed

3    photocopies of her driver's license and Social Security card to

4    Defendant Yvonne Salazar Quintanilla.

5              August 17, 2007, Deborah Allen signed a Uniform

6    Residential Loan Application on Condo 1104.  Deborah Allen, on

7    that same date, signed a Uniform Residential Loan Application.

8              August 20th, Deborah Allen sent documents by Lone

9    Star Overnight from Bulverde to Defendant Cesar Gonzales.

10             August 21, 2007, Robert Brooks, the defendant, and

11   others conducted a simultaneous flip on Condo 1104 in Dallas,

12   Texas.

13             August 22nd, 2007, Defendant Robert Brooks and others

14   conducted a simultaneous flip on Condo 1101.

15             On or about August 21, 2007, Defendant Robert Brooks

16   and others conducted a simultaneous flip on Condo 5204 in

17   Dallas.

18             August 30th, 2007, Robert Brooks and others conducted

19   a simultaneous flip on Condo 1105 in Dallas.

20             September 4, 2007, Defendant Robert Brooks and others

21   conducted a simultaneous flip on Condo 2103 in Dallas.

22             September 5, 2007, Defendant Robert Brooks and others

23   conducted a simultaneous closing or flip on Condo 3106 in

24   Dallas.

25             September 7, 2007, Defendant Robert Brooks and others

1  conducted a simultaneous flip on Condo 7204.

2           October 30th, 2007, Defendant Robert Brooks and
3  others conducted a simultaneous flip on Condo 1201.

4           November 2nd, 2007, Defendant Robert Brooks and
5  others conducted a simultaneous flip on Condo 7110.

6           On November 6, 2007, closing documents for 7110 were
7  sent via DHL Express to Wells Fargo Home Mortgage.

8           On September -- excuse me -- November 7, 2007, Robert
9  Brooks and others conducted a simultaneous flip on 4101, condo
10 in Dallas, Texas.

11          November 7, 2007, Robert Brooks and others conducted
12 a simultaneous flip on Condo 6208 in Dallas, Texas.

13          December 20, 2007, Defendant Robert Brooks and others
14 conducted a simultaneous flip on Condo 7101 in Dallas, Texas.

15          December 20, 2007, Defendant Robert Brooks and others
16 conducted a simultaneous flip on Condo 5108 in Dallas, Texas.

17          December 26, 2007, Defendant Robert Brooks and others
18 conducted a simultaneous flip on Condo 5105 in Dallas, Texas.

19          December 26, 2007, Geraldine Williams sent the
20 closing documents for Condo 5105 via Fed-Ex to Countrywide Bank
21 in Austin, Texas.

22          On or about December 26, 2007, Robert Brooks, the
23 defendant, and others conducted a simultaneous flip in
24 connection with Condo 5104 in Dallas, Texas.

25          On or about December 31, 2007, Defendant Deborah

1    Allen sent closing for Condo 4205 from Bulverde, Texas via

2    American Airlines Priority Parcel Service to Robert Brooks, the

3    defendant, in Dallas, Texas.

4              January 2nd, 2008, Robert Brooks and others, the

5    defendants, conducted a simultaneous flip on Condo 4205 in

6    Dallas.

7              January 16, 2008, Defendant Robert Brooks and others

8    did a simultaneous flip on Condo 6201 in Dallas, Texas.

9              February 5th, 2007, Defendant Robert Brooks conducted

10   a simultaneous flip on Condo 4106 in Dallas, Texas.

11             February 21, 2008, Defendant Robert Brooks and others

12   did a simultaneous flip on Condo 7205 in Dallas, Texas.

13             All of that, the government alleges by indictment

14   from the grand jury, is in violation of Title 18, United States

15   Code, Section 1349.

16             Count 2 of the indictment incorporates all of that

17   previously read material and alleges that on or about October

18   4, 2006, Defendant Robert Brooks, Cheryl Brooks, Stacey Owens

19   and Cedric Lester, aided and abetted by each other and others

20   known to the grand jury, for purpose of executing the above

21   described scheme to defraud and obtained money and property by

22   means of false and fraudulent pretenses, representations and

23   promises, did knowingly cause to be delivered by a private

24   commercial carrier, to wit:  UPS, according to the directions

25   thereon, from Flower Mound, Texas, in the Northern District of

1  Texas, to Supreme Mortgage Group in San Antonio, Texas, in the

2  Western District of Texas, items relating to the closing for

3  number XXXX XXXXX XXXX XXXX in Dallas, Texas, in violation of

4  Title 18, United States Code, Section 1341 and 2.

5          Now, Count 3, 4, 5, 7, 8 and 9 allege those same

6  kinds of use of interstate carriers to transport these papers

7  that you've seen the exhibits of.  I'll go back to Count -- and

8  it has different people involved in each count, but Robert

9  Brooks is alleged to be involved in each of those counts.

10          Count 6, the government has agreed, and the Court has

11  granted the defense motion to dismiss Count 6 for various

12  technical legal reasons.  So you don't have to be bothered with

13  Count 6.

14          And all of those counts involving use of interstate

15  commerce and interstate entities all are alleged by the grand

16  jury to be a violation of Title 18, United States Code, Section

17  1341 and 2.  All right.  That was -- yes.  All right.  That

18  concludes the reading of the indictment.  Now -- for that

19  conspiracy and the real estate mortgage case.

20          Next, you'll find the indictment for the income tax

21  matters which alleges in Count 1 that on or about October 21st,

22  2008, in the Western District of Texas, Robert Brooks did

23  willfully aid and assist in, and procure, counsel and advise

24  the preparation and presentation to the Internal Revenue

25  Service of a joint United States Individual Income Tax Return

1    Form 1040, of himself and his wife, for the calendar year 2007.

2    The return was false and fraudulent as to a material matter in

3    that it reported on Line 17, Schedule E income in the amount of

4    $200,991, whereas, as the Defendant then and there well knew,

5    he and his wife had Schedule E income well in excess of that

6    amount.  And that, the grand jury alleges, is a violation of

7    the Title 26, United States Code, Section 7206(2).

8            Count 2, on or about October 21, 2008, in the Western

9    District of Texas, Cheryl Brooks -- actually that -- we don't

10   need to read that because she's already pled guilty, and she's

11   not on trial.

12           Count 3, on or about October 27, 2008, in the

13   District of Utah, the defendants did willfully aid and assist

14   in, and procure, counsel and advise the preparation and

15   presentation to the Internal Revenue Service of a U.S. return

16   of partnership income Form 1065 of Upscale Realty, LLC, for the

17   tax year April 10, 2007, to December 31, 2007.  The return was

18   false and fraudulent as to a material matter in that it

19   reported on Line 20 Other Deductions in the amount of $798,855,

20   whereas, the Defendants well knew, included in that amount was

21   a $475,000 "management fee" to a corporation partly owned by

22   Robert Brooks which had not in fact been paid.  And that's

23   alleged to be a violation of Title 26, United States Code,

24   Section 7206(1).

25           Count 1 -- and we're going back now to the elements

1    that you have to focus on on the conspiracy case.  Title 18,

2    United States Code, Section 1349, makes it a crime for anyone

3    to conspire to use the mails in carrying out a scheme to

4    defraud.

5            The Defendant is charged with conspiring to use the

6    mails and interstate wire transfers for the purpose of

7    executing and attempting to execute a fraudulent scheme,

8    obtaining money from mortgage proceeds through the use of

9    simultaneous purchase at or about fair market value and sale at

10   an artificially inflated price, known as a land flip or

11   property flip.

12           A conspiracy is an agreement between two or more

13   persons to join together to accomplish some unlawful purpose.

14   It is a kind of partnership in crime in which each member

15   becomes the agent of every other member.

16           For you to find the defendant guilty of this crime,

17   you must be convinced that the government has proved each of

18   the following beyond a reasonable doubt:

19           First:  That the defendant and at least one other

20   person made an agreement to commit the crime of mail fraud as

21   charged in the indictment.

22           Second:  The defendant knew the unlawful purpose of

23   the agreement and joined in it willfully, that is, with the

24   intent to further the unlawful purpose; and

25           Third:  That one of the conspirators during the

1    existence of the conspiracy knowingly committed at least one of

2    the overt acts described in the indictment, in order to

3    accomplish some object or purpose of the conspiracy.

4           One may become a member of a conspiracy without

5    knowing all of the details of the unlawful scheme or the

6    identities of all the other alleged conspirators.  If a

7    defendant understands the unlawful nature of a plan or scheme

8    and knowingly or intentionally joins in that plan or scheme on

9    one occasion, that is sufficient to convict him for conspiracy

10   even though the defendant had not participated before and even

11   though the defendant played only a minor part.

12          The government need not prove that the alleged

13   conspirators entered into any formal agreement, nor that they

14   directly stated between themselves all of the details of the

15   scheme.  Similarly, the government need not prove that all of

16   the details of the scheme alleged in the indictment were

17   actually agreed upon or carried out.  Nor must it prove that

18   all of the persons alleged to have been members of the

19   conspiracy were such or that the alleged conspirators actually

20   succeeded in accomplishing their purpose -- their unlawful

21   objectives.  Excuse me.

22          Mere presence at the scene of an event, even with

23   knowledge that a crime is being committed, or the mere fact

24   that certain persons may have associated with each other and

25   may have assembled together and discussed common aims and

Chris Poage, RMR, CRR
United States Court Reporter

interests, does not necessarily establish proof of the existence of a conspiracy.  Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

Counts 2 through 5 and 7 through 9, mail fraud. Title 18, United States Code, Section 1341, makes it a crime for anyone to use the mails in carrying out a scheme to defraud.  Each separate use of the mails in furtherance of a scheme to defraud constitutes a separate offense.

For you to find the defendant guilty of Counts 2 through 9, excluding Count 6, of course, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First:  That the defendant knowingly created a scheme to defraud, that is to obtain money from mortgage proceeds through the use of a simultaneous purchase at or about fair market value and sale at an artificially inflated price, known as a land flip or property flip;

Second:  That the defendant acted with specific intent to defraud;

Third:  That the defendant mailed something or caused another person to mail something through the United States Postal Service or a private or commercial interstate carrier for the purpose of carrying out the scheme, to wit -- and then

1    it lists the various counts involving mail fraud.

2         Count 2 involving UPS.  Count 3 involving Lone Star

3    Overnight.  Count 4 involving DHL Express.  Count 5 involving

4    UPS.  Count 7, Lone Star Overnight.  Count 8, Federal Express.

5    And Count 9, American Airlines Priority Parcel Service.

6         Fourth:  The government must prove to you that the

7    scheme to defraud employed false, material representations;

8    And

9         Fifth:  That the scheme affected a financial

10   institution in Count 2 and Count 8.  The parties have

11   stipulated for purposes of Count 2 that Supreme Mortgage Group

12   in San Antonio, Texas is a financial institution.  The parties

13   have also stipulated for purposes of Count 8 that Countrywide

14   Bank is a financial institution.

15        A scheme to defraud includes any scheme to deprive

16   another of money, property or the intangible right to honest

17   services by means of false or fraudulent pretenses,

18   representations or promises.

19        An intent to defraud means an intent to deceive or to

20   cheat someone.

21        A representation is false if it is known to be untrue

22   or is made with reckless indifference as to its truth or

23   falsity.  A representation would also be false when it

24   constitutes a half-truth or effectively omits or conceals a

25   material fact, provided it is made with intent to defraud.

1    A false statement is material if it has a natural

2  tendency to influence or is capable of influencing the decision

3  of the person or entity to which it is addressed.  It is not

4  necessary that the government prove all of the details alleged

5  in the indictment concerning the precise nature and purpose of

6  the scheme, or that the mailed material was itself false or

7  fraudulent, or that the alleged scheme actually succeeded in

8  defrauding anyone, or that the use of the mail was intended as

9  the specific or exclusive means of accomplishing the alleged

10 fraud.

11    What must be proved beyond a reasonable doubt is that

12 the defendant knowingly devised or intended to devise a scheme

13 to defraud that was substantially the same as the one alleged

14 in the indictment and that the use of the mails was closely

15 related to that scheme in that the defendant either mailed

16 something or caused it to be mailed in an attempt to execute or

17 carry out the scheme.  To cause the mails to be used is to do

18 an act with knowledge that the use of the mails will follow in

19 the ordinary course of business or where such use can

20 reasonably be foreseen even though the defendant did not intend

21 or request the mails to be used.

22    The guilt of a defendant in a criminal case may be

23 established without proof that the defendant personally did

24 every act constituting the offense alleged.  The law recognizes

25 that ordinarily anything a person can do for himself may also

Chris Poage, RMR, CRR
United States Court Reporter

1  be accomplished by him through the direction of another person

2  as his or her agent or by acting in concert with or under the

3  direction of another person or persons in a joint effort or

4  enterprise.

5          If another person is acting under the direction of

6  the defendant or if the defendant joins another person and

7  performs acts with the intent to commit a crime, then the law

8  holds the defendant responsible for the acts and conduct of

9  such other persons just as though the defendant had committed

10  the acts or engaged in the conduct.

11          Before any defendant may be held criminally

12  responsible for the acts of others, it is necessary that the

13  accused deliberately associate himself in some way with the

14  crime and participate in it with the intent to bring about the

15  crime.

16          Of course, mere presence at the scene of a crime,

17  knowledge that a crime is being committed, are not sufficient

18  to establish that the defendant either directed or aided and

19  abetted the crime unless you find beyond a reasonable doubt

20  that the defendant was a participant and not merely a knowing

21  spectator.  In other words, you may not find the defendant

22  guilty unless you find beyond a reasonable doubt that every

23  element of the offense as defined in these instructions was

24  committed by some person or persons and that the defendant

25  voluntarily participated in its commission with the intent to

1    violate the law.

2           The good faith of a defendant is a complete defense

3    to the charge of mail fraud in the indictment because good

4    faith on the part of the defendant is inconsistent with the

5    intent to defraud.

6           A person who acts or causes another person to act on

7    a belief of an opinion -- or an opinion honestly held is not

8    punishable under the statute merely because the belief or

9    opinion turns out to be inaccurate, incorrect or wrong.  An

10   honest mistake in judgment or an honest error in management

11   does not rise to the level of criminal conduct.

12          A defendant does not act in good faith if, even

13   though he honestly holds a certain opinion or belief, that

14   defendant also knowingly makes false or fraudulent pretenses,

15   representations or promises to others.

16          While the term good faith has no precise definition,

17   it encompasses, among other things, a belief or opinion

18   honestly held, an absence of malice or ill will, and an

19   intention to avoid taking unfair advantage of another.

20          The burden of proving good faith does not rest with

21   the defendant because the defendant does not have any

22   obligation to prove anything in this case.  It is the

23   government's burden to prove to you beyond a reasonable doubt

24   that the defendant acted with the intent to defraud.

25          If the evidence in the case leaves you with a

1    reasonable doubt as to whether the defendant acted with intent

2    to defraud or in good faith, you must acquit the defendant.

3              Now it is the income tax case.  Title 26, United

4    States Code, Section 7206, makes it a crime for anyone

5    willfully to aid or assist in the preparation under the

6    Internal Revenue laws of a document which is false or

7    fraudulent as to any material matter.  Each separate act

8    constitutes a separate offense.

9              For you to find the defendant guilty of this crime,

10   as alleged in Count 1 and Count 3, you must be convinced that

11   the government has proved each of the following beyond a

12   reasonable doubt:

13             First:  That the defendant aided in, assisted in,

14   procured, counseled and advised the preparation and

15   presentation of a return arising under the Internal Revenue

16   laws;

17             Second:  That in this return the defendant falsely

18   stated that, in Count 1, the gross income was $200,991 in 2007,

19   and in Count 3, that Upscale Realty had other deductions in the

20   amount of $798,855;

21             Third:  That the defendant knew that the statement in

22   the return was false; and

23             Fourth:  That the false statement was material; and

24             Fifth:  That the defendant aided in, assisted in,

25   procured, counseled and advised the preparation and

1    presentation of this false statement willfully, that is, with

2    the intent to violate a known legal duty.

3         It is not necessary that the government prove that

4    the falsity or fraud was with the knowledge or consent of the

5    person authorized or required to present such return.

6         A statement is material if it has natural tendency to

7    influence or is capable of influencing the Internal Revenue

8    Service in investigating or auditing a tax return or in

9    verifying or monitoring the reporting of income by a taxpayer.

10        The word knowingly, as that term has been used from

11   time to time in these instructions, means that the act was done

12   voluntarily and intentionally, not because of accident or

13   mistake.

14        Evidence that the defendant in good faith followed

15   the advice of counsel would be inconsistent with an unlawful

16   intent to violate a known legal duty as charged in both

17   indictments.  Unlawful intent has not been proved if the

18   defendant, before acting, made a full and complete good faith

19   report of all material facts to an attorney he or she

20   considered competent;

21        Second:  Received that attorney's advice as to the

22   specific course of conduct that was followed; and

23        Third:  Reasonably relied upon that advice in good

24   faith.

25        To reach a verdict, whether it is guilty or not

1   guilty, all of you must agree.  Your verdict must be unanimous

2   on each count of the indictment.  Your deliberations will be

3   secret.  You will never have to explain your verdict to anyone.

4               It is your duty to consult with one another and to

5   deliberate in an effort to reach agreement if you can do so.

6   Each of you must decide the case for yourself but only after an

7   impartial consideration of the evidence with your fellow

8   jurors.  During your deliberations do not hesitate to reexamine

9   your own opinions and change your mind if you are convinced

10  that you are wrong.  But do not give up your own honest belief

11  as to the weight or effect of the evidence solely because of

12  the opinion of your fellow jurors or for the mere purpose of

13  returning a verdict.

14              Remember at all times, you are the judges, judges of

15  the facts.  Your duty is to decide whether the government has

16  proved the defendant guilty beyond a reasonable doubt.

17              When you go to the jury room, the first thing you

18  should do is select one of your number as your presiding juror

19  who will help to guide your deliberations and speak for you

20  here in the courtroom.

21              A form of verdict has been prepared for your

22  convenience.

23              The presiding juror will write the unanimous answer

24  of the jury in the space provided for each count of the

25  indictments, either guilty or not guilty.  At the conclusion of

1    your deliberations, the presiding juror should date and sign

2    the verdict.

3            If you need to communicate with me during your

4    deliberations, the presiding juror should write the message and

5    give it to the Court Security Officer.  I will either reply to

6    you in writing or bring you back into the courtroom to answer

7    your message.

8            Bear in mind that you are never to reveal to any

9    person, not even to the Court, how the jury stands, numerically

10   or otherwise, on any count of the indictments until after you

11   have reached a unanimous verdict.

12           There follows then the verdict forms, first for the

13   Cause No. 10-CR-536.  And that has eight different places for

14   you to answer.

15           Here, after a brief stretch recess, Mr. Harris is

16   going to close his summation for you, and he will tell you why

17   he thinks you ought to write in the word "guilty" on each

18   blank.  After that, Mr. Gordon will give his closing summation.

19   He will advocate on behalf of Mr. Brooks why he believes you

20   should write the word "not guilty" on each blank.

21           Now, each lawyer has an equal amount of time.  They

22   may or may not use all of the time that they are allotted.  But

23   because the government has the burden of proof, Mr. Harris has

24   the option and opportunity to give some statements and

25   summation at the beginning, when we come back here in a moment,

1  then Mr. Gordon will give his advocacy for Mr. Brooks, and then

2  Mr. Harris, because the government has the burden of proof,

3  will get to give the final closing argument.

4          So with that, we will be in recess for ten minutes,

5  and you-all get ready.

6     (Recess at 11:01 a.m. until 11:12 a.m., jury in, defendant

7  present, open court)

8          THE COURT:  You may be seated.  Thank you.

9          Mr. Harris, you may proceed to make your presentation

10  to the jury.

11                    **CLOSING STATEMENT**

12          MR. HARRIS:  Thank you very much, Your Honor.  May it

13  please the Court, students, ma'am, ladies and gentlemen of the

14  jury.  Good morning.

15          I submit to you that over the course of this trial we

16  have produced evidence that proves each and every one of the

17  elements of the offenses submitted to you beyond a reasonable

18  doubt.

19          You may recall that when I stood before you in

20  opening statement and gave you an overview, I even told you

21  that there was one count for which we may not have the proof of

22  the interstate shipment and that that count would not be

23  submitted to you.  And, indeed, that has come to pass.

24  However -- and I'll get into more detail on it later -- I do

25  submit that it is still relevant to the overall conspiracy and

1    the overall scheme.

2              But, first, we're going to talk tax.  We're going to

3    talk about the tax counts.  And while I submit to you that

4    there's evidence for each and every element beyond a reasonable

5    doubt, I'm also going to submit to you that there are certain

6    elements that I believe are not much in dispute and, therefore,

7    I won't spend that much time on them.

8              For instance, the element that both the Upscale

9    Realty return and the Brooks' personal 1040s were false as to

10   a material matter, I don't think that's in dispute.  I think

11   even their own expert testified that the $475,000 Amadeus

12   management fee should never have been in there.

13             So the return is wrong.  It's false as a material

14   matter.  It falsely increased the other deductions of Amadeus

15   to 798,000 -- I'm sorry -- the other deductions of Upscale to

16   $798,855; that that reduced Upscale's gross profit by $475,000;

17   that that flowed over to the defendants' 1040, their personal

18   return -- the Defendant Robert Brooks' personal return, jointly

19   with his wife Cheryl -- I still use the term plural,

20   defendants -- that it thereby reduced their gross income by

21   $475,000 to the amount of 290,000 -- $200,991 that appears in

22   the indictment.  So the return's clearly false.

23             Is that the sort of information that is material, as

24   His Honor described?  Would that affect the operations of the

25   Internal Revenue Service?  Well, of course, it would.  It

1  reduced how much the tax was going to be owed.  It reduced, you

2  know, what amount they were expecting by a check to come in.

3  So, clearly, materially -- clearly material, clearly false.

4  Those elements I think are not in dispute.

5          The big question, of course, becomes, to borrow from

6  the old Watergate line, what did he know and when did he know

7  it?  Did he know that it was false?  Did he file it willfully,

8  that is with the intent to violate the known legal duty to file

9  a truthful income tax return?  And I submit to you that the

10 evidence indicates yes.  Cheryl Brooks testified that they

11 first looked at a draft of the return, prior to the creation,

12 out of thin air, of this management fee of $475,000.  And the

13 reaction in so many words was:  Holy cats, we can't pay that.

14          So they go to their CPA, Stephen Scheller, who had

15 the work papers of Carol Harlem, that showed what the real

16 income was.  That's what made it into the original 1040 he

17 prepared.  To prepare a 1040, he had to have prepared an

18 Upscale return first so that he would know what would flow

19 over.

20          And the defendant, I think, is going to indicate that

21 he had a reliance on Mr. Scheller, the professional CPA, to

22 give advice.  Now, other people tell lawyer jokes.  I tell

23 accountant jokes, which may not be pretty smart considering

24 some of the company I keep.  But here we go.

25          What's the difference between a mathematician, a

 1    statistician and an accountant?  You ask a mathematician, how
 2    much is two plus two, a mathematician is going to look at you
 3    and go, two plus two is four.
 4              You ask a statistician:  How much is two plus two,
 5    and a statistician is going to say that with a degree of
 6    certainty of 100 percent and a variance of zero, two plus two
 7    will be four.
 8              You ask a certain CPA, how much is two plus two, and
 9    he's going to ask, what do you want it to be?  And that, I
10    submit to you, is what happened here.  The Defendant Robert
11    Brooks knew they were falsifying Upscale's return so that they
12    could falsify their personal return, so the tax bite would be
13    reduced from -- and I forget the figures.  You saw it.  It was
14    something like from 292,000 to something like 68,000, which
15    reduced the check they were going to have to write from 145,000
16    to something like 45,000, infinitely more manageable.
17              And as Cheryl Brooks told you, she didn't undertake
18    any action without consulting Robert, without consulting the
19    defendant.  So I submit to you that he knew, clearly knew that
20    they were filing false tax returns.  He caused Cheryl to file
21    them.  These are not charging him with filing the returns.
22    They're charging him with causing the filing of the false tax
23    returns, causing the preparation of the false tax returns.  And
24    he did it through Scheller, and he did it through Cheryl.  So I
25    submit to you we've established that.

1    The next thing that I think is not going to be in

2    serious dispute is the mailings.  But I'm going to go over them

3    again very briefly, relatively speaking he says, to cover

4    those, nonetheless.

5    Count 2, which you will see -- recall, is the XXXX

6    XXXXXXX property, Helen Bruns.  AmericaHomeKey was on the

7    HUD-1.  Government's Exhibit 18-01 we showed you was a UPS

8    shipment, interstate carrier, from Stacey Owens in Flower

9    Mound, Texas at Equity Title to LeDale Coles, Supreme Mortgage

10   in San Antonio, Texas.  I don't think the interstate -- I don't

11   think the shipment through a commercial and interstate carrier

12   is going to be disputed.  Even though it was intrastate, it's

13   an interstate carrier.  His Honor has given you the instruction

14   on that.

15   Count 3 pertains to Condo 7103.  That was one of

16   George Autobee's.  Government's Exhibit 30-01 is the Lone Star

17   Overnight shipping bill.  The lender on this one was Taylor,

18   Bean & Whitaker Mortgage Group, which you saw on the HUD-1.

19   And that was yet another shipment from Stacey Owens, Equity

20   Title, Flower Mound, Texas to LeDale Coles, Supreme Mortgage

21   Group, San Antonio, Texas.

22   Count 4 pertains to Condo 1103, Richard Schroeder.

23   That one was financed by Trian Mortgage, the lady who testified

24   that she and her husband had the business, dba AFM, out of

25   Austin.  And there, we have a shipment.  Government's Exhibit

1   36-01 is the shipping bill from Pro Processing in Dallas to

2   Richard Schroeder's home in Bulverde, Texas.

3           Count 5 pertained to Condo 5206.  That's Jon Jezek,

4   the fellow who worked as the abstracter at Progressive Title,

5   also got his mortgage through Trian doing business as AFM.  And

6   Government's Exhibit 41-01 clearly shows that UPS carried

7   critical documents from Stacey Owens at Equity Title in Flower

8   Mound, Texas to Trian's closing department in Austin, Texas.

9           Count 7 -- Count 6 is out.  We failed to show

10  shipping.

11          Count 7 is Condo 1104.  That's Deborah Allen's -- one

12  of her two.  But 1104 is one of them.  That was financed

13  through Bronco Mortgage.  And Exhibit 50-01 she testified is

14  her own handwriting.  No, I'm sorry.  I misspeak.  That's to

15  Count 9.  Count 7, the evidence showed, and I believe she

16  testified, that that one is a shipment from Cesar Gonzales in

17  Dallas, Texas to Debbie Allen's home in Bulverde.

18          Count 8 is Condo 5105.  That's Rick Russell.  That

19  was financed by Countrywide Federal Savings Bank.  And

20  Government's Exhibit 66-01 shows that Geraldine Williams, at

21  Progressive Title in Dallas, Texas, sent the final closing

22  documents to Countrywide FSB in Austin Texas.

23          Finally, Count 9 is Condo 4205.  That's Dr. Stephen

24  Snider, the podiatrist.  His was financed through Freedom

25  Mortgage.  And you may recall that he testified he went to some

1    lady's house in Bulverde.  He described her as blond.  You saw
2    Deborah Allen.  She testified that some dude she'd never seen
3    before or since came to her house for closing.  Clearly, it was
4    Dr. Snider.  She testified that she was asked to take the
5    closing documents after he signed them to the airport, put them
6    on a plane up to Dallas.  And, indeed, Government's Exhibit --
7    we forgot to write it down, but we put it up on the screen for
8    you, "he" being me.  American Airlines, from Deborah Allen,
9    to -- and she listed a series of names, specifically Yvonne, it
10   looked like maybe, or Juan Salazar -- no, Quintanilla.  That
11   one was Quintanilla, or Geraldine Williams or Robert Brooks at
12   Pro Processing.  So we have clearly established the mailing
13   element, I believe.
14             So, again, we come down to the scheme.  Was there
15   a conspiracy to carry out the scheme?  They overlap.  A meeting
16   of the minds.  Because, really, most of the other elements I
17   think are also not in dispute.  Most of the things that we have
18   alleged are not going to be in serious dispute.  We have shown
19   you time and time and time again.  We've put up samples of the
20   40 some properties that are in the indictment.  We focused
21   primarily on the transactions relating either to the specific
22   eight counts I just talked about or San Antonio people that
23   overlap with those.  But all 40 HUDs are in evidence before
24   you.
25             Now, I've never seen the movie *Groundhog Day*, but

my understanding of the storyline is that basically this guy
wakes up to relive the same day over and over and over again.
And that's essentially what I submit to you is the HUD-1s.
They are all basically alike because the deal was alike.  The
main variance that you have seen is at some point we go from a
sales price of $445,000 to a sale price of $460,000.

You will notice that up until about August of '07
the HUD-1s all show that the flipper, if you will, is Texas
Residential Properties and the signature is that -- states R.
Brooks, either signed by Robert Brooks personally, and you have
samples of his handwriting on the checks that we've put into
evidence, when Cheryl Brooks told you that she recognized his
signature, those were all his.  You will note that on some of
the HUD-1s it is a different signature, but I submit to you it
was all authorized by the defendant.

Come early August of '07 there is a change.  And
that's when you will see that the flipper becomes Upscale
Realty, and the signature -- the signatory is that C. scrawl
that we have seen so much of Cheryl Brooks.  Those are the
same -- are the main differences that those are all in.  So I
don't think there's going to be a whole lot of dispute that
they were bought and sold at about the same day.  That's on
HUD-1 after HUD-1 after HUD-1.

Again, it's going to be whether this defendant
devised a scheme, conspired with others or whether he had a

1    good faith reliance on others.  And I submit to you that when
2    you look at the totality of evidence, some of which I'll touch
3    on shortly, there is no good faith.
4              I'm reminded of a movie that I did watch called
5    *Casa Blanca*.  And in that movie, you know, an early 1940s
6    classic, there is a scene in which the chief of police
7    professes that he is shocked, shocked to find out that there's
8    gambling in this establishment, as a waiter walks up to him and
9    says, "Your winnings, sir."
10             So the notion that Robert Brooks was shocked,
11   shocked to find out that there were falsities being made to
12   various lenders, I submit just does not hold true.
13             The evidence clearly showed that he devised this
14   scheme to defraud the lenders through the misrepresentations
15   and conspired with many others, several who have pleaded guilty
16   to conspiring with him.  Yvonne Salazar Quintanilla said she
17   conspired with Robert Brooks.  Cheryl Brooks testified that she
18   conspired with her own husband.  Painful, painful to put her
19   through that, but there you have it.
20             Cedric Lester testified that he conspired with
21   Robert Brooks.  Richard Howard, our first witness, how can I
22   forget Richard Howard, testified that he conspired with Robert
23   Brooks.
24             Now, I anticipate that we will hear a lot about
25   the fact that Richard Howard was a lawyer; that Richard Howard

 1     was a licensed professional, as were several of the names I
 2     just mentioned.  I submit to you that that is not -- is not
 3     enough to establish the reliance; that Robert Brooks had enough
 4     experience in real estate, as Richard Howard told you, far more
 5     so than he himself had, and that Robert Brooks was, indeed, the
 6     driving force behind this conspiracy.
 7                His Honor gave you instruction that to rely upon
 8     the advice of counsel, you have to have made a full and
 9     complete good faith report of all material facts to an
10     attorney.
11                And remember, I asked Mr. Howard, well, did he
12     mention this part of the transaction?  No.  Did he mention they
13     were going to do this part?  No.  Okay.  Well, what were you
14     told?  Well, we were told that the property had to be reported
15     before you could turn around and sell it?  And did he follow
16     that advice?  No.  So we don't have the good faith reliance
17     upon counsel, not Richard Howard and not the other unnamed
18     attorney that Mr. Howard testified that he and Mr. Brooks went
19     to see.
20                Now, you've also heard that the conspiracy can
21     reach out to others even though you may not have had direct
22     contact with Robert Brooks.  So the fact Deborah Allen pleaded
23     guilty to conspiracy and testified that her contacts with
24     Robert Brooks was minimal, does not save Robert Brooks from
25     being guilty of conspiracy.  She testified that her principal

1    contact was always Yvonne, Yvonne Salazar, but she also told

2    you that as Cheryl Brooks' assistant, she personally saw Robert

3    Brooks direct her and others.

4              His Honor also gave you instructions about the

5    notion of false, false and fraudulent, that an intent to

6    deceive, to defraud somebody includes making false and

7    fraudulent pretenses, representations and promises; that the

8    making of that includes not just the overt lies but also what

9    you leave out.

10             And we submit that that is very critical in what

11   happened here, because, as we've heard over and over, the

12   disclosure to the lender of the substance of the transaction,

13   the true nature of the transaction, is critical.  And in that

14   sense every single one of these second side HUD-1s are false,

15   every single one.  And the defendant knew it.

16             There are lots of blank lines, I pointed out, on

17   both seller side and buyer's side of a HUD-1 to disclose any

18   aspect of the transaction to the lender.  They did not do it.

19   Now, the defendant, I anticipate, is going to testify, "But,

20   hey, I wasn't the escrow officer.  I relied on Geraldine.  I

21   relied on Stacey Owens.  I relied on Cesar Gonzales.  I submit

22   again that is a false reliance.  He corrupted these people.

23   Stacey Owens, he came up with tens of thousands of dollars when

24   she needed a loan that she never paid back.

25             As far as the others, Geraldine Williams, Cesar

1    Gonzales, those were his employees.  He set up Progressive

2    Title, and he directed everyone in that office.

3              People went through other people, you heard.  On

4    the Pro Processing side Tamatha Buckholt and Niesha Manuel went

5    through Yvonne Salazar.  Cesar Gonzales went through Geraldine

6    Williams.  But they all reported -- and you heard the testimony

7    that both Geraldine and Yvonne reported to the defendant,

8    Robert Brooks.  So he is -- he is clearly in control of what is

9    going on.

10             And the false representations, I'm just going to

11   go over the biggest ones.  The biggest ones are starting -- I

12   almost feel like Letterman's Top 10, although I don't have ten.

13   Number one, that this is a typical arm's length, freely

14   negotiated price between unrelated buyer and seller.  Clearly

15   false.  Mr. Brooks just simply set the price and at either 460

16   or 445.  So he clearly knows it is not an arm's length

17   transaction.

18             Two, that the property is at or near fair market

19   value, at 460 or $445,000.  Well, I submit to you, and I'm

20   going to get into a little more detail on the appraisals, but

21   having both bought the property at or about the same time for

22   approximately half those amounts, having corrupted or misled

23   appraisers, he clearly knows that that's not the fair market

24   value for which he is now flipping it to the buyer for whom he

25   has obtained the mortgage loan.

```
 1              Third, that the buyer is putting the buyer's own
 2   money in, something that every single lender required.  We
 3   heard about a hundred percent financing loans, but we've never
 4   seen one in any of these.  These all range between 95 to 90
 5   percent.  And that is that cash at closing, cash due from
 6   borrower is critical.  Every representation being made to the
 7   lender is that buyer has skin in the game, real equity being
 8   put in, their own money being put in.  The defendant knows it's
 9   otherwise because that's how he set this whole thing up, to get
10   money fraudulently.
11              Four, the implication is that when borrower is
12   borrowing, borrower's going to pay back.  And yet, we have
13   clearly heard, time and again, even out of his own voice on the
14   Bettie Artis recording, that he's taking care of closing.  He's
15   taking care of downpayment, and he's paying the mortgage for
16   the first year.  So false representation.
17              Five, the implication that he bought sufficiently
18   before he sold so as to be the titleholder of record.  Clearly
19   not true.  We heard about title commitments being changed.  We
20   heard about the crudity of LeDale Coles and Yvonne Salazar at
21   Supreme Mortgage whiting out.  We heard that Robert Brooks was
22   upset about that and that that had something to do with the
23   termination of the relationship with LeDale.  But I submit to
24   you that the fact that he turns around and sets up Pro
25   Processing and Progressive Title, which bought the expensive
```

1   machinery -- Mr. Howard testified about the money to buy the

2   machinery.  Mr. Jezek gave it a name.  It was the plant, the

3   ability to do their own abstracts.  Geraldine had supervisory

4   access to the plant.  Geraldine could change title commitments.

5          I submit to you that he wasn't upset at LeDale

6   Coles for falsifying.  He was upset at her for using something

7   as crude as Whiteout, that with the difference of type or maybe

8   going over a line could be detected.  That's what I submit to

9   you he was upset about.

10         So, false -- I'm on number five still.  False in

11  indicating that he is the record titleholder.

12         Six, paid to play.  This is the most material

13  omission perhaps of all.  Nowhere, nowhere, nowhere is it being

14  disclosed to the lenders that he is paying these buyers

15  post-closing for having participated.  Pay to play.  Here's

16  $20,000.  Thank you very much, Ms. Artis, on your first condo.

17  Here's 10 -- $15,000, thank you very much, on your second

18  condo.  Here's $10,000.  Here's 7,500.  And she wasn't the only

19  one who testified to the money back post-closing.  We heard

20  that from others, and we heard it from both of the Schroeders.

21  We heard it from Joseph Cooper.  Clearly, omitting pay to play.

22         Next, seven, the verification of deposit fraud.

23  This, I submit to you, is huge.  We have tens of thousands of

24  dollars.  I think we saw as much as $90,000 in the email that

25  Mr. Brooks is being told needs to be placed in what is

1    virtually a total stranger's account until the VOD, the

2    verification of deposit, has been done so that they can give it

3    to the lender.

4                Mr. Brooks clearly knows that is going on because

5    he's authorizing it to Cheryl Brooks.  Not just from her

6    testimony, but we have seen emails from RB to CB.  Along those

7    lines of the no cash due at closing from the borrower, we have

8    seen many times where he directed her in the emails, where

9    Robert Brooks directed Cheryl Brooks in emails, get separate

10   check; check, don't wire; wire, separate check; as the emails

11   are flowing up as to what we need for first side, second side,

12   moneys being put into people's accounts and artificially beef

13   them up so that they will pass muster.

14               Eight, and I'm going to put with -- eight, as the

15   biggest, I probably could have gone to a top ten, but I wasn't

16   thinking of that last night.  Eight is the false employment.

17   And we saw how many people listed as The Studios -- The Studios

18   Online, Studio and Fashion, a variant of one of Mr. and Mrs.

19   Brooks' other companies.  And the indication is, didn't work

20   there.

21               We saw an email from Deborah Allen, and she

22   testified that at the time of her two condos, 1104 and 1101,

23   she was losing her job.  She was going to have to file for

24   unemployment.  And there's emails indicating, don't worry.

25   We'll come up with a job for you.  And what was listed on her

1    application, The Studios, three years.

2            Cheryl Bussey, the defendant's own mother-in-law,

3    The Studio, three years.  True information?  No.  False

4    information.  As I recall, I think -- let me think.  Who else

5    did we see?  Brenda Hardaway didn't testify, but you saw the

6    emails where Yvonne is sending up the chain, we need to come up

7    with different employment for Brenda Hardaway, and in so many

8    words said her employment isn't going to cut it.  And what do

9    we see on a mortgage app. for her?  The Studio, three years.

10   And all of -- at $12,000 a year.  I'm sorry.  $12,000 a month,

11   $144,000 a year.  They had a pattern.  The pattern worked.  And

12   speaking of worked, we'll come back to the notion of when it

13   worked and when it may not have worked.  We'll come back at

14   that.

15           So I submit to you that you have to look at this

16   in its totality to see the defendant's intent was to defraud,

17   was to conspire, that it was not that he was acting in good

18   faith.

19           As I indicated, there was testimony that he had

20   substantial experience in buying and selling real estate.  You

21   heard from Richard Howard that the defendant had told him he'd

22   been doing it for about eight years as of -- I think that was

23   2004, the conversation that was being relayed.  Even if it was

24   2006, as late as 2006, eight years, that's a substantial

25   amount.

1    Of course, the defendant knew enough to put money

2  into setting up such companies as Pro Processing, Progressive

3  Title.  Well, actually, prior to that, putting the moneys in to

4  set up Supreme Mortgage Group.  Then around the time of his

5  falling out with LeDale Coles, he sets up in-house with Pro

6  Processing, sets up Progressive Title.

7    And it's highly significant that the defendant,

8  from the testimony we had, is the only one, the only one who

9  knew all the details of the transaction.  Did you notice that?

10  Richard Howard and Cedric Lester testified, well, yeah, we knew

11  that we were inflating values, but we didn't realize they were

12  simultaneous flips.  We thought he had actually bought them in

13  advance before selling them.

14    Other people, Deborah Allen -- I'm drawing a

15  blank, but other people testified, well, yeah, I knew that we

16  were falsifying information with false employment, the

17  verification of deposit thing.  I'm not putting any money in.

18  But I didn't know the price was inflated.  I wouldn't have done

19  it if I knew the price was inflated.

20    The defendant is the only one who knows every

21  single detail of the transaction, not even Cheryl Brooks.

22  Cheryl Brooks told you she never attended one of his

23  presentations.  She doesn't even know what he told the

24  prospective investors, the straw buyers.  So he is the only one

25  who knew all the details of the transaction.

1    He and his wife are the ones who drew the largest
2    financial benefit from this thing, although, as clearly shown,
3    they certainly paid others a substantial financial benefit in
4    order to bring it about.
5    He was the head of this.  He controlled Pro
6    Processing, Progressive Title, Stacey Owens at a different
7    title company, Texas Residential Properties, Upscale Leasing
8    and each of the buyers.  And this is very important.  Is there
9    anyone who could fire Robert Brooks?  No.  Is there anyone he
10   couldn't fire?  No.
11   Now, the question was asked if there is anybody
12   that he couldn't fire, and you may recall the answer was
13   something along the lines of, well, I suppose he couldn't fire
14   one of his partners.  Well, I submit to you that while
15   technically maybe he can't fire one of his partners, what he
16   could simply do is stop using that given company, set up a new
17   one and move on.  So maybe he couldn't fire LeDale Coles from
18   Supreme Mortgage Group.  But let's face it, he did because he
19   stopped using her.  He set up Pro Processing, and he moved on.
20   There is no one he couldn't fire, including his wife.  I asked
21   her the question, did he ever fire you?  Yes.  Repeatedly?
22   Yes.  No one he couldn't fire.
23   On the tape with Bettie Artis we hear from the
24   defendant in his own words that very fact and the importance of
25   the very fact.  And I quote, "Everybody that I deal with, I own

1    part of their business, or I don't deal with them at all," end

2    quotes.  That is critical to making this scheme work out.  It's

3    critical to the conspiracy.  And it hurt people.  It hurt

4    financial institutions, and it hurt people.

5              Putting Bettie Artis on the stand -- well, let me

6    just word it this way.  Her testimony was heartbreaking.  It

7    was absolutely heartbreaking.  While she puts much of the blame

8    from the witness stand on Richard Howard, perhaps more so than

9    Robert Brooks, we also heard Howard testify that behind the

10   scene he was questioning Robert Brooks about Bettie Artis'

11   ability to even be carrying that much debt, to even, you know,

12   apply for and acquire that much debt.  And Mr. Brooks' response

13   was to the effect of:  Don't worry about it.

14             Also a theme that we heard from Cheryl Brooks,

15   don't worry about it, when she questioned how can we manage

16   this negative cash flow between what we're pulling in rents and

17   what we're paying out on mortgage payments?  Don't worry about

18   it, I'll handle it.  Don't worry about it, I'll handle it.

19             The defendant also told Richard Howard, when he

20   was questioning about the ability to take on this much debt for

21   Bettie Artis based on her information, her credit score, the

22   defendant made note of the fact that it takes time for these

23   mortgage applications to hit the system.  In other words,

24   strike fast, get the money, move on.  Use them up, move them

25   on.

1    The scheme needed new money to keep coming in to
2    succeed.  That was also critical, because you had this cash
3    flow that Cheryl Brooks talked about.  You know, we heard from
4    the defendant's own realtor.  The question I asked her on
5    cross-examination was, you know, how much were these rents
6    bearing?  Oh, about $1,800.  Also matched what Cheryl Brooks
7    told you.
8    I asked her to do a quick calculation on how much
9    a 36-month -- I used the figure ten percent, I think.  I think
10   we'll also see some as low as eight percent, 360-month,
11   30-year, 30-year mortgage, $400,000 mortgage -- most of these
12   were 414, but I rounded to make it easy.  And we heard that the
13   monthly debt expense was going to be $4,000.  So we have about
14   a $2,300 cash flow shortfall on property after property after
15   property.  So you need to have new money coming in for the
16   scheme to continue.  And I submit to you that that's why they
17   pushed Bettie Artis to do more properties.
18   I also will ask you to recall the testimony of Jon
19   Jezek.  He's the fellow who did -- who worked there, who saw
20   that his colleague Cesar had more scratch than he thought the
21   job would bear, and said:  Hey, dude.  How do you do that?
22   Cesar goes off to have a discussion, comes back.  Next thing
23   Mr. Jezek knows, he's given the opportunity to buy a condo.
24   Well, I knew we were falsifying my income information.  I
25   didn't know that it was inflated.

```
 1              Jezek regrets it almost immediately, and that's
 2   why he goes to see a lawyer.  Oh, my God, what have I done?
 3   And at that time he's in the process of agreeing to do a second
 4   condo.  Remember that testimony?  And the lawyer basically
 5   tells him:  Don't you dare.  And when he goes back to tell Mr.
 6   Brooks, my lawyer says I can't do this, remember he testified
 7   that Brooks, the defendant, was angry at him for not going
 8   through with it.  Needed the new money to come in to keep the
 9   scheme going.
10              Is there any question who's in control?  I submit
11   to you no.  The emails clearly show that.  We had an email from
12   Mr. Brooks to Yvonne, talking about the need to get one of the
13   L.A. deals going.  Remember, I established that Marina del Rey
14   is in the Los Angeles area.  So we're talking about Anthony
15   Lorek.  We're talking about Rick Russell's transactions that we
16   put before you.  And he's saying:  I need to move -- I can't
17   remember the exact email.  I'm hoping y'all will recall it.  If
18   not, you can look it up.  But it's -- the gist of it is:  I
19   need those L.A. deals.  I need one of the L.A. deals to move.
20   Take it over from TH, which I submit is Tamatha, or NM, Niesha
21   Manuel, if you have to.  I haven't put pressure on for a while,
22   but I'm putting pressure now.  That's the boss.  That's the
23   boss putting it to the people at Pro Processing, get it done.
24              At the same time -- in the same timeframe he's
25   being told how much money needs to be put in these straw
```

1    borrowers' -- straw buyers' accounts to get a verification of
2    deposit that's going to pass muster with the lender.  We need
3    to show X.  He has X minus; therefore, we need Y.  I never was
4    good at math.  There is no question that he was in control, and
5    he did not take well to being questioned.
6            When I was talking about Mr. Howard and the whole
7    notion of, you know, did he rely on you?  Well, I answered what
8    real -- I answered what legal questions he asked me.  Well,
9    what was that about?  Mostly about corporate formation and
10   stuff.  Was it about real estate?  No, I'm not a real estate
11   lawyer.  When he took you to meetings with prospective
12   investors, did he portray you as our lawyer?  Yes.  Was that to
13   give the transaction the appearance of legitimacy?  And I
14   believe the answer to my question -- however I phrased it, his
15   answer was -- Richard Howard's answer was, the lawyer's answer
16   was, I was a manakin.  That speaks volumes.  It shows that the
17   defendant is out there to deceive.
18           Now, going back to his quote, everybody that I
19   deal with I own part of their business or I don't deal with
20   them at all -- now, he didn't own the --
21           THE COURT:  Mr. Harris, you've used 40 minutes.
22           MR. HARRIS:  Thank you, Your Honor.
23           He didn't own the appraisers' business, but he
24   substantially corrupted them, and I submit that that's the same
25   net difference.

          Mr. Ives, the defendant's own expert, referred to the

appraisers as the eyes and ears of the lender.  And you heard

from lender after lender, especially with these unconventional,

reduced proof, stated income, stated asset loans, that they

relied heavily on credit score and appraisal.  And you saw, you

heard from Mr. Lester that he let himself be corrupted by his

finder's fee, $10,000 a pop.  I wasn't independent.  It was a

target-oriented result.  He knew what the contract amount was

going to be, and he came up with comparables to establish that

price, rather than it being the other way -- or established

that value rather than it being the other way around.

          Ms. Kujan, who they put on yesterday, I think speaks

for itself.  She tells you that she's an independent appraiser,

came to her own evaluation.  And then I put before you -- what?

Some $70,000 or more in checks, in short order, payable to

either her or her husband, mostly the husband.  There's no

explanation for that.  She was corrupted.

          Ms. Coleman, who testified before you this morning, I

submit to you that that's a classic case of picking yourself up

by your own boot straps.  The defendant feeds her the

information.  He's already done enough phony flip transactions

to beef up comparables in the complex to 460.  Those weren't

valid appraisals either, and the defendant knew it.  Picked him

up by his own bootstraps.

          And every single lender, including Erik Sanchez who

```
 1    they called, testified:  Had we known the truth, we would not
 2    have done this transaction.
 3           I anticipate that you are going to hear a lot of
 4    blaming of the victims; that this whole notion of liar loans,
 5    stated income loans, stated asset loans, was stupid.  Maybe it
 6    was.  Maybe it was.  But it's not a license to lie, and we had
 7    that time and again; that they existed to be able to fit a
 8    market because not all one size fits all; and that in each
 9    instance they were still relying on cash from the borrower at
10    closing; and that you cannot -- the defendant cannot, his
11    buyers cannot unilaterally, behind the scenes change the terms
12    of the deal, come up with side seller agreements and not
13    disclose that to the lender.  That just totally shows the
14    defraud.
15           And the defendant's own voice, when we played the
16    tape from Mr. Cooper, and Mr. Cooper doing the best acting he
17    can, is:  Holy cow, I've been contacted by the FBI and the IRS.
18    What do I do?  What do I do?  What do I do?
19           The defendant says:  Get on a plane.  Get on a plane,
20    come to Dallas, one hour.  We'll talk.  The defendant knew, and
21    he wanted to get with Cooper in a face-to-face meeting so that
22    he could feed Cooper the line to spin to law enforcement.
23           So the bottom line, none of this was disclosed, that
24    the buyer, loan processor, appraiser, title company, named
25    employer are all acting in collusion, if not conspiracy -- some
```

of these people were duped, but they're all acting in collusion
with the defendant.  None of that is disclosed to the lenders.
The defendant knew you couldn't disclose it to the lenders.
For, if it were to be disclosed to the lenders, no loan, no
money, you're out.

So I submit to you that we have clearly proven each
of these allegations -- we have clearly proved each essential
element.  We've not put before you every allegation.  That's
why I backed off from that one.  But we have put before you
numerous transactions.  You have more in evidence than we
displayed on screen that clearly shows that he committed each
charged offense beyond a reasonable doubt.  And a week ago this
morning you took an oath that a true verdict you would return.
I submit to you there is no reasonable doubt.  That true
verdict will be guilty.  Thank you.

THE COURT:  Mr. Gordon, you may proceed.

Mr. Harris, you 15 minutes left.

MR. HARRIS:  Thank you, Your Honor.

**CLOSING STATEMENT**

MR. GORDON:  Good morning, ladies and gentlemen.  I
want to start again by thanking you for your service on this
jury.  I know you've taken a lot of time out of your lives to
devote your attention to this case.  And I do appreciate you
doing that.  I'm sure it hasn't been easy, and I know it has
been, obviously, a little bit boring in parts.

1    So as I told you when I started the case or I gave

2    you my opening statement, we have a very different view of this

3    case than the government.  That still holds true today, ladies

4    and gentlemen.  We believe that if you look at all the

5    evidence -- supports a finding that Robert Brooks is not

6    guilty; that he is not guilty of the specific elements that I'm

7    going to get into with you in a minute, the specific elements

8    of mortgage fraud, mail fraud or tax fraud, any of those

9    things.

10   We also believe that the evidence has shown overall

11   that he was not the ringleader of this conspiracy; that there

12   wasn't necessarily even a conspiracy in the first place, ladies

13   and gentlemen; and that Robert Brooks is not this magical

14   puppet master that the prosecutor keeps trying to make him out

15   to be.

16   And I believe that a huge part of their case rests on

17   trying to convince you to assume that Robert Brooks knew

18   everything that was going on, and he knew everything was bad

19   and wrong, but nobody else seemed to know that it was bad, not

20   the lawyers, not the licensed professionals, not the banks.

21   Nobody knew anything was wrong, apparently, except Robert

22   Brooks.

23   But, ladies and gentlemen, then the government

24   actually tries to go the other way and have it both ways.

25   Because, as you know from the testimony of Mr. Howard, he was

1   convicted of being part of a conspiracy, the same conspiracy

2   that Robert Brooks supposedly took place in.

3         So I'm having a hard time understanding how they can

4   say Mr. Howard didn't know any of the details of the

5   transactions.  He didn't know enough to advise Mr. Brooks that

6   this stuff was wrong.  He was just a manakin, just standing

7   there.  And yet, he's charged with the exact same crime and

8   convicted of it?  That just doesn't add up, ladies and

9   gentlemen.  That's a big flaw in the government's case, when

10  they sit here and argue that he did not know the details.

11        Now, I will submit to you, ladies and gentlemen, that

12  you've heard a lot of evidence in this case, and you've seen

13  Mr. Brooks involved in a lot of transactions.  And I'm not here

14  to deny that he was involved in transactions, and I'm not here

15  to deny that he was a businessman.  But what our argument is,

16  is that he did not intentionally try to commit fraud in this

17  case.

18        And I submit to you that with all the audiotapes

19  you've heard, with all the transcripts you've seen, with all

20  the emails, all the documents, the government has not put up

21  any documentation or concrete evidence of these people forming

22  a conspiracy in the first place, of these people coming

23  together to form a specific agreement to say:  Hey, let's not

24  just make money on real estate.  Let's do it illegally.  Let's

25  go ahead and defraud the banks.  I mean, where is that

1    evidence, ladies and gentlemen?  I think it's fair to ask.

2              If this was really going on and all this fraud was

3    existing, I think it's fair to ask why isn't there some

4    specific documentation or something you can hear with your own

5    ears or see with your own eyes, where people say:  Yes, here's

6    the deal.  I know it's wrong.  I know it's a lie.  I know it's

7    illegal.  Do it anyway.  It doesn't exist, ladies and

8    gentlemen.

9              The bulk of the government's case is based on

10   speculation and assumption.  And instead of presuming Robert

11   Brooks innocent and giving him the benefit of the doubt, their

12   whole case is premised on you doing the exact opposite,

13   presuming that he's guilty; that he knows every transaction;

14   that he's in charge of everybody; that he can control

15   everybody; that these are all just manakins or robots or

16   zombies.  Robert Brooks tells you to move, you're going to do

17   whatever he says.

18             And, ladies and gentlemen, I think when you hear the

19   witnesses, they didn't back that up, ladies and gentlemen.

20   There were multiple witnesses that said that Yvonne Quintanilla

21   ran Pro Processing; that she hired and fired people.  Now, what

22   happens to that evidence?  How does that tie in to the

23   government's argument that Mr. Brooks controlled everything?

24   It doesn't tie in.  It conflicts with their evidence.  It

25   conflicts with the arguments that you've just heard here.

1            And so the government's making an argument.  I

2    understand their argument.  But I submit to you that the

3    witnesses that testified and the evidence presented didn't

4    really support that, ladies and gentlemen.

5            If you really dig into the details of this case and

6    you really look for the specific allegations, what did Robert

7    specifically tell people that was illegal?  The closest that I

8    think you ever heard was Yvonne Quintanilla saying:  Well, I do

9    remember a discussion with Cheryl and Robert about doing

10   something with a verification of employment.  And she said in

11   so many words that it involved something dishonest.  That's

12   about the only specific thing I heard where a witness said that

13   she had a specific discussion with Mr. Brooks that involved

14   specifically doing something dishonest.

15           And you may remember that when I questioned her

16   further and I said, well, is it possible that as far as this

17   issue maybe it was just Cheryl Brooks you spoke to about these

18   VOEs.  And her response to me was:  Yeah, maybe, maybe so.

19           And you've seen these VOEs.  And just in case people

20   forget what that is, verification of employment.  You've seen

21   the forms with the false information, and you haven't seen

22   Robert Brooks' name on those forms.  You saw Cheryl Brooks'

23   name.  Now, again, the government will want you to assume that

24   every time Cheryl Brooks signs her name, that she's done it

25   because Robert's programmed her to sign it.  And there's no way

1    that she could have signed anything on her own because she

2    consulted with Robert on every single decision.

3            I don't think that really holds water, ladies and

4    gentlemen.  I think that's going a little bit too far, to say

5    that every one of these witnesses was controlled by Mr. Brooks.

6    None of them had any independent ability to stand up and say:

7    Hey, Robert, you know, the training I got said you really

8    shouldn't do it this way.  It should be done a different way.

9    According to the government, he corrupted them all.  And,

10   apparently, he robbed them of their free will.  Nobody could

11   ever stand up to Robert and say:  Robert, you know, as a title

12   company officer, it's not supposed to be done this way.  You've

13   got to do it differently.  According to the government, I guess

14   none of those people could ever stand up and say:  Robert, it's

15   wrong.

16           But as I said, the government likes to have it both

17   ways, because many of those same people, as you heard, were

18   indicted for being part of this alleged conspiracy.  So on the

19   one hand the government says, they didn't know anything.  They

20   didn't know any better.  They couldn't stand up to Robert and

21   tell him the truth.  But, on the other hand, the government

22   says:  Well, they did know about the conspiracy, and we're

23   going to go ahead and indict them.  There's just a major

24   conflict in their theory, ladies and gentlemen.  It just

25   doesn't hold water.  We've seen it time and time again.

```
 1              So what we have seen in this case, from my
 2   perspective, is we have seen some things that are undisputed.
 3   Obviously, Mr. Brooks bought and sold real estate, and he
 4   bought and sold a lot of it.  And we believe that undisputed
 5   testimony from our expert and even the government's agents and
 6   bank officials -- I'm sorry.  Not bank officials.  But the
 7   undisputed evidence is that it's not illegal to buy and sell
 8   property.  It's not illegal to buy and sell it and make a huge
 9   profit.  It's not illegal to buy and sell it on the same day,
10   even, and make a huge profit.  Those are undisputed.
11              Now, that might sound kind of weird to some people,
12   and you may say:  Well, I don't know.  Why would you sell and
13   buy it on the same day?  But it's not disputed.  It's not
14   illegal.
15              Now, we get into some other areas where I guess it's
16   fair to say there's a dispute about whether some of the other
17   things were legal.  One of the main things the government has a
18   problem with is the fact that Mr. Brooks paid the downpayment
19   for these buyers.  But I asked witness after witness on the
20   stand:  Where is the law or rule that says he can't make the
21   downpayment?  And they could never show me where it was, ladies
22   and gentlemen.  I said:  Is there a document we've seen on the
23   screen so far that says you cannot ever make the downpayment?
24   And they said:  No.  Well, some of them said:  Well, it's in
25   there somewhere.  I just -- I can't find it right now.  You
```

1   know, well, I'm sure it's in the papers I reviewed.  But they
2   never produced solid, credible documentation to show that he
3   was prohibited from making that downpayment, ladies and
4   gentlemen.

5         The best they could say was, well, it should have
6   been disclosed to the banks.  And that's a common theme you've
7   heard from them and from the bank witnesses.  They had a right
8   to know about this information.

9         But I pushed them on that, too.  I said:  Okay.
10  Okay.  Maybe you have a right to know in your mind.  Well, who
11  is the one who you think has a legal duty to tell you that the
12  downpayment is being made?  And all of them, even the bank
13  officials conceded, well, it would be the borrower or it would
14  be one of the loan officers.  They all admitted they don't have
15  an official contractual relationship with Mr. Brooks, the
16  seller.  And so he has no official legal duty to tell them:
17  Hey, I'm going to pay the downpayment for this person who's
18  getting a loan from you.  He just doesn't have a duty to do
19  that.

20        Now, is that a good thing?  Is that the way the
21  system should be?  I don't know.  I mean, it does sound funny
22  to me, but it doesn't sound illegal necessarily.  And that's
23  what you're here to make a determination on.  You're here to
24  distinguish between things that are funny, weird, unusual,
25  sound strange and things that are flat out illegal.  And they

 1    don't always go together, ladies and gentlemen.

 2            You know the entire system that was set up here of

 3    stated asset, stated income loans, liar loans, whatever you

 4    want to call them -- the whole system was weird from the start.

 5    It was full of holes.  The whole system that was created,

 6    created a scenario where bad information was just bound to

 7    happen.  You've heard that from some of the witnesses.  You

 8    were bound to get bad information.  You were bound to have

 9    people inflating their income.

10            And I'm not saying it's right to do that.  I'm not

11    saying anybody's ever excused from lying on a form.  But you do

12    have to come back to the question of who filled out these forms

13    and who's responsible for making sure they were filled out

14    correctly.  And it wasn't Robert Brooks, ladies and gentlemen.

15    Time and time again the witnesses had to admit that he's not

16    involved in the loan application process.  There's no specific

17    witness who ever said:  I saw him fill out a loan app., and I

18    saw him deliberately put in bad information.  So if there's bad

19    information in there on the loan app., it's clear who you

20    should hold liable, the borrowers who filled it out or the

21    borrowers who had someone else fill it for them and reviewed it

22    and didn't make the corrections and just let that bad

23    information stay in there.

24            So there were problems built into the system from the

25    beginning.  And it's not fair to blame Robert Brooks for all

1  these problems in the system that were there.

2          And I'll go even further, ladies and gentlemen.  If

3  the system was set up so that there was a legitimate, legal way

4  to engage in transactions that some people might consider a

5  loophole, it's not illegal to take advantage of an actual legal

6  loophole.  Some people may not like it or think it's weird or

7  think it's strange.  But if the rules just weren't set up to

8  catch certain things and nobody was asking the right questions,

9  it's not fair to pick somebody out and say:  Well, you should

10  have disclosed it.  You had the duty to tell all those people.

11  There has to be some specific rule or guideline or law or some

12  form that says that they have to disclose it.  And in this case

13  there just wasn't such a form.

14          Now, I'm going to take a minute here, and I'm going

15  to put up an exhibit that we think kind of explains the various

16  roles that the people played in this case.  And it will help

17  explain why we think certain people should be taking

18  responsibility for their actions and not Robert Brooks.  And it

19  may help refresh your memory about some of the witnesses and

20  what we believe their testimony was and the rules in this case.

21  So let me just make sure I get this set up correctly.

22          See here.  Okay.  So our argument to you is that

23  Robert Brooks was basically an investor/entrepreneur.  Whoops.

24  There we go.  Okay.  So from our perspective, what was he doing

25  in this case?  What was he primarily doing?  Well, again, he

1    bought and sold homes for profit.  He did put up some funds to

2    start Pro Processing and Progressive Title.  Again, keep in

3    mind he had no professional training or licenses in real

4    estate.

5              The government keeps wanting to paint this picture of

6    him as this real estate mogul, and he knew everything, and,

7    therefore, he should be held to this high standard.  But,

8    again, he had no professional training.  He was basically

9    working on on-the-job training.

10             And we believe there's clear, solid evidence that he

11   did rely on other professionals to do their part and to speak

12   up if something he was doing wasn't the way it was supposed to

13   be done in the system.

14             Then we get to one of the other witnesses in the

15   case, Cheryl Brooks.  Well, Cheryl Brooks, the evidence shows

16   she was primarily the bookkeeper.  She was the one who kept

17   track of the financial records.  She's the one who turned them

18   over to the CPA's office to do the taxes.  And she actually

19   became a licensed mortgage broker in 2007.

20             Now, this gets us a little bit into the tax issue

21   here.  And I'm going to address it a little bit later.  But

22   just keep in mind that, again, she was the one who was

23   apparently in charge of the books from her own testimony.

24             So let's talk about Mr. Richard Howard a little bit

25   more.  Now, I have put up here at the top real estate lawyer,

1   and that's disputed by the government.  They don't call him a
2   real estate lawyer.  Now, he did get up on the stand and
3   testify that he does practice white collar crime.  And he did
4   concede that includes mortgage fraud and mail fraud cases, but
5   he insisted that he's not officially a real estate lawyer.
6          But you might also recall that he admitted he took a
7   check from Mr. Brooks for $200,000.  And at the bottom of the
8   check it said "attorney's fees."  And he also admitted that he
9   followed Mr. Brooks around from meeting to meeting and answered
10  his legal questions.  So what was going on at those meetings?
11  What kind of questions was he answering?  The prosecutor says:
12  Well, he said it was just about corporate stuff.  I submit to
13  you that just doesn't add up, ladies and gentlemen.  He's
14  following Robert Brooks to these meetings.  He knows what kind
15  of activities Robert's involved in.  He even got other people
16  to come in and buy properties on his own.  He knew exactly what
17  was going on with the system Robert set up.  And he had a legal
18  duty to speak up and tell Robert if something wasn't being done
19  right.
20          Also of note, he was the owner of Progressive Title &
21  Abstract.  And he seems to take absolutely no responsibility
22  for what happened at Progressive Title & Abstract.  The
23  government wants to put more of the blame on Robert Brooks, and
24  he wasn't even an owner of the company.
25          We also heard a little bit about some of the real

estate agents involved in this case, Joey Cooper and Lisa
Richard.  And I don't have a lot to say about them, to be
honest with you.  They just -- you know, they helped him find
buyers and other professionals.  But it is important to note
they were also licensed professionals.  And it was fair of Mr.
Brooks to rely on their advice throughout this process.  And if
he was doing something that didn't look right to them, I think
they should have spoken up.

        Then we also have a lot of buyers who -- we didn't go
through the details on all the buyers.  But, generally
speaking, we think the evidence showed that the buyers either
filled out the loan applications or at least reviewed them and
said:  Okay, I'll go ahead and sign off on this.  And I put
here they did it with the assistance of a loan officer.  And in
all honesty, from what I've seen, there wasn't a whole lot of
assistance provided, unfortunately, to these people.  The loan
officers were supposed to interview them.  But in a lot of
cases they apparently didn't.  They just passed it off to
somebody else or had them sent off through the mail.  And I
think if there was any problems with the loan applications,
those are the people you should hold liable, the people who
signed the applications affirming the truth.

        Now, we also have various other people involved in
the case that you remember, loan officers.  Some of these names
you may recognize.  Others you may not.  You recognize LeDale,

1    I'm sure, and Mr. Adkins and Ms. Whittington.  And, again,

2    their job was to collect and enter loan application information

3    and go over the loan terms with the buyer.

4            And they worked with the banks to help them make

5    money for the loans.  And, again, they're licensed

6    professionals.  Once again, if there's a problem with the loan

7    application, I say hold the licensed professionals liable.

8    Don't hold Mr. Brooks liable.  These are the people who were

9    signing off on these documents.

10           Then you have the loan processors:  Yvonne, Niesha,

11   Tamatha, Pro Processing.  Generally speaking, they put

12   paperwork together.  They sent out some requests for appraisals

13   and title commitments.  They were the ones who would call

14   out -- or send off the requests for verifications of

15   employment.  And I kind of went a little too fast there.

16           But the government's argument, or one of their

17   arguments in the case, is that Robert Brooks controlled Pro

18   Processing.  They started off, again, saying, well, nobody

19   could fire anybody there, or nobody could fire Robert, and

20   Robert could fire anyone.  They had to concede later on that

21   wasn't totally true because, again, he did have a partnership

22   with Yvonne -- Robert, Yvonne and Cheryl, they all own that

23   company jointly.

24           So the idea that these people are partners and that

25   one person can somehow control them all anyway, we just think

Chris Poage, RMR, CRR
United States Court Reporter

1    that just doesn't add up.  That is based on a lot of negative

2    assumptions about Robert.  And it wasn't proven with the

3    evidence in this case.

4           So let's talk about the appraisers a little bit.  We

5    had Mr. Lester, Jennifer Coleman and Sherri Kujan.  Their role

6    was to research the owner of the property, estimate the fair

7    market value of the property.  And keep in mind, again, they're

8    licensed professionals.

9           Now, the government's pointed out a few things about

10   these appraisals that I totally understand.  I understand why

11   they're pointing it out, and it looks weird.  It looks even

12   suspicious, I'll say.  Let's start with Mr. Lester.  So Mr.

13   Lester says that in addition to doing the appraisals on these

14   properties, he got a finder's fee from Mr. Brooks for doing the

15   appraisals.  But keep in mind, ladies and gentlemen, who was it

16   who came up with the idea for that finder's fee?  Was it Mr.

17   Brooks?  Did he go to Cedric and say:  I need somebody who's

18   going to lie on my appraisals.  I need somebody who's going to

19   inflate them.  How about I pay you 10,000 right off the bat?

20   That's not the way it happened, ladies and gentlemen.

21          This appraiser approached Robert, and he asked him

22   for money.  And I'm sure Mr. Brooks would have preferred not to

23   pay the money, but he felt it was a good deal.  And he said:

24   Well, these are, you know, properties I can buy cheap and sell

25   for good money.  All right.  I'm in.

```
 1              Now, Mr. Lester should not have taken that money and
 2    done the appraisal.  But who should be held liable for that
 3    mistake, for that lack of independence?  Mr. Brooks, again?  Is
 4    it always his fault?  He's got to take the fault for that?  No,
 5    I think it's fair to blame Mr. Lester for that.  And he is
 6    being held liable, as you can see.  He's already been charged
 7    and convicted in this case.
 8              So we'll talk about Sherri Kujan next.  And I'll be
 9    honest.  I was a little bit surprised with her testimony.  She
10    did get on the stand and testify that she had an appraiser, and
11    she did the appraisal for one of the condos -- or I'm sorry.
12    For a house.  And she said that Mr. Brooks didn't ever like pay
13    her to inflate the appraisal or offer to pay her X money to
14    inflate it.  And I asked her if she stood behind the
15    appraisals.  She said, yes.
16              Well, then the government produced some checks, a
17    significant amount of checks.  And I don't have all the answers
18    to that, ladies and gentlemen.  And we didn't get into all the
19    details behind those checks, and we didn't bring in her
20    husband.  So we don't know what's going on with all that.  The
21    implication for the government is, aha, look at all these extra
22    payments.  Well, there's only one thing to think from the
23    government's perspective.  There's only one way to view that,
24    which is must be Robert Brooks' fault.  Must be a payoff for a
25    bad appraisal.
```

```
1              But that's not the only way to look at it.  Some of
2    those checks actually said that they were being paid for
3    consulting fees and things like that.  And the checks that were
4    produced did not have the actual name of that property on it,
5    XXXX XXXXX XXXX.
6              So you could assume against Robert, can make the
7    worst assumption and say, well, there you go.  Must have been
8    for a payoff.  But that's not necessarily true.  You could
9    continue to give Robert the benefit of the doubt and say, well,
10   we just don't know.  It's suspicious, looks weird, not proper.
11   Ms. Kujan should not have received any money from Robert if she
12   was going to do the appraisal, no extra money on the side.  But
13   it's not necessarily Robert Brooks' fault, and it doesn't
14   necessarily mean the appraisal's bad, either.  Some of these
15   people could have come up with an appraisal of 450 anyway and
16   tried to just get extra money out of Robert.
17             We had Ms. Jennifer Coleman testify, and she believed
18   that the value of her appraisal was fair as well.  Now, there's
19   problems with these appraisals.  I'm not going to argue that.
20   There were problems and mistakes.  But it's not fair to hold
21   Mr. Brooks liable for these mistakes of the appraisers.  Hold
22   them liable.
23             So we have the title company, too, ladies and
24   gentlemen.  They're responsible for preparing -- researching of
25   the property as well, preparing title commitments and HUD
```

```
 1   statements, setting up and conducting closings.  And, again,
 2   they have people in there who are licensed agents, ladies and
 3   gentlemen.  And if they're not preparing the HUDs correctly,
 4   which is a big issue in this case, then they should be held
 5   liable for that.  It's not always Mr. Brooks' fault when
 6   somebody else screws up on the paperwork.
 7           Now, the government's made a big deal about these
 8   HUDs.  As you know, there's 40 HUDs you've got there.  And
 9   their whole premise of their argument seems to rely on the fact
10   that it says "cash from borrower."  And every time it says
11   "cash from borrower," they're saying it really wasn't from the
12   borrower, ladies and gentlemen.  It was from the seller.  And
13   I've gone back and forth with these people over whether that's
14   meant to be taken literally or not.  Some people say, oh, yes,
15   cash from borrower means literally.
16           And I said:  Well, maybe could it be cash given to
17   the borrower or paid on behalf of the borrower?  And they told
18   me:  Nope, this is literally cash from borrower.  And then I
19   say:  Well, what about the term cash?  Is that meant to be
20   taken literally?  And then they back off and say:  Well, no,
21   not that part.  That part can be cash, check, money order, et
22   cetera.  But the rest of it, absolutely literal, and everybody
23   should know that.  Even an unlicensed professional like Robert
24   Brooks should know better.  And that seems to be the heart of
25   their case.
```

```
 1              We have another important player in this, ladies and
 2     gentlemen, which is the banks.  And I want you to keep in mind
 3     that the evidence showed that they promoted and put out these
 4     subprime mortgages and no doc loans.  They had a special
 5     department to review all the paperwork in this case.  They had
 6     the final authority to accept or reject every single one of
 7     these loans if they wanted to.  And they could have asked for
 8     more information if they wanted on every single one of these
 9     loans, ladies and gentlemen.
10              Just a moment.  May I ask how I'm doing on time,
11     Judge?
12              THE COURT:  Let's see.  You've used 30 minutes.
13              MR. GORDON:  Excuse me.  Now, let's talk a little bit
14     about the witnesses the government's put up here in this case.
15     I believe I told you in the beginning that I expected most of
16     the government's witnesses to be people who have taken plea
17     bargains in this case, have already admitted that they're
18     guilty, former business associates of Robert or investors who
19     are going to be upset at him, going to be disgruntled because
20     they lost money, and then maybe some government agents.  And
21     that's been the vast majority of the witnesses that you've seen
22     for the government.  Not all.  They did bring in some bank
23     representatives.
24              But it probably won't surprise you the bank
25     representatives have their own bias in this case as well.  And
```

1    instead of taking the blame for not reviewing their paperwork

2    properly and offering these crazy, ridiculous loans, they want

3    to point the finger at somebody else.  And they're more than

4    happy to come in here and point the finger at Robert Brooks and

5    say:  Well, he's the big person involved, and he's the

6    ringleader, and let's go after him.

7            And I had this debate with every single one of them

8    when they said:  We have a right to know all this stuff.  We

9    had a right to know that he was buying and selling the

10   property.  We had a right to know that he was making payments.

11   And I kept saying:  Well, where is this right to know?  Where's

12   the paperwork that says that he had to tell you, Mr. Brooks

13   specifically?  And, again, they couldn't come up with the

14   details or documents to show me why it was his responsibility.

15   And whenever I asked him, I said:  Well, couldn't you have just

16   picked up the phone and called and checked this verification of

17   employment yourself?  Couldn't you have just clicked on your

18   mouse and gone to Topaz Townhomes and seen that they were

19   selling them for 250,000?  Well, that was too much for them.  I

20   guess they just couldn't handle that.  They just didn't have

21   the time or resources to do that, apparently.  That seems to be

22   their response.

23           So what you have, also, from the government witnesses

24   time and time again is trying to shift responsibility away from

25   themself and shift it to Robert Brooks, and say:  Robert told

1    me to do it.  Robert directed me to do this.  And that's a

2    fundamental point in this case, ladies and gentlemen, because

3    there's -- there are documents with Robert Brooks' signature on

4    them.  But, generally speaking, they're not fraudulent

5    documents.  The only one that's arguably fraudulent from the

6    government's perspective is the HUD.  If you accept that that

7    cash from borrower is wrong, then that's probably the only

8    document that Robert signed that you could say was wrong.

9           And so a big part of their case is relying on blaming

10   Robert for what everybody else did.  Every time somebody else

11   signed a paper or they put wrong information in, well, let's

12   just tie it right back to Mr. Brooks and say it was all his

13   fault.  And that's really critical when you look at the mailing

14   part of this case.

15          And, you know, the government says there probably

16   wouldn't be that much dispute about the mailings.  Well, he's

17   right in a certain sense.  I don't dispute the papers were

18   mailed out, but I do dispute that they were mailed out by

19   Robert Brooks.  And I submit to you that when you saw those

20   papers being mailed out, Robert Brooks' name was not on any of

21   those papers that were mailed out to the mortgage companies.

22          Now, they're trying to say he's responsible anyway

23   because he's part of this conspiracy.  So if anybody else sends

24   papers out that helps promote this alleged fraud, then he's

25   responsible automatically.  But my argument is that there is no

1   conspiracy; that Robert did not specifically agree to be a part
2   of any illegal activity.  And so if you don't find that there's
3   a conspiracy there, you can't hold him liable for that
4   particular -- for those transactions.  And if you take that out
5   of the mix, there's, in my opinion, no mail fraud.
6           Just give me a moment, please.  So let me go ahead
7   and talk to you about the elements of the jury charge that
8   you're going to be looking at.  Mail fraud is defined as using
9   the mail to carry out a scheme to defraud.  But it is important
10  to remember that you cannot convict the defendant of such a
11  crime unless you find that he's guilty of all the elements.
12  Now, I'm not going to ask you to read every single one of
13  these.  But let me just have a second here.
14          All right.  So the first element you have to look at
15  is whether or not the defendant knowingly created a scheme to
16  defraud.  I, right there, have a big dispute with the
17  government on this case.  I don't think he knowingly created a
18  scheme to defraud.  I think he knowingly created a real estate
19  business, and he knowingly created a real estate business that
20  was trying to make a profit and be successful and follow the
21  rules that existed then.  And some of the rules were weird and
22  sloppy, and some of the advice he was given by people to do
23  things, in hindsight, probably shouldn't have done.
24          And specifically keep in mind that there was bank
25  officials throughout this case who gave advice to people to

 1    leave information off loan apps.  Don't put this on there.  Do
 2    put this.  I mean, they were heavily involved in this process,
 3    and they were directing people to specifically leave out
 4    information in certain cases.  And I think it's fair that
 5    sometimes people might get mixed up and think okay, well, if I
 6    can leave that off, maybe I can leave this other part off.  It
 7    doesn't make sense for the banks to come in here and argue now
 8    that they were misled because of that.
 9            So, again, you have -- the government will have to
10    prove all these particular elements of the crime.  And I'm not
11    going to go through each one in detail, but there's a few I
12    think that are more important to focus on.  What are the second
13    elements?  It's just important to remember that the government
14    has to prove a specific intent to defraud.  It's not enough to
15    prove that Robert Brooks had an intent to make money or he had
16    an intent to buy and sell property legitimately and other
17    people did things behind his back that they shouldn't have.
18    That's not enough.  They have to show that he had that specific
19    intent.  And that's why I say over and over again they seem to
20    be basing it on assumptions, rather than proof from witnesses
21    about specific acts that he engaged in.
22            In terms of the mail fraud, again, have to prove the
23    defendant mailed something or caused another person to mail
24    something.  I submit to you there's no proof that he caused
25    anybody to mail anything.  They mailed these things of their

1    own freewill.  Yvonne Salazar was a part owner of the company.
2    How did Robert force her or cause her to put these things in
3    the mail?  I submit to you the evidence is just not there to
4    support these charges.
5            We also talked -- I'm sorry.  One of the elements
6    they also have to prove is that if there was a scheme to
7    defraud, it had to involve some kind of material
8    representation.  And what that means is if there was something
9    false, but it really was a minor typo and it didn't matter to
10   the banks, then you can't really hold it against him.  And I do
11   submit to you that when it came to the actual income stuff, if
12   income information was wrong, I submit to you that really
13   wasn't material to the bank's decision.  You may recall forms
14   that I went over with one of the bank reps.  And it
15   specifically said:  We will not require, not even consider, a
16   person's income.  If they're not even going to require or
17   consider it, I put to you it was not material to their
18   decision.
19           Again, intent to defraud means an intent to deceive
20   or cheat somebody, not just an intent to make money.  And I
21   hope you can distinguish between those things.  You don't
22   automatically assume, because Robert intentionally did a lot of
23   things that he felt were legal and legitimate, that that means
24   that he intended to commit fraud.
25           In regards to the false statement, it's just

1    important to remember it's got to be material.  So, again, it

2    kind of goes back to what I said a minute ago.  If somebody

3    makes a false statement in a document, but it really didn't

4    affect the other person's decision, then it's not supposed to

5    be counted against them.

6           So I put it to you that, really, the government has

7    not proved the intent portion of the charge.  They have not

8    specifically proved that he had an intent to defraud people.

9    You can make assumptions that that's what he did and say:

10   Well, I think maybe he did.  But remember, the government still

11   has to prove this case beyond a reasonable doubt.  And if you

12   go back there and you have a reasonable doubt and you say:

13   Well, I -- you know, I'm suspicious, and this guy might be

14   guilty.  And you go:  But, on the other hand, I mean, there are

15   other arguments that are legitimate that maybe he's not guilty.

16   Then you have a duty to give him the benefit of the doubt and

17   vote not guilty.

18          We've gone over this part a little bit here.  I'm

19   going to move to another slide real quick.  I want to talk to

20   you a little bit about the tax case as well.  Again, the

21   government's got to prove each element of the charges that are

22   going to be given to you, or you have to render a verdict of

23   not guilty.

24          The government -- the charge talks about the

25   defendant assisting, procuring, counseling or advising the

Chris Poage, RMR, CRR
United States Court Reporter

 1    preparation of a false return.  Well, ladies and gentlemen, I

 2    put it to you that Robert Brooks did not know that what this

 3    CPA proposed was false; that it was possible that maybe you

 4    could do this deduction and maybe pay it off later.  And I

 5    don't know -- I mean, it doesn't make sense to me that -- this

 6    particular idea that the CPA came up with.  And you've heard

 7    from the other expert that this was just flat out bad advice.

 8    And I think it's fair, when you're looking at did this guy do

 9    it on purpose, was he intentionally trying to defraud the

10    government or did he just get really bad advice, I think it's

11    legitimate to say:  Yeah, he got bad advice.  It's not fair to

12    hold him liable for taking that bad advice.

13            But the government is -- sorry.  Just a moment here.

14    The key that we would have to -- the government would have to

15    prove in this case the defendant knew the statement was false.

16    And I think there's some legitimate debate about that.  Once

17    again, the government wants you to assume the worst about

18    Robert Brooks; that, oh, he absolutely knew that that deduction

19    was false and there's no way he could deduct that 475,000.  But

20    that hasn't been proven, ladies and gentlemen.  That's

21    assumption and speculation.  What has been proven and is

22    undisputed is that he got bad tax advice.

23            And, again, the government, we think, has not put up

24    enough evidence to show that he willfully assisted in the

25    preparation of this return with the specific intent to violate

1    a known legal duty.  That's why we believe it is fair to render
2    a verdict of not guilty.
3         And what's also important here is that you may
4    remember the testimony of Cheryl Brooks.  And I asked her about
5    this, and she seemed to say that initially she thought this was
6    okay.  And I asked her:  Wasn't the plan to delay payment of
7    taxes, not just avoid it completely?  And she seemed to confirm
8    that.  And, once again, it's clear that Mr. Scheller, the CPA,
9    suggested this deduction, not Mr. Brooks.  And I think it's
10   clear that Mr. Brooks did not counsel his own CPA; that the CPA
11   counseled him and advised him, advised him poorly,
12   unfortunately.
13        So, again, we believe that they will not be able to
14   prove these essential elements of their case, and that if you
15   follow your oath as a juror, you'll give him the benefit of the
16   doubt, and you will vote not guilty on these charges.
17        I'm going to skip over a couple of other issues
18   because I think we're probably going to get short on time.  But
19   the good faith defense is really important in this case.  And
20   as you have been told, and the charge tells you, if Robert
21   actually had a good faith belief that this stuff he was doing
22   was okay and approved by the banks or, you know, that somebody
23   else told him was okay, then it is a defense to the charges.
24   And even though you think all the things he did were bad, if he
25   didn't know it and he was relying on other people and getting

```
 1   more bad advice, then you have a duty to vote him not guilty.
 2            Now, it's going to be up to you whether he
 3   legitimately held this belief or he actually knew the truth.
 4   That's up for you to decide.  But if you do accept our argument
 5   or you think it's at least a legitimate argument and you have
 6   some reasonable doubt, then you need to give him the benefit of
 7   that doubt and render a verdict of not guilty on those charges.
 8            And I want you to look at the bottom portion, if you
 9   don't mind, real quick.  I think it's important to emphasize,
10   and this is in your charge, an honest mistake in judgment or an
11   honest error in management, even, does not rise to the level of
12   criminal conduct.  And I ask you to keep that in mind when
13   you're making your decisions.
14            And, again, the burden of proof in this case does not
15   rest with us.  We don't have a duty to prove anything.  They
16   have to prove that there was a specific intent to defraud.  And
17   when I say prove, I mean prove it.  I don't mean make
18   insinuations about it, like Mr. Lester by saying:  Well, wasn't
19   there some kind of, you know, lack of independence, or didn't
20   you kind of feel like there was an insinuation maybe you should
21   inflate it?  That's not good enough evidence to convict him in
22   my opinion, ladies and gentlemen.
23            Cedric Lester, I specifically asked him:  Did Robert
24   specifically ask you to inflate these appraisals?  And he said
25   no.
```

1           And so you have there a lack of that specific intent
2    to commit fraud.  And you have a lack of that concrete, solid,
3    hard evidence that you need to convict a person in this case,
4    ladies and gentlemen.
5           And the same thing applies on the tax charge as well,
6    that Mr. Brooks is entitled to a defense in that respect if he
7    relied on the advice of his attorney, and if his belief was
8    inconsistent with a showing of intent to defraud.  And there's
9    some -- elements there.  I'm not going to review all of them
10   with you.
11          So, ladies and gentlemen I think this case comes down
12   to a few big questions.  First of all, were the specific things
13   Mr. Brooks doing -- were they all prohibited?  And I think,
14   clearly, they were not.  Were some of them prohibited?  Well,
15   that's even debatable, ladies and gentlemen.  I've asked the
16   witnesses to show me where the things Robert were doing should
17   have been -- you know, there was something prohibiting him from
18   doing these things.  And they can't tell me.  They just keep
19   saying:  Well, it just looks bad, and they should have known
20   that he was doing it.  They should have known he was doing it.
21   But there's no duty that we found that he had to disclose it to
22   these people.
23          And then you've got to ask yourself:  Well, if the
24   banks should have known and they had a right to know, who was
25   supposed to tell them?  Was it really his burden?  Was it

1    really up to Robert to do it?  No, it just -- the evidence
2    doesn't show that he had the duty to do it.
3            Now, were other people working for the bank sloppy,
4    and did they fail to do their jobs, and were they supposed to
5    tell the bank?  Probably so.  But those people are not on trial
6    here today, ladies and gentlemen.  It's Mr. Brooks.
7            So the other question you've got to ask yourself,
8    again, is, let's say that some of the stuff was wrong,
9    shouldn't have been done.  Did Mr. Brooks really know it was
10   wrong?  Have they really proven that?  They've argued it, and I
11   can see some people might assume it.  But have they proved it
12   beyond a reasonable doubt, ladies and gentlemen?  I don't
13   believe they have.  I don't believe they have.
14           Then you've got to look at some of the other issues.
15   Well, let's say that some of these things were wrong.  What if
16   Robert did them because he relied on other people?  Well, if
17   that is true, ladies and gentlemen, that right there is a legal
18   defense.  And that's enough for you to say, boy, this guy did a
19   bunch of stupid things.  I can't believe he did this.  But you
20   know what?  He did rely on other people, and they should have
21   spoken up and told him what to do.  And, boy, this guy just
22   seemed like he got bad advice from everybody he dealt with.
23           And so if that is the case, ladies and gentlemen,
24   then that right there is enough for you to go ahead and render
25   a verdict of not guilty on all these charges.

1      Any idea on time, Judge?

2      THE COURT:  Yeah.  You've got 15, 20 minutes.

3      MR. GORDON:  Okay.  And I also want to emphasize,

4  ladies and gentlemen, that it's important to take into

5  effect -- into account the expertise and training these people

6  had and did not have.  Again, it's undisputed that Robert had

7  no formal training in real estate.  Now, they say that, you

8  know, he learned as he went along, and that he knew all this

9  stuff because of all the many years he'd been involved in this.

10  But that's not necessarily true.  He could have been involved

11  in this for many years but still just had a layman's

12  perspective on everything, without the specific training that

13  you get to become licensed in the laws and the rules and the

14  regulations.  You can do it for ten years, and you still might

15  not know more than the average person.

16      And so it's important to distinguish the roles of

17  these people and consider the fact that he was not specifically

18  licensed or trained.  If he was licensed or trained and then he

19  -- you know, there's evidence that he didn't follow the rules,

20  that's a different story.  But, again, in this particular case

21  they haven't proven that, ladies and gentlemen.

22      Now, as has been explained to you, the prosecutor's

23  going to be able to get up here in a few minutes, and they're

24  going to make another statement.  And I will not get another

25  chance to talk to you.  And the prosecutor might say a bunch of

```
 1   things that I really disagree with.  And if I had another
 2   chance to get up here, I might be able to knock down all those
 3   arguments.  But I won't be able to.  So I'm just going to have
 4   to trust you to take everything that is said to you with a
 5   grain of salt and not just believe it because I say it or
 6   because the prosecutor says it.  You have the evidence.  You've
 7   heard the witnesses.  I'm sure you're intelligent enough people
 8   to make the right decision.
 9            But I do urge you to remember the standards that
10   you're supposed to follow as a juror.  It's not a 50/50
11   proposition.  If you go back and you say, well, I'm not sure if
12   he's guilty or not.  I think I'm leaning a little more guilty,
13   that's not enough to convict.  If you're leaning a little bit
14   guilty or a lot guilty, but you have reasonable doubts, you've
15   got to continue, even to the end, to give Mr. Robert Brooks the
16   benefit of that doubt.  And I hope that you will follow your
17   oath as jurors and do that.  And I thank you, again, for all of
18   your time.
19            THE COURT:  Mr. Harris, you have 15 minutes.
20            MR. HARRIS:  Thank you.
21            THE COURT:  Okay.  All right.  Mr. Harris, you may
22   proceed.  Thank you.
23            MR. HARRIS:  Thank you, Your Honor.
24                          CLOSING STATEMENT
25            MR. HARRIS:  Ladies and gentlemen, let me begin with
```

```
 1      where I agree with Mr. Gordon, and that is it is a high burden,
 2      beyond a reasonable doubt.  It's not the preponderance of the
 3      evidence where you're pretty sure or more likely than not.
 4      It's not the clear and convincing that seems -- it's darn sure.
 5      And are you darn sure that he has -- that Mr. Brooks has done
 6      that which we allege?  That's the standard.  If you find it,
 7      find him guilty.  If you don't, please acquit him.  That is
 8      what I'm asking you to do.
 9              Now, I submit that Mr. Gordon is trying to create
10      reasonable doubt in a gallant effort where none exists, not
11      when you look at the instructions, not when you look at the
12      totality of the situation, the totality of the dealings.
13              Not to throw out yet another movie, but I'm also --
14      I'm almost reminded of -- you know, Mr. Gordon is essentially
15      saying, pay no attention to the man behind the curtain.  Keep
16      watching the great, you know, wonderful Oz.  Pay no attention
17      to the man behind the curtain.  The man behind the curtain is
18      the manipulator, and that is Robert Brooks.
19              And the instructions are clear.  He did not have to
20      do everything himself.  He did not have to sign this document
21      or that document.  The question is:  Did he know that false
22      representations were being made?  Yes.  Was that part of his
23      plan?  Yes.  Did he conspire with others to bring it about?
24      Yes.
25              Mr. Gordon complains that there's no evidence of a
```

 1    criminal manifesto; that they didn't sit down and say:  Hey,

 2    kids, let's put on a crime.  Well, the instructions address

 3    this.  It clearly says, the government need not prove that the

 4    alleged conspirators -- I'm reading on Page 10 -- that the

 5    alleged conspirators entered into any formal agreement, nor

 6    that they directly stated between themselves all the details of

 7    the scheme.  The government need not prove that all the details

 8    of the scheme alleged were actually agreed upon or carried out.

 9         So no, not everyone knew everything.  Maybe not even

10    Mr. Brooks.  Maybe he found out after the fact about Whiteout.

11    But he certainly knew enough of the false representations, the

12    false pretenses, the false promises that are being made to the

13    lenders to be found guilty.

14         Similarly, he may not have counseled or advised the

15    tax return -- notice that those were the only two words

16    underlined.  What was not underlined was aided or assisted in.

17    And here's the thing, it cannot be reliance on the suggestion

18    of the accountant just because it was the accountant who came

19    up with the how we're going to do it.

20         The defendant had the benefit of the before and

21    after.  He saw the draft tax return that showed the -- to them

22    the ridiculous amount of income tax that they were going to

23    have to pay on their true income, and balked.  And when they

24    balked to their CPA, it's their CPA who, according to Cheryl,

25    asked:  Well, don't you have some other company, maybe a

1    dormant company that you can shove off some kind of expense to?

2    It's not the accountant who comes up specifically with 475,000.

3    There's no information of that, that he would come up with it.

4                Or how about Amadeus, Inc.?  Where does the

5    accountant even know the name?  No, that has to come from --

6    who?  From the defendant.  He knew that they were going to be

7    lying on their tax returns.  He knew the returns were going to

8    be filed.  That's all it takes for you to find him guilty of

9    that.  The elements have clearly been met.  The elements are a

10   breakdown of those two broad brushes, but it's there.

11               I neglected to cover this when I was talking about

12   not knowing everything.  But the Court already instructed you

13   and this is at the top of Page 10, just above what I said:  One

14   may become a member of a conspiracy without knowing all the

15   details.  If the defendant understands the lawful [sic] nature,

16   that is sufficient to convict him.  Well, I submit that this --

17   that this evidence showed that he knew far more than just the

18   unlawful nature.

19               Made a big -- Mr. Gordon made a big point about the

20   few witnesses that said Yvonne ran Pro Processing.  Well, I

21   submit that, yes, the testimony is clear.  Yvonne operated Pro

22   Processing, but the emails show that she is clearly reporting

23   to the defendant, even on such things as, we need different

24   employment for Brenda Hardaway.

25               He talks about -- "he" being Mr. Gordon, excuse me --

```
 1   talked about the conversation with Cedric Lester and his
 2   question to Cedric Lester:  Did Mr. Brooks ask you to inflate
 3   the appraisals?  And he hangs his hat on the answer that was:
 4   No.  But do you remember my redirect question?  And that was:
 5   Well, were those words spoken?  No, those words didn't have to
 6   be spoken.  We had an understanding, a tacit understanding.
 7   Again, the circumstances show that the defendant knew that
 8   these appraisals are false.
 9            How can they not be false, when you or I could have
10   walked into Topaz and bought the same condominiums ourselves
11   for the mid-200s?  We couldn't have turned around and sold them
12   to a willing buyer for 450 when the next person could have
13   walked into Topaz and bought the comparable unit for 260.  It
14   just defies logic.  And you've been told that reasonable doubt
15   is based on logic, common sense.  That's all we're talking
16   about, applying logic and common sense.
17            The defense also wants to put a big point on the
18   notion that it was the borrowers who filled out.  It was the
19   borrowers who were responsible for the loan applications.  But
20   the evidence is clear that the borrowers did not fill them out;
21   that the defendant's people did.  Now, ask yourself, again,
22   this, logic and common sense:  Why on earth would the
23   defendant's people knowingly put false information into the
24   applications?  Why on earth, if they are not engaged in a
25   conspiracy with -- who?  With the defendant.  It's the
```

1    defendant who financially benefits from these flips that go

2    through.

3         You know, he -- Mr. Gordon talks about the government

4    wanting to have it both ways.  I submit that, actually, he's

5    the one who wants to have it both ways because he put an expert

6    on to talk about how it's the duty of the loan originator to

7    get all this stuff right.  And when they say "loan originator,"

8    you know, don't look at the man behind the curtain.  Look at

9    the great and wonderful Oz.  They're pointing to the likes of

10   Hector Adkins and Penelope Whittington and LeDale Coles and

11   Yvonne Salazar.  But in this case who is the ultimate loan

12   originator?  Who's coming up with the properties?  Who's coming

13   up with the borrowers?  Robert Brooks.  Clearly, he is

14   controlling all these participants.

15        He focused on the attorney's fees, the $200,000

16   attorney's fees.  But remember what Mr. Howard said, how that

17   money originated; that that was the proceeds that he received

18   back after closing from the defendant, after the defendant

19   flipped to him his own home that he currently lives in, and

20   that it was written to make it look legal.  Those words just

21   reek.  Make it look legal.

22        We have heard a lot of blame the victim, blame the

23   victim.  Let's blame the lenders.  Well, a couple of things

24   there.  First off, he says the lenders could have done extra.

25   They could have gone on the Topaz web site.  Folks, again, use

1    logic and common sense.  Their own expert, Mr. Ives, testified

2    that because of the huge volume of home sales that were going

3    on in the mid-oughts, that that was why a market had been

4    created for all these intermediaries, all these loan brokers to

5    suddenly sprout up.  And you heard, time again, we don't have

6    time to go out and verify.

7              I mean, being defrauded is not the prevailing mode.

8    If it were the prevailing mode, I mean, think about it.  Would

9    you be willing to give that waiter at the restaurant, who's

10   walking away with your credit card, your credit card?  Would

11   you be willing to give the cashier at the HEB your check with

12   your bank account number and your name and address?  No.  Being

13   defrauded is not the normal operating mode.  So the notion of

14   putting it on the lenders, that they could have looked further,

15   I submit to you is, again, don't look at the man behind the

16   curtain.

17             We heard about all this information.  We don't want

18   to know this.  We don't want to know that.  Yeah, it was

19   probably pretty stupid.  But here's a key thing:  If info was

20   allowed to be left blank, leave it blank.  But if the info is

21   filled in, if you put in an employer, if you put in $12,000 a

22   month as income, yes, they said, we are relying on that to be

23   truthful and complete.

24             Similarly with the VODs.  We don't want to know --

25   well, if a VOD was done, this was not -- you heard this was not

1    a stated asset loan.  They were looking to verify.  Granted,

2    maybe a little on the quick by just going that route, rather

3    than asking for bank statements.  But, again, logic and common

4    sense, you can't go putting $90,000 into some stranger's

5    account to make it pass muster.  You know that that's a false

6    representation that is being made to a lender.

7            Yeah, it's pretty -- maybe it was stupid programs by

8    the lenders in that time.  But I'll submit to you, it's pretty

9    stupid if I were to leave my car in the Park and Ride

10   underneath 1604 and 10 with the keys in the door.  That would

11   be pretty stupid of me.  But that doesn't give the car thief

12   the right to come along and steal my car.

13           If I go off for two weeks of vacation and I forget to

14   cancel the Express-News delivery, I leave my front door ajar,

15   that's pretty stupid.  But it doesn't give the burglar the

16   right to come in and steal, you know, my china and my TV and

17   kick my dog.  So let's not blame the victim.

18           They also point to -- Mr. Gordon also points to,

19   well, there wasn't a rule here that said you can't do this, and

20   there wasn't a rule here that said you can't do this, and there

21   wasn't -- but, again, I ask you to look at the totality of the

22   circumstances.  Look at the totality of the transaction.

23           And I'll give you another example.  Nothing illegal

24   about me driving a car.  I'm a licensed driver.  Nothing

25   illegal about me picking up my friend in my car.  Nothing

1   illegal about me taking my friend to the bank in my car.

2   Nothing illegal about me waiting in my car while my friend goes

3   into the bank.  Nothing illegal about me driving my friend away

4   from the bank when he comes back to the car.  And I can tell

5   from a smirk or two I think you know where I'm going.

6          If I know that my friend is going in there to rob the

7   bank, I'm the get-away driver, and I know I'm the get-away

8   driver, and I'm every bit as guilty, even though I'm not the

9   one who walked in the bank.  I'm not the one who pulled the gun

10  or handed the note that said:  This is a stickup.  Give me the

11  money.

12         It's the totality of the circumstances.  And I submit

13  to you that while we think of crime as being done with the gun

14  at the bank or the Quickie Mart, that a crime like this, here's

15  the weapon of choice, a pen.

16         THE COURT:  Three minutes.

17         MR. HARRIS:  Blaming the victims for not looking

18  further.  And yet, we heard that if there is collusion between

19  the title company, the processor, the buyer, the seller, the

20  appraiser, all of whom are supposed to be independent at arm's

21  length from each other, there will be no red flags for the

22  lender to start looking into.  And the defendant knew this.  He

23  took advantage of a weakness in the system.  He devised a

24  scheme to defraud, and he conspired with others to help him

25  carry it out.  And when it turned out to be so very lucrative,

1    he had to cheat on his taxes to boot.

2            I submit to you that we have met that high burden.

3    And I ask you to find him guilty of each of the counts going to

4    you.   I thank you for your time, your attention, your service.

5    I ask you to do a very difficult thing.   I know it's a

6    difficult thing, but I submit it's your sworn duty.

7            THE COURT:   Ladies and gentlemen, the case is now in

8    your hands.   You-all, obviously, have been sitting here for a

9    while.   But because the case is in your hands, your schedule

10   from this point forward is up to you-all.   The first thing you

11   need to do is select one of your members as your presiding

12   juror.   And then you can decide to have a lunch break or do --

13   however you wish to proceed.

14           In the meantime, whoever is the presiding juror, I'll

15   ask that you hold on to this that has the file mark up in this

16   corner.   And then when you return your verdict, it will also be

17   filed by Ms. Vela up here in this corner.

18           In the meantime, Ms. Vela and the support staff will

19   be getting the evidence together and in to you into the jury

20   room.

21           At this time, Mr. Miller, you may take the jury to

22   deliberate.   Thank you.

23      (Recess at 12:59 p.m. until 3:47 p.m., jury out, defendant

24   present, open court)

25           THE COURT:   You may be seated.   Mr. Dorgan is the

```
 1    presiding juror.
 2        (Jury enters courtroom)
 3            THE COURT:  You may be seated.
 4            Mr. Dorgan, without saying what the verdict is, is it
 5    correct that, number one, you have been elected presiding
 6    juror; and, number two, that the jury has reached a verdict?
 7            THE JUROR:  Yes, Your Honor, to both.
 8            THE COURT:  All right.  If you'll hold on to that for
 9    just a few moments.
10            As you-all probably figured out, Mr. Moreno is your
11    alternate.  And so he was excused, subject to having to be
12    called back if something should happen to one of you-all before
13    the verdict was reached.
14            Now, before we receive the verdict, a couple of
15    things I want to say.  First of all, I talked to you this
16    morning about how the support staff has helped to put this
17    production together.  And, of course, the lawyers were the
18    people who actually got up and presented it to you.
19            I want to say a word about them.  We cover 14
20    counties in this division of the Western District of Texas.
21    The whole district is 92,000 square miles.  But in this 14
22    counties there are 6,000 lawyers.  There are only 150 who are
23    allowed to do what Mr. Gordon and Mr. Harris do because they
24    have to go through extra training and experience to be able to
25    be Assistant U.S. Attorneys or people like Mr. Gordon who
```

1304

1    defend people like Mr. Brooks.  So they have done an excellent

2    job in presenting to you the evidence that they had.

3              As I told you, every lawyer would like to have an

4    airtight case.  Every medical doctor would like to have a

5    perfectly healthy patient.  But the professionals don't get to

6    do it that way.  They have to deal with what they have.

7              I also want to talk about law enforcement.  As you

8    saw and as you were told, our law enforcement officers are held

9    to a much higher standard.  It would be a lot quicker and a lot

10   more efficient in one way for our law enforcement agents to be

11   like the Gestapo or the Iraqi police or the Mexican police who

12   take people out behind the barn and beat a confession out of

13   them.  As you saw, these agents don't operate that way.  And

14   they operate within the confines of the Fourth Amendment under

15   which you are sitting; that they have to build their case

16   according to those constitutional standards.

17             Indeed, if there was any question that these agents

18   had violated any kind of constitutional protections, Mr. Gordon

19   would have filed what we call motions to suppress that

20   evidence.  There weren't any filed because, clearly, these

21   agents did their job according to those high standards that we

22   expect of them.

23             I hope that this has been a learning experience for

24   you.  Now that the case is over, you're free to go home and

25   tell your families and your neighbors and your students about

1    where you've been and what you did.  And we hope that you will

2    be an ambassador for jury service.  Certainly, it is different

3    from anything you see on television lawyer shows or television

4    police shows.

5           I want to talk about you-all, the jury.  80 years ago

6    my father left the orphanage where he grew up.  And after World

7    War II, because of the GI Bill, he was the first in his family

8    to be able to go to school.  And he went to law school.  And so

9    he got out.  And by the time all of World War II was done and

10   going to law school, I was already seven years old.  And he

11   would take me to the courthouse.  And so I got to watch some

12   trials.

13          In fact, the first trial I watched was over in the

14   old federal courthouse by the Alamo.  And the judge was -- as

15   you go out this door and turn right, the first picture on your

16   right was the judge, Judge Rice.  And when I would go with

17   him -- I didn't think about it a whole lot then, but looking

18   back on it, I did observe it.  In those days the only people

19   who would have been sitting there were Mr. Dorgan and Mr.

20   Cochran.  None of the rest of you would be seated in that jury

21   box because it was exclusively a white male domain in terms of

22   participating and being a part of our democratic experience.

23   So we've come a long way.

24          And you are to be congratulated on your service.  You

25   have been not only judges for the United States and for Mr.

1    Brooks, but also, as I told you, guardians for that document

2    under which you sit and to which we all pledge allegiance.

3              We want to thank you again.  Now that the case is

4    over, you can read the newspaper articles that have been in the

5    paper and talk about the case.  You're free to take your notes

6    home with you and to talk to your families and friends and so

7    forth.

8              Now, even though Mr. Gordon and Mr. Harris have done

9    as good a job as they could with what they had to work with,

10   they are practicing lawyers.  And that means they want to

11   continue to learn and improve their skills.  So if it should

12   happen that Mr. Harris or Mr. Gordon should speak with you or

13   communicate with you, you may talk with them now.  They might

14   want to get your constructive critique on the way they present

15   their case and so forth.  So that, though, is entirely up to

16   you as to whether you do that.

17             At this time, Mr. Dorgan, if you'll give the verdict

18   to Mr. Miller, please.

19             All right.  Mr. Brooks, if you will please stand and

20   receive the verdict of the jury.  And, Mr. Gordon, you want to

21   stand with him there?

22             MR. GORDON:  Yes, Judge.

23             THE COURT:  In Cause No. 10-CR-536, *United States of*

24   *America versus Robert Brooks*, Count 1 is guilty.  Count 2, 3,

25   4, 5, 7, 8 and 9, the verdict of the jury is guilty.

1     In Cause No. 12-CR-666, *United States of America*

2  *versus Robert Brooks*, the verdict of the jury on Count 1 is

3  guilty.  The verdict of the jury on Count 3 is guilty.

4     Thank you, sir.  You may be seated.

5     Now, ladies and gentlemen, you may have observed

6  during the course of the trial that I was writing and taking

7  notes.  And I was working on various other cases besides this

8  one.  But I have some observations about this case.

9     First of all, your verdict comes from the Latin word

10 *veredicto*, or to speak the truth.  And as we've said throughout

11 this trial, this has been a search for the truth.  And your

12 verdict is one of which you need never second-guess yourself.

13 It came as a result of your collective wisdom and deliberation.

14     At the beginning we talked about the different

15 references in the Bible to fraud and trickery, about the money

16 temple and Jacob and Esau and the proverbs:  Food gained by

17 fraud tastes sweet to a man, but he ends up with a mouth of

18 gravel.

19     And I came across another one in the Book of

20 Ecclesiastes.  And this doesn't apply just to Mr. Brooks.  It

21 applies to a lot of the people about whom you heard in this

22 case.  Whoever loves money never has money enough.  Whoever

23 loves wealth is never satisfied with his income.

24     And, of course, we also talked about examples of this

25 kind of thing from literature, starting with Oliver Twist and

1    Fagin.  Mr. Harris stole some of my thunder because I was going
2    to talk about the Wizard of Oz and the man behind the curtain
3    pulling the strings.  But he thought about that before I did,
4    or I had an opportunity to talk about it.
5            Other sayings that came to mind in watching this
6    human experience was:  If something sounds too good to be true,
7    it probably is.  And as you saw, these folks who were
8    victimized by this, some of that victimization was because of
9    their own love of money and thinking that they could make a
10   quick buck.  And I'm told that some of them reported their
11   ill-gotten gains for income tax purposes.  I'm told that some
12   of them didn't, but that will be followed up upon later.
13           And, of course, our parents have taught us,
14   hopefully, from the very beginning there's three things you
15   don't do:  Don't lie, cheat or steal.  And if you just observe
16   that simple lesson, you won't end up in federal court as a
17   defendant.
18           And last but not least, we heard, of course, from Ms.
19   Bussey, one of the ladies I think who garnered great sympathy,
20   and Ms. Artis and others who were manipulated and taken
21   advantage of.  And Ms. Bussey, as you recall, is from Scotland.
22   And one of my favorite authors is Sir Walter Scott who is also
23   of Scottish descent and background.  And he wrote a play called
24   Marmion.  And his famous line in Marmion is:  Oh, what a
25   tangled web we weave when we practice to deceive.

```
 1              And then, of course, it all -- the house of cards did
 2    collapse along with the economy.  And while Mr. Brooks and the
 3    people who were helping him weren't alone in causing the
 4    problems -- but there were, unfortunately, lots and lots of
 5    people like this who manipulated the system.  And all of us
 6    collectively, as a society, have had to pay for it.
 7              Of course, now the pendulum has swung the other way.
 8    Young couples now trying to get a loan, it's very difficult
 9    because the rules have tightened up so much because of the
10    kinds of things that you-all saw happening in this case.
11              From here -- of course, you will be excused.  You'll
12    give your button back to Mr. Miller.
13              Ms. Vela, do they need to go back downstairs?
14              THE CLERK:  No, sir.  No, sir.
15              THE COURT:  All right.  You'll be excused here in
16    just a few moments.  From here, for those of you who are
17    interested in how this process moves along, first of all, we
18    just got our 2012 calendar year statistical report.  There
19    were -- in the last 12 months, ended December 31st, there were
20    1,003 people like Mr. Brooks who came through this courthouse.
21    12 of them went to trial.  987 pled guilty.  And so those who
22    do go to trial, there are a few who get found not guilty.  Most
23    of them do get found guilty.  The ones that do go to trial are
24    cases which, obviously, could go either way.
25              But once someone has been found guilty, either by the
```

1    plea of guilty or by a jury verdict -- Mr. Brooks will be
2    sentenced.  As of now it will be May the 3rd.  If you-all want
3    to come and watch the sentencing, you're free to do so.  You
4    might call ahead and make sure the date has not been changed.
5    But between now and then the United States probation office
6    will do a full background report on Mr. Brooks.
7             Under the statutes that he was convicted of, he is
8    looking at a maximum of somewhere around 35 to 40 years in
9    prison.  The sentencing system probably will not get up to that
10   level of the maximum because the Court looks at various
11   factors:  His prior record, or his lack of prior record, his
12   behavior while he's in the pretrial release program, as he has
13   been now for a couple of years.  And so the Court will make
14   that decision.  As of now, it will be May the 3rd.
15            There are other -- the other people who testified
16   before you, who have pled guilty, have not been sentenced yet.
17   They will be sentenced in the meantime based in part, of
18   course, under the plea agreement, on their cooperation in this
19   case.
20            There are still about 15 other defendants who have
21   not either pled guilty or been tried.  And now that this lead
22   defendant case is over with, probably what you-all have done in
23   this case will have some effect on those remaining defendants.
24   So that will all play out in time.
25            So, again, thank you very much.  We've got some more

1  finishing up here to do.  But the jury's excused at this time.

2  Thank you.

3      (Jury leaves courtroom)

4          THE COURT:  All right.  You may be seated.

5          And this needs to be filed.

6          THE CLERK:  Yes, sir.

7          THE COURT:  All right.  Mr. Brooks, come right up

8  here with your lawyers.

9          First of all, Mr. Harris, anything else for the

10  government?

11         MR. HARRIS:  Other than addressing the matter of

12  release pending sentencing, no, Your Honor.

13         THE COURT:  I'm sorry.  Addressing the matter of

14  what?

15         MR. HARRIS:  Release pending sentencing.

16         THE COURT:  Oh, no, I'm going to address that.

17         MR. HARRIS:  Okay.

18         THE COURT:  But I also wanted to mention -- I think

19  we've mentioned it to some of the other defense lawyers, but

20  now that this part is over, sometime, as soon as I can juggle

21  all these other matters, I want to have a status conference of

22  just the lawyers on these remaining defendants, and then we'll

23  see where we go from there.

24         Mr. Gordon, anything at this time before the Court

25  addresses Mr. Brooks?

1    MR. GORDON:  No, Your Honor.

2    THE COURT:  Mr. Brooks.

3    THE DEFENDANT:  Yes, sir.

4    THE COURT:  I haven't heard you speak in this trial.

5    I think we heard you speak during the course of one of the

6    pretrial conferences.  You've made your decisions both in

7    getting to this trial situation but also in terms of -- based

8    on the jury's verdict, and I think the evidence was

9    overwhelming.  And, indeed, the fact that it only took the jury

10   the little amount of time it did to reach a verdict, with the

11   enormous volume of evidence in this case, there wasn't anything

12   even close to a shadow of a doubt in your favor, much less a

13   reasonable doubt.  And as you heard me say, Mr. Gordon did the

14   best he could.  And, indeed, his closing argument held the

15   jury's attention.  It gave them something to think about, so

16   forth.  But he didn't have a whole lot to work with.

17   The tragic thing, as -- I referred to this, also, is

18   that this country is in a mess because of people like you.  And

19   you didn't, of course, bring down the whole banking industry.

20   But there were lots of other folks like you, the Bernard

21   Madoffs and the -- I forgot to tell the jury that story.  But

22   people like you, not only in the mortgage industry but credit

23   card abuse, identity theft, all of those sorts of things hurt

24   the whole economy.

25   And when I was a law student in Dallas, Texas, Judge

Chris Poage, RMR, CRR
United States Court Reporter

1   Sarah T. Hughes, who was a little, bitty lady who swore in

2   President Johnson on Air Force One, she used to come and teach

3   us that people like you, who have an education, who are bright,

4   are held to a higher standard, who have a whole lot more

5   opportunities than people who haven't had opportunities, and

6   who have the ability -- obviously, you're quite capable of

7   running a good business, just like some of these drug

8   organizations.  They're very complex organizations.

9   Unfortunately, they're put together for illegal purposes.  And

10  you had the ability to do that.  But it was all built on lies.

11          And, of course, on a human level you had to sit

12  here -- and I don't know whether you felt any of the pain that

13  the rest of us felt, but it was terribly painful for me, and I

14  could tell for others, to have to watch your wife, your

15  mother-in-law, Mrs. Artis, these people who were devastated by

16  your scheme, just so that you could drive an Aston Martin.  Did

17  you have an Aston Martin before you started this?

18          THE DEFENDANT:  No, sir.

19          THE COURT:  So was it worth it to have an Aston

20  Martin and do this to your mother-in-law and your wife?

21          THE DEFENDANT:  No, sir.

22          THE COURT:  Okay.  All right.  Marshal.

23          The probation office will come and visit with you and

24  make a presentence report, and you are now remanded to the

25  custody of the United States Marshal to begin serving whatever

1   sentence you have.  Obviously, the Court doesn't know what it

2   is.  But you will serve time in custody until your sentencing

3   date on May the 3rd.

4           Mr. Harris, anything else before we finish?

5           MR. HARRIS:  No, Your Honor.

6           THE COURT:  Mr. Gordon?

7           MR. GORDON:  No, Your Honor.

8           THE COURT:  Mr. Brooks, any questions?

9           THE DEFENDANT:  No, sir.

10          THE COURT:  All right.  Good luck.  We're in recess.

11  Thank you.

12  * * *

13      (End of requested transcript)

14

15

16

17

18

19

20

21

22

23

24

25

-oOo-

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.  I
further certify that the transcript fees and format comply with
those prescribed by the Court and the Judicial Conference of
the United States.


Date:  5/24/2013
                              /s/ Chris Poage
                              United States Court Reporter
                              655 E. Cesar E. Chavez Blvd., Rm. 314
                              San Antonio, TX  78206
                              Telephone:  (210) 244-5036